**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**(SOUTHERN DIVISION)**

THE DOOR
121 Avenue of the Americas, 3rd Floor
New York, NY 10013;

AMICA CENTER FOR IMMIGRANT RIGHTS
1025 Connecticut Avenue NW, Suite 701
Washington, DC 20036;

FLORENCE IMMIGRANT AND REFUGEE RIGHTS PROJECT
P.O. Box 32670
Phoenix, AZ 85064;

GALVESTON-HOUSTON IMMIGRANT REPRESENTATION PROJECT
6001 Savoy Drive, Ste. 400
Houston, TX 77036;

IMMIGRANT DEFENDERS LAW CENTER
634 S. Spring Street, 10th Floor
Los Angeles, CA 90014;

JEWISH FAMILY AND COMMUNITY SERVICES
5743 Bartlett St.
Pittsburgh, PA 15217;

*Plaintiffs*,

v.

JOSEPH B. EDLOW, in his official capacity as Director, United States Citizenship and Immigration Services;

UNITED STATES CITIZENSHIP AND IMMIGRATION SERVICES
5900 Capital Gateway Drive
Camp Springs, MD 20588;

Case No. ____________

**COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**

MARKWAYNE MULLIN, in his official capacity as Secretary of Homeland Security;

U.S. DEPARTMENT OF HOMELAND SECURITY
2707 Martin Luther King Jr Ave SE
Washington, DC 20528;

SIRCE C. OWEN, in her official capacity as Acting Director; Executive Office for Immigration Review;

EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
5107 Leesburg Pike
Falls Church, VA 22041;

TODD BLANCHE, in his official capacity as Attorney General;

U.S. DEPARTMENT OF JUSTICE
950 Pennsylvania Avenue NW
Washington, DC 20530;

*Defendants*.

## INTRODUCTION

For decades and by bipartisan consensus, Congress has made clear that migrant children who arrive in the United States without a parent or guardian are uniquely vulnerable and should receive heightened protections as they navigate the immigration system. These unaccompanied children—who have often fled violence, sexual assault, or other physical abuse—have the right to present their asylum claims through a non-adversarial interview rather than in a more formal court setting. Their time in government custody is meant to be limited, and they must be released to suitable sponsors as soon as possible. They may apply for asylum on a lengthier timeline than their adult counterparts.

Congress stressed that these children should be represented by qualified, independent attorneys in their immigration proceedings and has consistently appropriated funding for attorneys—such as the Plaintiff legal service providers in this case. Plaintiffs and their unaccompanied child clients receive at least several weeks' notice of their asylum interviews, which take place in person after Plaintiffs have prepared the children to present testimony, gathered relevant documents, and supplemented their asylum applications. In short, Plaintiffs and their clients participate in a process designed to afford children a full, fair hearing while accounting for their youth and inability to navigate a byzantine system alone.

That, at least, is how it is supposed to work. But for the last year, and especially since July 2026, Defendants United States Citizenship and Immigration Services (USCIS) and the Executive Office for Immigration Review (EOIR) have eroded every protection in this framework. Most recently, USCIS has accelerated asylum interviews for unaccompanied children, demanding that they and their attorneys prepare to testify and supplement application materials with little notice (the "USCIS Inadequate Notice Policy"). When attorneys request routine rescheduling—increasingly because USCIS has double-booked them for asylum interviews—even that is denied (the "USCIS Exceptional Circumstances Policy"). Plaintiffs challenge both of these draconian policies.

The situation is even worse for detained unaccompanied children, who are told they must file their asylum applications immediately, or they will lose that opportunity. When they do apply for asylum, an unprecedented new USCIS policy provides them with just 24 hours' notice before an asylum interview. At the same time, EOIR has instructed immigration judges to complete all detained unaccompanied children's cases by January 31, 2027 ("EOIR's Detained Docket Deadline"), no matter the circumstances. Plaintiffs also challenge this inhumane policy.

Plaintiffs are six legal service providers who together represent thousands of unaccompanied children, hundreds of whom have already been subjected to USCIS and EOIR's reimagined immigration system for children. Their core work is providing effective representation to unaccompanied children in their immigration proceedings. Defendants have made that all but impossible in their rush to expel thousands of unaccompanied children. Since August 1, 2026, Plaintiffs have collectively received more than 600 notices of asylum interviews scheduled to take place in quick succession. Their attorneys are expected to represent children in multiple asylum interviews on the same day, sometimes at the same time, forcing them to forgo preparation and severely limiting their ability to effectively represent their unaccompanied child clients. For these children, who risk being sent back to the countries they fled, the stakes could not be higher.

The United States guarantees unaccompanied children an immigration system that meets their unique needs. EOIR's and USCIS's new policies make those guarantees a hollow promise. This is not the immigration process that Congress intended for unaccompanied children; it is a deportation assembly line depriving them of their rights. On behalf of themselves and their unaccompanied child clients, Plaintiffs ask this Court to vacate and set aside Defendants' unlawful policies and restore the meaningful asylum process due to Plaintiffs' clients.

## JURISDICTION AND VENUE

1. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1346.

2. This case arises under the Administrative Procedure Act (APA), 5 U.S.C. § 551 *et seq.*, 5 U.S.C. § 701 *et seq.*; the Trafficking Victims Protection Reauthorization Act, 8 U.S.C. § 1232; the Immigration and Nationality Act, 8 U.S.C. § 1001 *et seq.*; and the Fifth Amendment to the U.S. Constitution.

3. The waiver of sovereign immunity in 5 U.S.C. § 702 applies to this action, in which the Plaintiffs seek only non-monetary relief.

4. The Court has authority to enter a declaratory judgment and injunctive relief under 28 U.S.C. §§ 2201 and 2202, the Federal Rules of Civil Procedure 57 and 65, and the Court's inherent equitable powers. The APA authorizes the Court to stay, set aside, and vacate unlawful agency action. *See* 5 U.S.C. §§ 705, 706.

5. Venue is proper because Defendants are agencies and officers of the United States acting in their official capacities and at least one Defendant resides in this District, *see* 28 U.S.C. § 1391(e)(1)(A), and because a substantial part of the events giving rise to the claims in this action take place in this District, *see id*. § 1391(e)(1)(B).

## PARTIES

### I. Plaintiffs

6. Plaintiffs are nonprofit organizations whose missions compel them to provide effective legal representation to unaccompanied children navigating the United States immigration system.

7. Plaintiff **The Door** is a membership-based nonprofit organization based in New York City and established in 1972. The Door's mission is to empower the City's diverse population of youth by providing them with free comprehensive services, from legal assistance to career development to immigration representation to mental health counseling. Through its Detained Minors Project, The Door routinely represents up to 350 unaccompanied children who are detained by the Office of Refugee Resettlement (ORR) at multiple facilities in New York

State. The Door offers membership to unaccompanied children after they are released from ORR custody, allowing them to access The Door's comprehensive services. The Door represents unaccompanied children, both non-members and members, and other child and young adult members in removal proceedings and in their applications for immigration relief. The Door currently represents hundreds of unaccompanied children and has hundreds of members who have been designated unaccompanied children.

8. Plaintiff **Amica Center for Immigrant Rights** ("Amica") is a nonprofit organization based in Washington, D.C. Established in 1999, Amica provides pro bono legal services and representation to indigent immigrant men, women, and children at risk of detention and deportation in the Maryland, Virginia, and Washington, D.C. metropolitan area. Amica's Children's Program was created in 2010 to serve unaccompanied children in the greater Washington, D.C., Virginia, and Baltimore areas before USCIS and EOIR. Amica attorneys appear before the Baltimore, Hyattsville, Sterling, and Annandale Immigration Courts. The core work of Amica Center's Children's Program is to offer trauma-centered legal services to unaccompanied immigrant children in ORR custody—including in ORR-subcontracted facilities providing shelter and long-term foster care in Virginia and Maryland—as well as to released children who remain in its service area. Amica currently represents more than 850 unaccompanied children.

9. Plaintiff **Florence Immigrant & Refugee Rights Project** ("Florence Project") is a nonprofit organization based in Arizona. Founded in 1989, the Florence Project's mission is to provide free legal and social services to detained adults and children facing immigration removal proceedings in Arizona. Since 2000, the Florence Project has provided legal services for detained and non-detained unaccompanied children before both USCIS and in the Tucson and Phoenix Immigration Courts. The Florence Project also provides legal orientations, screening, legal representation, Spanish-language tutoring, and social services to detained and non-detained unaccompanied children. FIRRP's core work with unaccompanied children involves providing

free legal and social services to unaccompanied children facing removal in Arizona. The Florence Project is the only nonprofit organization that provides free legal services to unaccompanied children in Arizona, and it currently represents more than 500 such children.

10. Plaintiff **Galveston-Houston Immigrant Representation Project** ("GHIRP") is a nonprofit legal services organization based in Houston, Texas, whose mission is to provide comprehensive representation and holistic legal services to immigrants in need. Launched in 2020, GHIRP serves unaccompanied children in the Galveston-Houston area before USCIS and in the Houston Immigration Court. Its Immigrant Children & Youth program is dedicated to providing comprehensive legal services to indigent unaccompanied children, including tender-aged children (children under the age of 13), who are not in detention as well as those in ORR custody throughout the Galveston-Houston area. GHIRP's core work is representing unaccompanied children to ensure they have equal access to due process in our complex immigration system. GHIRP has provided legal orientation and consultation services to approximately 4,500 unaccompanied children and represented over 750 unaccompanied children. GHIRP currently represents 400 unaccompanied children.

**11.** Plaintiff **Immigrant Defenders Law Center** ("ImmDef") is a nonprofit organization headquartered in Los Angeles, California, with additional offices in Santa Ana, Riverside, and San Diego. ImmDef was founded in 2015 to provide universal representation, so that no immigrant is forced to face removal proceedings without an attorney at their side. ImmDef provides pro bono representation and other legal services to unaccompanied children, indigent detained adults, individuals deemed mentally incompetent to represent themselves, deported veterans, and families separated at the border, among others. ImmDef's Children's Representation Project (CRP) is composed of staff and attorneys who are primarily responsible for representing unaccompanied children in their immigration matters before USCIS, including the Asylum Office; in guardianship and custody proceedings, and proceedings to obtain Special Immigrant Juvenile (SIJ) findings in state court; and before EOIR and the Board of Immigration

Appeals (BIA). ImmDef currently represents 1,900 unaccompanied children and has represented 4,000 children over the past eleven years.

12. Plaintiff **Jewish Family and Community Services** ("JFCS") is a nonprofit, non-partisan social services organization that has served the Greater Pittsburgh Community for nearly 100 years. Through its Immigration Legal Services Program, JFCS provides pro bono and low-cost affirmative and family-based immigration legal services to refugees and immigrants throughout Western Pennsylvania. In addition, JFCS's Immigration Legal Services Program provides legal representation to unaccompanied children throughout Western Pennsylvania and West Virginia, including before USCIS and the immigration courts. Over the last five years, JFCS has provided legal orientations for and legal screenings of 2,906 unaccompanied children, and has represented 983 unaccompanied children from over 30 countries. JFCS currently represents over 200 unaccompanied children.

13. Collectively, Plaintiffs represent thousands of unaccompanied children in asylum proceedings before USCIS and in removal proceedings before EOIR. Until July 31, 2026, all Plaintiffs received federal funding to represent unaccompanied children through the Acacia Center for Justice, a nonprofit organization that oversaw the federal grant for such representation. ORR has since allowed its contract with Acacia to expire and, consequently, ended all federal funding for Plaintiffs and similar legal service providers. Plaintiffs, however, continue to represent their existing unaccompanied child clients. Plaintiffs' unaccompanied child clients cannot protect their own interests because of their tender age, their custody status, and their lack of access to the legal system outside of Plaintiffs' advocacy on their behalf.

## II. Defendants

14. Defendant **Joseph B. Edlow** is sued in his official capacity as Director of U.S. Citizenship and Immigration Services. In that capacity, Defendant Edlow is responsible for setting policy as it pertains to USCIS and for overseeing all functions of that agency, including the adjudication of asylum applications filed by unaccompanied children.

15. Defendant **U.S. Citizenship and Immigration Services** is a subagency of the Department of Homeland Security (DHS) responsible for adjudicating, among other things, affirmative applications for immigration relief under the Immigration and Nationality Act, including asylum applications filed by unaccompanied children. USCIS is headquartered in Camp Springs, Maryland.

16. Defendant **Markwayne Mullin** is sued in his official capacity as the Secretary of DHS. In that capacity, he is responsible for administering U.S. immigration laws pursuant to 8 U.S.C. § 1103. Defendant Mullin oversees each of the component agencies within DHS, including USCIS, and has ultimate authority over all DHS policies, procedures, and practices.

17. Defendant **U.S. Department of Homeland Security** is the cabinet-level agency of the U.S. government responsible for enforcing U.S. immigration laws and for overseeing the adjudication of applications for relief that fall outside the jurisdiction of the immigration courts, including affirmative asylum applications.

18. Defendant **Sirce C. Owen** is sued in her official capacity as the Acting Director of the Executive Office for Immigration Review. Defendant Owen is responsible for setting and administering policy for EOIR, including policies governing immigration courts throughout the country.

19. Defendant **Executive Office for Immigration Review** is a subagency of the U.S. Department of Justice (DOJ) responsible for adjudicating federal immigration cases. Under delegated authority from the Attorney General, EOIR conducts immigration court proceedings, appellate review, and administrative hearings.

20. Defendant **Todd Blanche** is sued in his official capacity as the Attorney General of the United States. In that capacity, he is responsible for administering U.S. immigration laws pursuant to 8 U.S.C. § 1103. Defendant Blanche oversees each of the component agencies within DOJ, including EOIR, and has ultimate authority over all DOJ policies, procedures, and

practices.

21. Defendant **Department of Justice** is a cabinet-level agency of the U.S. government. Its components include EOIR, which is responsible for administering immigration courts throughout the country.

## STATEMENT OF FACTS

### I. Federal Law Provides Unique Protections to Unaccompanied Children Navigating the Immigration System.

22. The United States immigration system is built for adults. With one caveat: when a child under the age of 18 presents at the United States border without a parent or legal guardian and without lawful immigration status, a cluster of federal laws ensure the child—deemed an unaccompanied child, 6 U.S.C. § 279(g)(2)—is treated differently than an adult.

23. This was not always so. For decades, the United States treated unaccompanied children much the same as adults. When they arrived in the United States, children were previously detained indefinitely in prison conditions, denied basic childhood needs like education and recreation, and kept in the custody of the same agency responsible for their prosecution, creating conflicts of interest. Senator Dianne Feinstein, pushing for a comprehensive bill to correct these practices, once described witnessing a 15-year-old unaccompanied girl appear "shackled and in prison clothing" for her asylum hearing, without counsel. 154 Cong. Rec. S10887 (daily ed. Dec. 10, 2008). "She could not wipe away her tears because her hands were chained to her waist." *Id.*

24. A series of lawsuits in the 1980s and 1990s began to set a new standard of care for unaccompanied children, culminating in two pieces of legislation: the Homeland Security Act of 2002 (HSA), 6 U.S.C. § 279, and later, the William Wiberforce Trafficking Victims Protection Reauthorization Act of 2008 (TVPRA), 8 U.S.C. § 1232. Today, any immigration enforcement agency that encounters an unaccompanied child must transfer that child to the care of ORR within 72 hours. *See* 8 U.S.C. § 1232(b)(3).

25. ORR, part of the Department of Health and Human Services, is not an immigration enforcement agency; it is a child welfare agency obligated to treat "unaccompanied children . . . with dignity, respect, and special concern for their particular vulnerability." 45 C.F.R. § 410.1003(a); (Unaccompanied Children Program Foundational Rule, 89 Fed. Reg. 34384 (Apr. 30, 2024) (the "Foundational Rule")). Children in ORR custody live in restrictive congregate care settings while ORR vets potential sponsors—often family members—present in the United States. If no such sponsor exists or is approved, the child stays in ORR custody until they turn 18 or are granted immigration relief. With limited exceptions, ORR's governing regulations require it to "release a child from its custody without unnecessary delay" to a suitable sponsor. 45 C.F.R. § 410.1201(a).

26. Together, the HSA, the TVPRA, and their implementing regulations try to account for the vulnerability of a child navigating a foreign immigration system alone—without a parent, without a lawyer, and frequently without English fluency. For example, the statutes have multiple provisions that address safety and child-appropriate procedures for unaccompanied children.

### A. Unaccompanied Children Are Entitled to File Affirmative Asylum Applications.

27. Unaccompanied children are guaranteed the right to present an application for asylum before USCIS's Asylum Office, which has "initial jurisdiction over any asylum application filed by an unaccompanied [] child." 8 U.S.C. § 1158(b)(3)(C). This allows unaccompanied children to apply for asylum in the first instance through an "affirmative," non-adversarial process—an exception to the ordinary rule that noncitizens in removal proceedings may not apply for asylum before USCIS.

28. The affirmative asylum process allows unaccompanied children to apply for asylum without being subject to cross-examination about their most difficult life experiences by government attorneys in a courtroom setting, before an immigration judge who is simultaneously

adjudicating their claims. Instead, they are interviewed by USCIS asylum officers who are trained in child-sensitive and trauma-informed interviewing techniques. *See* 8 U.S.C. §§ 1232(d)(8); 1158(b)(3)(C).

29. Federal law also exempts unaccompanied children from the otherwise generally applicable rule that an individual seeking asylum must file her application within one year of arriving in the United States (the "one-year bar"). *Compare* 8 U.S.C. §§ 1158(a)(2)(B), *with* 1158(a)(2)(E). This exemption reflects the reality that children alone in the United States cannot be expected to apply for asylum on their own, on fast timelines; they require time to understand their legal rights, secure counsel, prepare their applications, and stabilize in a new place.

30. These procedural safeguards are necessary to give unaccompanied children a real chance of obtaining asylum, which requires a child to prove that that she has a "well-founded fear of persecution" on account of her race, religion, nationality, membership in a particular social group, or political opinion. 8 U.S.C. § 1101(a)(42)(A). Applicants often establish their burden of proof through detailed testimony and corroborating evidence establishing that they previously suffered harm rising to the level of persecution on a protected ground in their country of origin, and that there is a reasonable possibility that they will suffer the same again if forced to return. Even for adults, developing an asylum claim is emotionally difficult. It often requires confronting past experiences of physical abuse, violence, and sexual assault against the applicant or their family members.

31. These difficulties are amplified for unaccompanied children. Some children are pre-verbal, developmentally delayed, or so traumatized that they cannot easily tell their story. Most do not speak English, and some require interpreters for rare languages. Attorneys spend weeks developing relationships with their unaccompanied child clients before those clients feel comfortable sharing the details of their greatest hardships and horrors. Once they have gained a child's trust, attorneys then spend more time gathering the evidence, expert evaluations, and testimony needed to help their child client present their best case.

32. The exemption from the one-year bar and the right to present a claim for asylum in a non-adversarial setting in the first instance are procedural safeguards that account for unaccompanied children's specialized needs.

**B. Unaccompanied Children Are Entitled to Attorney Representation.**

33. For the same reason that unaccompanied children are exempt from certain asylum requirements and entitled to additional safeguards, Congress has long ensured they have access to counsel. Through the HSA, Congress ordered ORR to submit a plan "on how to ensure that qualified and independent legal counsel is timely appointed to represent the interests of each such [unaccompanied] child[ren]." 6 U.S.C. § 279(b)(1)(A). After a pilot program determined that volunteer attorneys could not, alone, represent all the unaccompanied children in ORR custody, Congress ordered ORR to fund legal representation of unaccompanied children.

34. The TVPRA, for its part, requires ORR to "ensure, to the greatest extent practicable" that unaccompanied children "have counsel to represent them in legal proceedings or matters and protect them from mistreatment, exploitation, and trafficking." 8 U.S.C. § 1232(c)(5); *accord* 45 C.F.R. § 410.1309(a)(4).

35. Until recently, ORR tried to meet this mandate by funding legal service providers like Plaintiffs, who in turn provided comprehensive and skilled representation to unaccompanied children across the country. *See* 45 C.F.R. § 410.1309(a)(4).

36. Plaintiffs and their attorneys have taken on the overwhelming work of representing hundreds of thousands of unaccompanied children for years. Plaintiffs' attorneys specialize in screening children for human trafficking and exposure to persecution, war, violence, abuse, and crime. If a child has a claim for asylum, attorneys file the appropriate application, which requires gathering extensive information, conducting interviews, relying on social workers and clinicians, and tailoring their approach to the needs of their child clients. They engage expert witnesses and investigate country conditions, collect documentary evidence (sometimes overseas), take witness statements, and draft post-interview briefing.

37. Without Plaintiffs' work, thousands of unaccompanied children would fall through the cracks of our immigration system or inadvertently forgo valid claims to asylum. As the House Appropriations Committee noted in 2009, "legal representation is absolutely critical to ensure that children understand their rights as they navigate the legal process to determine their status in the United States." H. Rep. No. 111-220, at 165 (2009). Indeed, legal services like those provided by Plaintiffs improve the system overall: in 2018, a Senate Subcommittee observed that providing independent, qualified legal counsel for unaccompanied children "can increase the efficiency and effectiveness of immigration proceedings and significantly reduce the failure-to-appear rate of children who are released from HHS custody." S. Rep. No. 115-289, at 150 (2018).

## II. Defendants Previously Managed the Asylum Process Consistent with Federal Mandates.

38. Until 2025, Defendants USCIS and EOIR generally followed practices that accounted for the specialized needs of unaccompanied children. These practices took several forms. Most relevant here, USCIS previously generated notice of an asylum interview at least 21 days in advance of that interview; allowed Plaintiffs to reschedule the noticed interview date once as a matter of right and a second time upon a showing of "good cause"; and held in-person interviews as part of a broader child-centered approach. Within EOIR, immigration judges historically paused removal proceedings while unaccompanied children pursued affirmative asylum applications before USCIS.

39. These asylum policies made it possible for Plaintiffs to effectively represent unaccompanied children consistent with Congress's intent and their organizational missions.

### A. USCIS Provided At Least 21 Days' Notice of Asylum Interviews.

40. According to its Affirmative Asylum Procedures Manual (AAPM), USCIS generates notice for an asylum interview either 21 or 22 days before the interview for "eligible" cases that are randomly selected in batches by USCIS's scheduling system, *or* 45 days before an

interview that is manually scheduled by an asylum officer.[1] USCIS generally adhered to this notice timeline when it scheduled asylum interviews for Plaintiffs' clients.

41. Based on their own experiences and USCIS's written policies, Plaintiffs expected USCIS to generate written notice at least 21 days before Plaintiffs' clients were expected to appear for an asylum interview and expected that USCIS would send that written notice via USPS mail shortly thereafter.

42. After Plaintiffs received notice of a client's scheduled asylum interview, they would begin preparing their client for the interview and compiling supplemental evidence. This process could take anywhere from 10 to 30 hours per client.

43. Preparing a child for their interview is often the most difficult part of the process for attorneys and children alike. A child's eligibility for asylum hinges on their testimony describing the traumatic experiences in their home country. Children are, understandably, anxious about this step in the process. Plaintiffs therefore regularly undertake extensive client preparation, including multiple moots where staff play the role of an asylum officer questioning the child.

44. Attorneys must also evaluate whether supplemental evidence is necessary to present a comprehensive asylum claim considering new developments after the application was filed. Supplemental evidence often includes updated or additional witness declarations, expert medical reports, or updated country conditions evidence. Plaintiffs also prepare briefing on their client's eligibility for asylum, given the frequent changes in asylum law.

45. Per USCIS regulation, asylum applicants are entitled to submit supplemental evidence up to 14 days before an asylum interview. Individual officers also have discretion to accept evidence after that deadline. 8 C.F.R. § 208.9(e)(1). The AAPM, in turn, allows applicants

---

[1] *See* USCIS, Affirmative Asylum Procedures Manual (Feb. 2025) at § II.G(2)(a), (2)(b), (2)(c), (3), *available at* https://www.uscis.gov/sites/default/files/document/guides/AAPM.pdf (hereinafter "AAPM (Feb. 2025)").

to present supporting documents during their interviews. AAPM (Feb. 2025) at 49. These standards account for the practical reality that evidence supporting an asylum claim, such as the sudden disappearance of a family member in the applicant's country of origin or a significant change in country conditions that bolster an applicant's claim, might arise at any time. That flexibility provided Plaintiffs' attorneys sufficient time to collect additional material and submit fully supported asylum applications for their child clients.

46. Plaintiffs relied on this minimum-21-day notice in evaluating how many children they could represent and in offering representation to children seeking asylum. If Plaintiffs knew that USCIS would schedule asylum interviews of Plaintiffs' unaccompanied child clients en masse and generate notice mere days, and sometimes hours, before the interview, Plaintiffs would have made representation and staffing decisions accordingly.

**B. USCIS Allowed Plaintiffs to Reschedule Interviews for Good Cause.**

47. If the circumstances of the asylum case or the child's needs warranted additional time, Plaintiffs could request to reschedule the interview date.

48. "As a matter of Asylum Division policy," the AAPM permits rescheduling once as a matter of right if it is "the applicant's first request for a rescheduling, and the request is received prior to the interview date." AAPM (Feb. 2025) at 238. If an applicant seeks to reschedule for a second time, the AAPM requires a showing of "good cause," which USCIS defines as a "'reasonable excuse for being unable to appear for an asylum interview.'" *Id.* at 239.

49. In Plaintiffs' experience, USCIS found good cause in situations such as attorney or client scheduling conflicts or the need for additional time to gather updated records and reports. With good cause provided, USCIS would typically reschedule the asylum interviews between two to four weeks later.

50. Good-cause rescheduling guaranteed that Plaintiffs and their unaccompanied child clients could attend the interview if the originally scheduled date conflicted with the attorney's

schedule or the child's school or family obligations. It also ensured that Plaintiffs had sufficient time to update client and witness materials, update country conditions and expert reports, and draft briefing on the child's eligibility for asylum based on those updated materials and any intervening changes to asylum law. Finally, it allowed Plaintiffs to properly prepare their child clients for perhaps the most significant interview of their lives.

51. Thus, adequate notice, coupled with the flexibility in evidence-submission deadlines and the opportunity to reschedule an asylum interview, ensured that Plaintiffs consistently had enough time to submit a fully supported and thorough asylum application for all their unaccompanied child clients.

**C. USCIS Conducted In-Person, Child-Sensitive Interviews.**

52. When the asylum interview happened, Plaintiffs expected it to occur in-person and to be conducted by an asylum officer trained in child-sensitive practices, as required by agency guidance.

53. In-person asylum interviews have always been the norm. The AAPM (Feb. 2025) reflects as much, establishing a strong preference for in-person interviews. It explains that "[m]ost [unaccompanied children] can be scheduled for interview at an asylum office or a pre-existing circuit ride," whereby asylum officers go to other locations to conduct interviews. *Id.* at 90. If an unaccompanied child "is in a non-secure ORR facility located more than an hour from a current interview location, the asylum office may need to arrange for a new circuit ride location" to allow the interview to take place in-person. *Id.* Even a child detained in secure custody typically has the option of an in-person interview. *Id.*

54. USCIS's Refugee, Asylum and International Operations Directorate, Children's Claims Lesson Plan (revised Dec. 6, 2024) establishes "procedural adjustments [that an asylum officer] must make when interviewing children, and the legal issues that must be considered

when analyzing cases and making determinations."[2]

55. USCIS's Children's Claims Lesson Plan also establishes guidance around the tone of an asylum interview. Based on "[r]esearch into child development and particularly brain and cognitive development," and the consequent "obstacles to a child's ability to encode and recall information," USCIS considers it "crucial when interviewing children that the tone of the interview allows the child to testify comfortably and promotes a full discussion of the child's past experiences." *Id.* at 28.

56. In-person interviews also allow Plaintiffs to sit by their client's side during the interview, ask clarifying questions, and better assess whether post-interview briefing or additional evidentiary submissions are appropriate. The presence of the child's representative can make all the difference when a child is asked to share the most traumatic moments of their lives with an unfamiliar asylum officer. A confidential in-person interview in a safe environment is therefore necessary for USCIS's procedural adjustments and tone to have the intended effect—i.e., putting children at ease and encouraging open conversation about their asylum claims.

57. Following an asylum interview, USCIS may either grant the applicant asylum or "refer" the asylum application to the immigration court. 8 C.F.R. § 208.14(b), (c). If USCIS grants asylum, its decision is final. For people without lawful immigration status, including unaccompanied children, USCIS does not "deny" an asylum application. Rather, it refers the asylum application for de novo review by an immigration judge. *See id.* § 208.14(c)(1).

**D. EOIR Respected the Right to Asylum Adjudication Before Removal.**

58. The TVPRA provides that an unaccompanied child seeking asylum cannot be removed until after USCIS adjudicates their asylum application. 8 U.S.C. § 1232(a)(5)(D)(i). If the child then wishes to present that asylum claim to an immigration judge, they are likewise

[2] *See* USCIS, RAIO Directorate, Children's Claims Lesson Plan (revised Dec. 6, 2024) at 28, *available at* https://www.uscis.gov/sites/default/files/document/foia/Childrens_Claims_LP_RAIO.pdf.

entitled to do so. *Id.* In those proceedings, children have the right to a full and fair hearing, as well as certain enumerated statutory rights, including representation by counsel of the child's choosing, examination of evidence and witnesses, and access to a complete record of testimony and evidence. 8 U.S.C. § 1229a(b)(4)(A)–(C).

59. Because a positive outcome before USCIS obviates the need for removal proceedings, immigration judges historically allowed unaccompanied children to pursue all forms of affirmative relief before moving forward with removal proceedings. 8 C.F.R. § 1003.29 (allowing continuance for good cause shown), *id.* § 1240.6 (allowing reasonable adjournments). Before 2026, immigration judges often used docket management tools such as continuances, administrative closure, or termination to pause removal proceedings for this purpose.

60. In Plaintiffs' experience, immigration judges regularly granted several-month-long continuances for Plaintiffs to file affirmative asylum applications on behalf of their unaccompanied child clients. For detained and non-detained children alike, once their application was filed, Plaintiffs would submit to the court the USCIS filing receipt as proof that the child's asylum application was pending before USCIS. With that proof, immigration judges routinely administratively closed or terminated removal proceedings to allow USCIS to adjudicate the child's application for asylum.

61. These docket management tools were critical to providing unaccompanied children meaningful access to the asylum process both before USCIS and EOIR. They allowed Plaintiffs and other legal representatives to assist unaccompanied children in developing their claims and applying for relief under child-sensitive circumstances, as required by the TVPRA. *See* 8 U.S.C. 1232(d)(8). They prevented children and their counsel from having to appear in court repeatedly, only to say that their affirmative asylum applications were still pending before USCIS. And they gave unaccompanied children time and space to gather evidence supporting their asylum applications, and USCIS time to review those applications in a manner consistent with the mandates of the TVPRA and the AAPM.

## III. Defendants' New Asylum Policies Effectively Deprive Unaccompanied Children of Their Right to Meaningful Access to the Asylum Process.

62. In July 2026, just as ORR declined to extend the Acacia contract, *see supra* ¶ 13, USCIS began issuing an unprecedented number of asylum interview notices for Plaintiffs' unaccompanied child clients. From July through November 2026, USCIS has noticed asylum interviews for more than 600 of Plaintiffs' unaccompanied child clients.

63. This sudden influx was no coincidence; it was by design. Plaintiffs have learned that USCIS is deploying a scheduling and case-processing initiative focused on unaccompanied children, where USCIS provides woefully inadequate notice before an asylum interview and rubberstamps referrals to immigration court, with the goal of completing interviews of every unaccompanied child with a pending asylum application by the end of the 2026 calendar year.

64. At virtually the same time, EOIR launched a series of policy changes that have placed *every* detained unaccompanied child's case on an accelerated timeline that makes it nearly impossible for Plaintiffs to provide effective representation.

### A. USCIS Fast-Tracks the Interview, Review, and Adjudication of Affirmative Asylum Applications Filed by Unaccompanied Children.

65. In September 2026, Plaintiffs realized that USCIS was no longer generating notices at least 21 days before an asylum interview. Instead, Plaintiffs began receiving a few days' notice—and in some cases fewer than 24 hours' notice—of their child clients' asylum interviews (the "**Inadequate Notice Policy**").

66. Public reporting confirmed that Plaintiffs' experiences were the result of high-level policy changes within USCIS. According to that reporting, on September 23, 2026, USCIS issued an internal memorandum requesting approval from Defendant USCIS Director Edlow to eliminate the 21-day advance notice requirement for unaccompanied children in ORR custody.[3]

---

[3] The Memorandum's existence became public on the evening of September 23, 2026. See Jonathan Blitzer (@JonathanBlitzer), Twitter (Sept. 23, 2026, 9:20pm ET), https://x.com/JonathanBlitzer/status/2102931169427820908.

Upon information and belief, the September 23, 2026, memorandum memorializes USCIS's intent to provide detained unaccompanied children just 24 hours' notice before an asylum interview.

67. On August 21, 2026, USCIS announced a new policy that only permits applicants to reschedule an asylum interview based on a showing of "exceptional circumstances," departing from its prior standard of "good cause" (the "**Exceptional Circumstances Policy**"). Plaintiffs quickly learned that "exceptional circumstances" does not include, for example, counsel of record's inability to attend an interview because USCIS scheduled several of their other clients for interviews at the same time in different places. It does not even include a car crash involving an unaccompanied child's counsel of record.

68. Meanwhile, USCIS also implemented an agency-wide ban on supplemental evidence submitted fewer than fourteen calendar days before an asylum interview (the "**Evidence Submission Policy"**).[4] This policy creates a profound risk that Plaintiffs will have no opportunity to submit supplemental evidence in support of their unaccompanied child's application now that USCIS generates interview notices fewer than 21 days before the date of an interview, with no real opportunity to reschedule. Indeed, Plaintiffs have received notice mere days before the new deadline to submit evidence, and sometimes even after the deadline has expired.

69. These policies operate in concert to prevent Plaintiffs from providing effective legal representation to their unaccompanied child clients before USCIS. Under its Inadequate Notice Policy, USCIS authorizes notice of only a few days, and sometimes only hours, notice before an asylum interview. When Plaintiffs try to reschedule the interview so they can supplement the record and prepare their client on these tight timelines, the Exceptional

[4] *See* USCIS, Asylum, ALERT: Updated Evidence Submission Policy for Affirmative Asylum Applications, *available at* https://www.uscis.gov/humanitarian/refugees-and-asylum/asylum (last visited Oct. 15, 2026 at 1:24pm PT).

Circumstances Policy prevents it. Unable to continue the interview date, Plaintiffs invariably run up against the Evidence Submission Policy, which precludes Plaintiffs' submission of any supplemental evidence that they manage to compile in the few days (if that) between receiving notice and the evidence submission deadline.

70. These new USCIS policies also make it physically impossible for Plaintiffs to attend all their child clients' asylum interviews. USCIS is scheduling multiple children's asylum interviews to take place on the same day and at the same time. Many of those children are represented by the same attorney of record—a fact that is reflected in USCIS's case management system. To state the obvious: it is impossible for one person to be in more than one place at the same time. Yet USCIS routinely denies Plaintiffs' requests to reschedule those double-booked interviews on the ground that "double booking" is not an "exceptional circumstance." At best, Plaintiffs send a different attorney to represent a child whose attorney is double-booked. But even that solution eliminates any sense of safety that the child would have felt with a known and trusted adult—i.e., their attorney—by their side. At worst, Plaintiffs must send a child client to their asylum interview alone.

71. And when USCIS provides 24 (or fewer) hours' notice, Plaintiffs' hands are effectively tied. Plaintiffs cannot meaningfully prepare a child for her asylum interview or assemble a comprehensive record of supplemental evidence with just 24 hours' notice. And even if they could, the evidence would be untimely under USCIS's Evidence Submission Policy. Yet since September 2026, USCIS has provided as little as 18 hours' notice before an asylum interview through afternoon telephone calls from unknown asylum-office employees who state that Plaintiffs' child clients are scheduled for an asylum interview the following business day.

72. Plaintiffs' objections to untimely notice have been ignored, forcing Plaintiffs' attorneys to drop everything, clear their schedules, coordinate next-morning transportation with the ORR facility where their clients are detained, and arrange an interpreter just to give their client a shot at presenting some quantum of their claim for asylum.

73. Further, USCIS has begun scheduling *virtual* asylum interviews for detained unaccompanied children. On September 11, 2026, ORR sent an email and new guidance to its "entire UAC Provider Network," stating: "In the coming weeks, the United States Citizenship and Immigration Services (USCIS) will be requesting to conduct virtual interviews with the Unaccompanied Alien Children (UAC) claiming asylum." Shortly thereafter, USCIS began scheduling Plaintiffs' detained unaccompanied child clients for virtual asylum interviews.

74. This is the first time that USCIS has implemented a policy of conducting unaccompanied children's interviews virtually. Even during the COVID-19 pandemic, unaccompanied children were required to appear for their interview at the Asylum Office building, where they met the interviewing officer in-person to establish their identity. Only then did the parties proceed to two separate offices, where the interview was conducted virtually.

75. To make matters worse, USCIS has repeatedly failed to provide Plaintiffs *any* notice when a virtual interview has been scheduled. USCIS has on several occasions directed that notice to ORR—and only ORR. On multiple occasions, Plaintiffs have received "notice" of a virtual asylum interview only after the interview concluded.

76. Absent extenuating circumstances, virtual asylum interviews are simply not suitable for unaccompanied children. Plaintiffs have seen their child clients disassociate from the adjudicator during virtual interviews, causing them to provide insufficient detail or to be unresponsive. The shift to virtual asylum interviews creates a significant risk that children will not have an adequate opportunity to present their cases and therefore will not have meaningful access to the asylum process—much less a process that accounts for their specialized needs, as required by the TVPRA.

77. Whether virtual or in person, these interviews are rushed and often followed by a rapid referral to EOIR. Indeed, upon information and belief, USCIS leadership has instructed case managers to issue decisions on unaccompanied child affirmative asylum cases within 24 hours of interviews, and that referrals to EOIR are not subject to supervisory review.

78. Consistent with that instruction, Plaintiffs have received referrals to EOIR within one day of their client's interview. They have even received referrals before the final day that the interviewing officer gave Plaintiffs to submit post-interview briefing. This is the first time in Plaintiffs' practice that USCIS has adjudicated an asylum application one day after an interview.

79. These policies inundate Plaintiffs with rapid-succession interviews that make effective representation impossible. Plaintiffs cannot supplement the record with evidence, cannot prepare their child clients for interviews, cannot prepare post-interview briefing, and sometimes cannot appear because they cannot be in two places at once. The timing of these policies—all issued within the span of a few weeks and just after ORR had allowed Plaintiffs' and other legal service providers' funding to lapse—suggests that this outcome was no accident.

### B. EOIR Deprives Plaintiffs and the Detained Unaccompanied Children They Represent of Meaningful Access to the Asylum Process.

80. The mad rush to move unaccompanied children through the immigration system is equally attributable to EOIR. In or around April 2026, immigration judges began refusing to grant continuances longer than three weeks in Plaintiffs' detained unaccompanied children's cases. Plaintiffs and other legal service providers have observed immigration judges state outright that they have no discretion to grant anything more than a three-week continuance for detained unaccompanied children.

81. Immigration judges across the country have corroborated this, telling Plaintiffs and other legal service providers that judges are under orders to complete all detained unaccompanied children's removal cases by a date certain and are unable to schedule any hearing in any detained unaccompanied child's case after that date. The specific date varies from immigration court to immigration court, but it is invariably before January 31, 2027 (the "**Detained Docket Deadline**").

82. To meet the Detained Docket Deadline, an immigration judge cannot grant anything more than a three-week continuance, even when they acknowledge that Plaintiffs'

detained clients are prima facie eligible for immigration relief, or when they know that Plaintiffs need more than three weeks to fully present an asylum claim before USCIS. Because the immigration judge must issue a final decision before the date certain, they order unaccompanied children to immediately initiate the affirmative asylum process or risk the judge considering the claim abandoned. This all happens shortly after removal proceedings are initiated and while the unaccompanied child is still in ORR custody.

83. EOIR's Detained Docket Deadline deprives detained unaccompanied children of meaningful access to the asylum process. To preserve their clients' right to apply for asylum before USCIS and EOIR, Plaintiffs must elicit sensitive information under conditions and timelines inimical to the TVPRA, risking re-traumatizing their clients in the process. Plaintiffs must then submit to USCIS an asylum application based on the limited facts they managed to discover in the few weeks provided. Developing a detained unaccompanied child's asylum claim within the first few weeks of meeting them is impractical; doing the same for multiple clients at the same time is nearly impossible.

84. Plaintiffs' clients are children who have been held, sometimes for months, in ORR custody away from families and systems of support. Between 2015 and 2024, unaccompanied children spent, on average, 44 days in ORR custody before they were released to a sponsor.[5] Today, that average is approximately six months.[6]

85. Because of longer periods of detention and the dramatic changes in Defendants' policies, many unaccompanied children will apply and be interviewed for asylum while they are detained in large, restrictive, congregate care settings. This all happens within days or weeks of horrific journeys to the United States, and while children are uncertain if they will reunite with anyone who cares for them. Their asylum applications are rushed despite a statutory framework

[5] *See* Office of Refugee Resettlement, Fact Sheets and Data, Average Length of Care (current as of April. 7, 2025), *available at* https://perma.cc/SPV6-3KBD.

[6] *See* Office of Refugee Resettlement, UAC Operational Data (Oct. 7, 2026), https://acf.gov/orr/data/uac-operational.

designed to ensure the opposite. If their attorneys receive notice of an upcoming asylum interview, that interview takes place virtually, without the benefit of supplemental evidence, and end with a rapid referral to EOIR. And in the hands of an immigration judge, they are all but guaranteed to be deprived of meaningful access to the asylum process by the end of January 2027.

## IV. Defendants' New Asylum Policies Interfere with Plaintiffs' Core Activities and Cause Irreparable Harm.

86. Plaintiffs The Door, Amica, the Florence Project, GHIRP, ImmDef, and JFCS are nonprofit legal service providers with programs dedicated to providing trauma-informed, child-sensitive, effective legal representation to unaccompanied children who seek various forms of immigration relief, including in their affirmative asylum applications filed with USCIS and in their removal proceedings before EOIR.

87. Separately and together, USCIS's Inadequate Notice and Exceptional Circumstances Policies, as well as EOIR's Detained Docket Deadline, have and will continue to directly interfere with Plaintiffs' core business activities of providing meaningful representation to unaccompanied children before USCIS and EOIR, and will cause irreparable harm, in several ways.

88. *First*, USCIS's Inadequate Notice and Exceptional Circumstances Policies have made it functionally, if not actually, impossible for Plaintiffs to provide effective legal representation to their unaccompanied child clients before USCIS. USCIS has scheduled hundreds of Plaintiffs' clients for asylum interviews with fewer than 21 days' notice, and sometimes fewer than 24 hours' notice. Plaintiffs cannot effectively prepare each of their many impacted child clients for their asylum interviews on that compressed timeline. In some instances, Plaintiffs cannot appear for their clients' interviews at all. USCIS's Inadequate Notice and Exceptional Circumstances Policies also prevent Plaintiffs from supplementing the evidentiary record in support of their clients' asylum applications now that USCIS refuses to

consider evidence submitted fewer than 14 days before an interview. And when Plaintiffs receive notice of an asylum interview fewer than 14 days before the interview, they lose their right to submit critical supplemental evidence.

89. *Second*, EOIR's Detained Docket Deadline requires Plaintiffs to submit proof that their detained unaccompanied child clients have filed affirmative asylum applications with USCIS within weeks of being placed in removal proceedings. To comply with those deadlines, Plaintiffs must deviate from the kind of representation that provides their clients the greatest chance of success on the merits. Plaintiffs are also unable to properly prepare their child clients for an interview that could be scheduled days after the child's application is filed.

90. *Third*, in their rush to rapidly remove unaccompanied children, USCIS and EOIR have scheduled multiple of Plaintiffs' unaccompanied child clients for asylum interviews and immigration court hearings at the same or similar times. Predictably, Plaintiffs' attorneys have been double-, triple-, or even quadruple-booked for simultaneous USCIS interviews. The same will soon be true before EOIR, as USCIS refers asylum applications to immigration judges who must complete detained unaccompanied children's cases by a date certain. Plaintiffs' attorneys are forced to choose one of their child clients, leaving the others to be accompanied to an interview by an unfamiliar representative. A represented child who attends their asylum interview without their primary attorney loses the benefit of having their counsel by their side.

91. *Fourth*, Defendants' accelerated processing of unaccompanied children's cases creates an untenably high risk that Plaintiffs' clients will be ordered removed to the country that they recently fled, where they may face grave harm, before they have a meaningful opportunity to seek relief from removal in the United States.

92. *Fifth*, because Defendants have made it impossible for Plaintiffs to effectively manage their current clients' cases, they also prevent Plaintiffs from taking on new cases. Plaintiffs exist in large part to help unaccompanied children navigate their rights within a foreign immigration system, and this limitation on Plaintiffs' capacity undermines their core activities.

Without representation from Plaintiffs, countless unaccompanied children have been, and will continue to be, unable to obtain meaningful access to the asylum process. Forcing Plaintiffs to heighten their focus on representing children seeking asylum before USCIS and in their removal proceedings, the unworkable strictures of Defendants' new policies have deprived Plaintiffs' clients of the ability to pursue other potential immigration relief.

93. *Sixth*, Defendants' focus on expelling unaccompanied children as soon as possible has forced Plaintiffs to redirect staff time and resources in an attempt to triage the representation needs of hundreds of unaccompanied children in asylum interviews and immigration court hearings that are occurring within a matter of months. Plaintiffs have had to enlist attorneys and staff working in other departments, such as their adult representation teams, who are unfamiliar with the specialized needs and processing of children's cases.

94. All Plaintiffs have experienced each of these injuries and fear that they will only worsen in the coming weeks.

95. Plaintiff The Door has received notices of approximately 75 asylum interviews scheduled to take place between early August and November 9, 2026, and expects to receive more. In four cases, USCIS provided notice just one business day before the scheduled interview dates. The Door's attorneys had no opportunity to prepare their clients, one of whom suffers from a heart condition and was hospitalized the evening before the interview. When USCIS nonetheless proceeded with the interview the next day, the child became so demonstrably distressed that a supervising asylum officer finally agreed to reschedule the interview—but only after repeatedly refusing to allow the client's attorney to intercede on her behalf. USCIS has likewise repeatedly denied The Door's requests to reschedule asylum interviews, even when an attorney is scheduled for simultaneous interviews at different asylum office locations. The Door had to frantically search for an alternate attorney to represent each child, even though the attorney was unfamiliar to the child. The Door has multiple clients, including two ordered removed, who have been subjected to accelerated proceedings before EOIR. Both USCIS's and

EOIR's policies have caused The Door to redirect limited staff and resources to respond to rapidly shifting and overlapping demands, while significantly impeding The Door's ability to prepare unaccompanied children to meaningfully participate in their immigration proceedings. The abbreviated case timelines and the resulting limited time to build attorney-client relationships severely jeopardize the level of comprehensive, trauma-informed legal representation that unaccompanied children need and that The Door is committed to providing.

96. Plaintiff GHIRP has received notices of more than 120 asylum interviews scheduled to take place from August to October 2026 and expects to receive more. From August 1 to September 29, 2026, GHIRP's 8 attorneys represented 65 unaccompanied children in their USCIS asylum interviews. USCIS has consistently provided fewer than 21 days' notice and ignored or denied GHIRP's requests to reschedule, even when counsel of record was scheduled to appear in five asylum interviews at the same time. USCIS also scheduled two of GHIRP's detained unaccompanied child clients for asylum interviews with fewer than 24 hours' notice. The GHIRP counsel of record was forced to halt all other work to focus exclusively on preparing her two clients, who were deeply distressed by the idea of an asylum interview the next morning.

97. USCIS has referred approximately 40 to EOIR, where hearings are being set at an unprecedented pace. Defendants' policies have subjected GHIRP's clients to an artificially rushed asylum process that forces young children to confront deep trauma very quickly, often in the detained setting without familial support. The Policies have therefore interfered with GHIRP's ability to provide trauma-informed and comprehensive representation to their unaccompanied child clients.

98. Plaintiff Florence Project has received over 70 interview notices since August. Because of the overwhelming number of asylum interviews, the Florence Project has been forced to limit the scope of its services to unaccompanied children in Arizona. Under its new standard for rescheduling, Defendant USCIS has refused to reschedule the Florence Project's clients' interviews, even when, for instance, an attorney was in a car accident hours before the interview

or a client was unable to attend due to medical complications from recent childbirth. The Florence Project's attorneys and their clients are unable to meaningfully prepare for these interviews, a process that in the past would take 15 to 30 hours. While the Florence Project previously offered near-universal representation to all detained unaccompanied children in Arizona, the deluge of interview notices and the preparation each interview entails has forced the Florence Project to stop accepting new cases, leaving over 40 children in ORR custody unrepresented. Because of EOIR's Detained Docket Deadline, at least eight Florence Project clients have been ordered removed before they were able to pursue all forms of available relief from removal. As for the children who have not yet been removed, the increased frequency of court appearances, coupled with the accelerated client and evidence preparation for back-to-back USCIS asylum interviews, has prevented the Florence Project from dedicating the time and resources it otherwise would have in support of each child's application for asylum before USCIS and EOIR.

99. Plaintiff Amica has been overwhelmed with 50 asylum interview notices since August, including eight interviews on October 6, 2026. It received fewer than 21 days' notice for at least half these cases, and expects to receive more interview notices in the future given its more than 100 clients with pending asylum applications. Amica Center staff is unable to serve its clients on these expedited schedules, and it cannot reschedule interviews for good cause. Amica Center has been forced to forgo its usual practices of preparing clients and gathering supplemental evidence as it normally would. It has even had to proceed with asylum interviews using interpreters who do not speak a child's language. The urgent need to prioritize staff time to prepare for asylum interviews has further stymied Amica Center's staff from providing other legal services to its current clients and accepting new cases. Defendants' policies have also placed Amica's staff in the position of making impossible choices about how to prioritize clients' cases under these unreasonable timelines.

100. Since July 31, 2026, Plaintiff ImmDef has received asylum interview notices for

more than 300 unaccompanied child clients, all scheduled to take place between July and mid-November 2026. Because of EOIR's Detained Docket Deadline, many of those children were pressured to apply for asylum before USCIS on short timelines, shortly after they were detained in ORR custody. To preserve their client's right to apply for asylum, ImmDef has had to prepare and submit asylum applications based on the often limited information that their detained unaccompanied child clients were willing and able to disclose before developing rapport and trust with their attorney. Since late July 2026, ImmDef has increasingly received fewer than 21 days' notice of asylum interviews for their child clients, including one with two business days' notice and one with 24 hours' notice. Because of USCIS's evidence submission policy, ImmDef has been unable to submit supplemental evidence 14 or fewer days before an interview, even when notice was received within the 14-day timeframe. Moreover, ImmDef has been unable to reschedule interviews under the exceptional circumstances standard. The rapid pace of asylum interviews has made it exceedingly difficult for ImmDef to prepare unaccompanied child clients for their interviews, which exacerbates their stress and compounds their trauma. Many of ImmDef's attorneys have been scheduled for multiple interviews with overlapping appointment times in a single day. As a result, ImmDef has been unable to provide the type of child-sensitive representation to which unaccompanied children are entitled under the TVPRA. ImmDef has about 800 additional unaccompanied child clients with pending asylum applications who have not yet received interview notices.

101. Of the more than 200 unaccompanied child clients whose asylum interviews ImmDef has attended since July 2026, USCIS has referred approximately 80 of those children's applications to EOIR, sometimes within one day of the interview. The remaining approximately 120 children's cases are still pending. Once USCIS refers the asylum application to EOIR, immigration judges are scheduling merits hearings within weeks. Because of USCIS's and EOIR's treatment of unaccompanied children's cases, ImmDef has had to rely on attorneys from its Adult Representation Project, which only represents adult noncitizens, to attend asylum

interviews with ImmDef's unaccompanied child clients, even if the attorney is unfamiliar with children's representation. ImmDef has had to postpone otherwise time-sensitive legal work for other clients, simply because all staff time is focused on representing unaccompanied children before USCIS and EOIR, and to turn away many referrals of children whose cases they would have otherwise taken. In short, USCIS's and EOIR's policies directly interfere with ImmDef's ability to provide zealous, universal representation to noncitizens, and specifically unaccompanied children, in the immigration system.

102. Plaintiff JFCS has received notices of more than 20 asylum interviews scheduled to take place from August to October 2026 and expects to receive more. While JFCS historically received a month's notice prior to an asylum interview, now they receive 7–12 days' notice. Moreover, their requests to reschedule these interviews are consistently ignored even when an attorney or a child client is unavailable. At the same time, JFCS' clients are being rushed through EOIR proceedings because of EOIR's Detained Docket Deadline. JFCS attorneys are now spending the majority of their work weeks preparing for court or attending court rather than doing other necessary case work for child clients, and JFCS has had to reallocate responsibilities for multiple staff members to meet these accelerated deadlines and hearing dates. Defendants' policies have subjected JFCS's clients to rushed timelines that force young children to confront and disclose deep trauma very quickly, often in the detained setting without familial support.

## CAUSES OF ACTION

## COUNT ONE

**USCIS's Inadequate Notice Policy Violates the APA, 5 U.S.C. § 706(2)(A)**
**Contrary to Law**
**Violation of Immigration and Nationality Act,**
**8 U.S.C. §§ 1158(a)(1), (b)(3)(C); Immigration Regulations, 8 C.F.R. § 208.9(e)(1);**
**Trafficking Victims Protection Reauthorization Act, 8 U.S.C. §§ 1232(c)(2), (c)(5), (d)(8)**
**(All Plaintiffs on Behalf of Themselves and Their Unaccompanied Child Clients Against USCIS)**

103. Plaintiffs incorporate by reference each paragraph of this Complaint as if fully set forth herein.

104. The APA provides that courts "shall . . . hold unlawful and set aside agency action" that is "arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

105. USCIS has implemented a policy of authorizing fewer than 21 days' notice of unaccompanied children's asylum interviews (the "Inadequate Notice Policy"), depriving children of meaningful access to the asylum process. 8 U.S.C. §§ 1158(a)(1), (b)(3)(C).

106. The Inadequate Notice Policy constitutes final agency action.

107. Upon information and belief, USCIS recently memorialized this policy as to detained unaccompanied children in an internal Decision Memo dated on or about September 23, 2026. Upon information and belief, the memorandum describes USCIS's policy of moving away from a default 21-day notice requirement and toward a 24-hour notice requirement for detained unaccompanied children.

108. USCIS's longstanding prior policy, reflected in its AAPM, required USCIS to generate notice at least 21 days before a scheduled interview. The prior policy, coupled with USCIS's prior policy of consistently granting rescheduling requests for good cause, allowed Plaintiffs to prepare their unaccompanied child clients for asylum interviews and timely submit supplemental evidence in support of their asylum claims.

109. The Inadequate Notice Policy violates the asylum statute, 8 U.S.C. §§ 1158(a)(1), (b)(3)(C), because it deprives unaccompanied children of meaningful access to the asylum process.

110. The Inadequate Notice Policy violates the TVPRA because it subjects children to an expedited asylum process directly at odds with the TVPRA's guarantees of child-sensitive timelines and use of child-centric standards. 8 U.S.C. §§ 1232(c)(2), (c)(5), (d)(8).

111. The Inadequate Notice Policy is contrary to 8 C.F.R. § 208.9(e)(1), which presumes that Plaintiffs and the unaccompanied children they represent will receive notice of an

asylum interview with sufficient time to submit supplemental evidence at least 14 days before the interview. The Inadequate Notice Policy prevents Plaintiffs and their unaccompanied child clients from timely submitting supplemental documentary evidence in support of their asylum applications.

112. The Inadequate Notice Policy directly interferes with Plaintiffs' ability to perform their core function of providing effective representation of their unaccompanied child clients before USCIS.

113. The Inadequate Notice Policy directly interferes with the ability of Plaintiffs' unaccompanied child clients, with whom Plaintiffs have an attorney-client relationship, to present their asylum claims by denying them time to meaningfully prepare for their interviews and the ability to submit supplemental evidence. Plaintiffs' unaccompanied child clients are hindered from protecting their own interests because of their tender age, their custody status, and their lack of access to the legal system without Plaintiffs' advocacy on their behalf.

**COUNT TWO**

**USCIS's Inadequate Notice Policy Violates the APA, 5 U.S.C. § 706(2)(A)**
**Arbitrary and Capricious**
**(All Plaintiffs on Behalf of Themselves and Their Unaccompanied Child Clients Against USCIS)**

114. Plaintiffs incorporate by reference each paragraph of this Complaint as if fully set forth herein.

115. The APA provides that courts "shall . . . hold unlawful and set aside agency action" that is "arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

116. The Inadequate Notice Policy is arbitrary and capricious because Defendants failed to articulate a reasoned explanation for their change of policy, considered factors that Congress did not intend to be considered, failed to consider reasonable alternatives, failed to consider important aspects of the problem, and offered explanations for their decisions that run

counter to the evidence before the agencies. Among other things, Defendants failed to consider the reliance interests of Plaintiffs and their unaccompanied child clients, USCIS's deadlines for submission of supplemental evidence, and the unique vulnerability and needs of unaccompanied children. In particular, Defendants failed to consider the impact of the Inadequate Notice Policy on Plaintiffs' ability to develop rapport with their unaccompanied child clients, assist them in effectively developing and presenting their asylum claims, and prepare their child clients for their asylum interviews.

117. USCIS's Inadequate Notice Policy directly interferes with Plaintiffs' ability to perform their core function of providing effective representation of their unaccompanied child clients before USCIS.

118. USCIS's Inadequate Notice Policy directly interferes with the ability of Plaintiffs' unaccompanied child clients, with whom Plaintiffs have an attorney-client relationship, to present their asylum claims by denying them time to meaningfully prepare for their interviews and the ability to submit supplemental evidence. Plaintiffs' unaccompanied child clients are hindered from protecting their own interests because of their tender age, their custody status, and their lack of access to the legal system without Plaintiffs' advocacy on their behalf.

## COUNT THREE

**USCIS's Exceptional Circumstances Policy Violates the APA, 5 U.S.C. § 706(2)(A)**
**Contrary to Law**
**Violation of Immigration and Nationality Act, 8 U.S.C. §§ 1158(a)(1), (b)(3)(C);**
**Immigration Regulations, 8 C.F.R. § 208.9(e)(1);**
**Trafficking Victims Protection Reauthorization Act, 8 U.S.C. §§ 1232(c)(2), (c)(5), (d)(8)**
**(All Plaintiffs on Behalf of Themselves and Their Unaccompanied Child Clients Against USCIS)**

119. Plaintiffs incorporate by reference each paragraph of this Complaint as if fully set forth herein.

120. The APA provides that courts "shall . . . hold unlawful and set aside agency action" that is "arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

121. As of August 21, 2026, USCIS implemented a new policy prohibiting asylum applicants from obtaining any continuance of a scheduled asylum interview absent "exceptional circumstances" (the "Exceptional Circumstances Policy"). Under this policy, "exceptional circumstances" do not include issues relating to attorney scheduling that prevent an unaccompanied child's attorney from attending the asylum interview. USCIS's prior policy allowed continuances for "good cause," which included competing obligations or scheduling conflicts that prevented an unaccompanied child's attorney from appearing at an asylum interview.

122. The Exceptional Circumstances Policy constitutes final agency action.

123. The Exceptional Circumstances Policy violates the asylum statute, 8 U.S.C. § 1158(a)(1), (b)(3)(C), because it deprives unaccompanied children of meaningful access to the asylum process.

124. The Exceptional Circumstances Policy violates the TVPRA, including 8 U.S.C. § 1232(c)(2), (c)(5), and (d)(8), because it subjects children to an expedited asylum process directly at odds with the guarantees of child-sensitive timelines and use of child-centric standards.

125. The Exceptional Circumstances Policy violates 8 C.F.R. § 208.9(e)(1), which presumes that Plaintiffs and the unaccompanied children they represent will receive notice of an asylum interview with sufficient time to submit supplemental evidence at least 14 days before the interview. The Exceptional Circumstances Policy prevents Plaintiffs and their unaccompanied child clients from timely submitting supplemental documentary evidence in support of their asylum applications.

126. The Exceptional Circumstances Policy directly interferes with Plaintiffs' ability to perform their core function of providing effective representation of their unaccompanied child clients before USCIS.

127. The Exceptional Circumstances Policy directly interferes with the ability of Plaintiffs' unaccompanied child clients, with whom Plaintiffs have an attorney-client relationship, to present their asylum claims by denying them time to meaningfully prepare for their interviews and the ability to submit supplemental evidence. Plaintiffs' unaccompanied child clients are hindered from protecting their own interests because of their tender age, their custody status, and their lack of access to the legal system without Plaintiffs' advocacy on their behalf.

**COUNT FOUR**

**USCIS's Exceptional Circumstances Policy Violates the APA, 5 U.S.C. § 706(2)(A)**
**Arbitrary and Capricious**
**(All Plaintiffs on Behalf of Themselves and Their Unaccompanied Child Clients Against USCIS)**

128. Plaintiffs incorporate by reference each paragraph of this Complaint as if fully set forth herein.

129. The APA provides that courts "shall . . . hold unlawful and set aside agency action" that is "arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

130. The Exceptional Circumstances Policy constitutes final agency action.

131. The Exceptional Circumstances Policy is arbitrary and capricious because Defendants failed to articulate a reasoned explanation for their change of policy, considered factors that Congress did not intend to be considered, failed to consider reasonable alternatives, failed to consider important aspects of the problem, and offered explanations for their decisions that run counter to the evidence before the agencies. Among other things, Defendants failed to consider the reliance interests of Plaintiffs and their unaccompanied child clients, USCIS's deadlines for submission of supplemental evidence, and the unique vulnerability and needs of unaccompanied children. In particular, Defendants failed to consider the impact of the Exceptional Circumstances Policy on Plaintiffs' ability to develop rapport with their unaccompanied child clients, assist them in effectively developing and presenting their asylum claims, and prepare their child clients for their asylum interviews.

132. The Exceptional Circumstances Policy directly interferes with Plaintiffs' ability to perform their core function of providing effective representation of their unaccompanied child clients before USCIS.

133. The Exceptional Circumstances Policy directly interferes with the ability of Plaintiffs' unaccompanied child clients, with whom Plaintiffs have an attorney-client relationship, to present their asylum claims by denying them time to meaningfully prepare for their interviews and the ability to submit supplemental evidence. Plaintiffs' unaccompanied child clients are hindered from protecting their own interests because of their tender age, their custody status, and their lack of access to the legal system outside of Plaintiffs' advocacy on their behalf.

**COUNT FIVE**
**USCIS's Policies Violate the Fifth Amendment of the U.S. Constitution**
**Procedural Due Process**
**(All Plaintiffs on Behalf of Themselves and Their Unaccompanied Child Clients Against USCIS)**

134. Plaintiffs incorporate by reference each paragraph of this Complaint as if fully set forth herein.

135. The Due Process Clause of the Fifth Amendment provides that the government shall not "deprive any person of life, liberty, or property without due process of law." U.S. Const. amend V.

136. The TVPRA and the asylum statute provide unaccompanied children the right to apply for asylum in the first instance through a non-adversarial process before USCIS. *See* 8 U.S.C. §§ 1158(a)(1), (b)(3)(C); 8 U.S.C. § 1232(d)(8).

137. USCIS's own regulations further confer on unaccompanied children the right to "have counsel or a representative present, … present witnesses, and … submit affidavits of witnesses and other evidence." 8 C.F.R. § 208.9(b).

138. USCIS's regulations also expressly provide that, after the asylum interview concludes, counsel of record "will have an opportunity to make a statement or comment on the

evidence presented" and "ask follow-up questions of the applicant and any witness." 8 C.F.R. § 208.9(d)(1).

139. These statutory and regulatory guarantees give rise to substantial property interests under the Fifth Amendment's Due Process Clause. Indeed, the right to have counsel appear on an unaccompanied child's behalf, to submit evidence in support of a child's claim, and to present witnesses are fundamental procedural rights that are critical components of a full and fair hearing. USCIS's Inadequate Notice and Exceptional Circumstances Policies, as well as USCIS's new 14-day evidence submission deadline and shift to virtual interviews, have and will continue to deprive Plaintiffs' unaccompanied child clients of their rights to meaningful access to counsel and to the asylum process as guaranteed by the TVPRA, the asylum statute, USCIS's own regulations, and the Constitution.

140. The risk of erroneous deprivation of rights would be mitigated by safeguards such as adequate and timely notice of asylum interviews, allowing scheduling accommodations to preserve Plaintiffs' ability to meaningfully represent their clients, and flexible evidence-submission policies that account for administrative and practical obstacles to preparing evidence in children's cases on short timelines.

141. Defendant USCIS has no legitimate interest in depriving unaccompanied children of a full and fair opportunity to present their asylum claims.

142. USCIS's policies directly interfere with Plaintiffs' ability to perform their core function of providing effective representation of their unaccompanied child clients before USCIS.

143. USCIS's policies directly interfere with the ability of Plaintiffs' unaccompanied child clients, with whom Plaintiffs have an attorney-client relationship, to present their asylum claims by denying them time to meaningfully prepare for their interviews and the ability to submit supplemental evidence. Plaintiffs' unaccompanied child clients are hindered from

protecting their own interests because of their tender age, their custody status, and their lack of access to the legal system outside of Plaintiffs' advocacy on their behalf.

**COUNT SIX**

**EOIR's Detained Docket Deadline Violates the APA, 5 U.S.C. § 706(2)(A)**
**Arbitrary and Capricious**
**(All Plaintiffs Against EOIR)**

144. Plaintiffs incorporate by reference each paragraph of this Complaint as if fully set forth herein.

145. The APA provides that courts "shall . . . hold unlawful and set aside agency action" that is "arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law" or that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C).

146. Upon information and belief, EOIR has instructed immigration judges to complete their detained unaccompanied child dockets by a date certain that is on or before January 31, 2027 (the "Detained Docket Deadline").

147. The Detained Docket Deadline constitutes final agency action.

148. The Detained Docket Deadline is arbitrary and capricious because Defendants failed to articulate a reasoned explanation for their change of policy, considered factors that Congress did not intend to be considered, failed to consider reasonable alternatives; failed to consider important aspects of the problem, and offered explanations for their decisions that run counter to the evidence before the agencies. Among other things, Defendants failed to consider the reliance interests of Plaintiffs and their unaccompanied child clients, the unique vulnerability and needs of unaccompanied children, and the impact of the Detained Docket Deadline on Plaintiffs' ability to effectively represent their unaccompanied child clients in their removal proceedings.

149. The Detained Docket Deadline directly interferes with Plaintiffs' ability to perform their core function of providing effective representation of their unaccompanied child

clients before EOIR.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs hereby request that the Court:

a. Assume jurisdiction over this matter;

b. Declare that the Inadequate Notice Policy and the Exceptional Circumstances Policy, are contrary to law and arbitrary and capricious;

c. Vacate and set aside the Inadequate Notice Policy and the Exceptional Circumstances Policy;

d. Exercise the Court's authority under 5 U.S.C. § 705 to provide relief pending review of the Inadequate Notice Policy and the Exceptional Circumstances Policy;

e. Declare that USCIS's Inadequate Notice and Exceptional Circumstances Policies, as well as USCIS's new 14-day evidence submission deadline and shift to virtual interviews, violate the Fifth Amendment to the U.S. Constitution and order adequate procedural safeguards;

f. Issue injunctive relief that, at minimum, orders USCIS to return to the status quo of generating notice at least 21 days prior to an asylum interview, permitting one opportunity to reschedule as of right, and applying a good cause standard for any subsequent rescheduling requests to ensure that Plaintiffs' unaccompanied child client have meaningful access to the affirmative asylum process;

g. Declare that the Detained Docket Deadline is arbitrary and capricious;

h. Vacate and set aside the Detained Docket Deadline;

i. Exercise the Court's authority under 5 U.S.C. § 705 to provide relief pending review of the Detained Docket Deadline;

j. Award Plaintiffs reasonable attorney's fees and costs; and

k. Grant such other and further relief as the Court deems just and equitable.

Dated: October 15, 2026

Respectfully submitted,

/s/ Melissa Crow
Melissa Crow (Bar No. 15622)
CENTER FOR GENDER & REFUGEE STUDIES
1901 Pennsylvania Avenue, NW
Suite 900, PMB 228
Washington, DC 20006
Telephone: (202) 355-4471
crowmelissa@uclawsf.edu

/s/ Hannah K. Comstock
Hannah K. Comstock* (CA Bar No. 311680)
Lynn Damiano Pearson* (GA Bar No. 311108)
Kevin Siegel* (NY Bar No. 5800511)
Farah Khan** (MD Bar No. 2112140243)
NATIONAL IMMIGRATION LAW CENTER
P.O. Box 34573, Washington, DC 20043
Telephone: 213.674.2907
comstock@nilc.org
damianopearson@nilc.org
siegel@nilc.org
khan@nilc.org

/s/ Mishan Wroe
Mishan Wroe* (CA Bar No. 299296)
Diane de Gramont* (CA Bar No. 324360)
Neha Desai* (PA Bar No. 205048)
NATIONAL CENTER FOR YOUTH LAW
428 13th Street, Floor 5
Oakland, CA 94612
Telephone: 510.920.8098
mwroe@youthlaw.org
ddegramont@youthlaw.org
ndesai@youthlaw.org

/s/ Sara Haji
Sara Haji* (CA Bar No. 330834)
Marjorie Menza* (CA Bar No. 321512)
TRIAL IMPACT PROJECT
523 W. 6th Street
Los Angeles, CA 90026
Telephone: 213.542.5241
shaji@trialimpact.org

mmenza@trialimpact.org

/s/ Robert Pauw
Robert Pauw* (WA Bar No. 13613)
CENTER FOR GENDER & REFUGEE STUDIES
c/o Gibbs Houston Pauw
1000 Second Avenue, Suite 1600
Seattle, WA 98104
Telephone: (206) 682-1080
rpauw@ghp-law.net

* *Pro hac vice motions forthcoming*
** *Motions for admission pending*

*Counsel for Plaintiffs*