**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| THE DOOR ET AL., | * | |
| Plaintiffs, | * | |
| v. | * | Civil No. 26-4326-BAH |
| JOSEPH B. EDLOW ET AL., | * | |
| Defendants. | * | |

* * * * * * * * * * * * *

## MEMORANDUM AND ORDER

Plaintiffs The Door, Amica Center for Immigrant Rights ("Amica"), Florence Immigrant and Refugee Rights Project ("Florence Project"), Galveston-Houston Immigrant Representation Project ("GHIRP"), Immigrant Defenders Law Center ("ImmDef"), and Jewish Family and Community Services ("JFCS") (collectively "Plaintiffs") bring this lawsuit against Joseph B. Edlow in his official capacity as director of United States Citizenship and Immigration Services ("Edlow"), United States Citizenship and Immigration Services ("USCIS"), Markwayne Mullin in his official capacity as Secretary of Homeland Security ("Mullin"), Sirce C. Owen in her official capacity as acting director of Executive Office for Immigration Review, Executive Office for Immigration Review ("EOIR"), Todd Blanche in his official capacity as Attorney General ("Blanche"), United States Department of Justice ("DOJ"), and United States Department of Homeland Security ("DHS") (collectively "Defendants"). ECF 1 (complaint).[1]

Plaintiffs assert multiple claims arising from Defendants' policies regarding the adjudication of unaccompanied immigrant children's asylum applications. *Id.* at 32–41 ¶¶

[1] The Court references all filings by their respective ECF numbers and page numbers by the ECF-generated page numbers at the top of the page.

103–49. Pending before the Court is Plaintiffs' motion for a stay under the Administrative Procedure Act (APA) and temporary restraining order ("TRO") (the "motion for a TRO"). ECF 23. Although Plaintiffs originally sought an *ex parte* TRO, Defendants accepted the Court's invitation to respond. ECF 32. Plaintiffs filed a reply in support of their motion. ECF 53. The Court has reviewed all relevant filings and finds that no hearing is necessary. *See* Loc. R. 105.6 (D. Md. 2025). For the reasons stated below, the motion for a TRO is **GRANTED**.

## I. BACKGROUND[2]

Plaintiffs are immigration legal service providers who represent unaccompanied children[3] seeking lawful status in the United States in proceedings before both USCIS and EOIR. ECF 1, at 4. Plaintiffs explain that unaccompanied children seeking asylum begin the process with a non-adversarial interview before the Asylum Office ("AO"), located within USCIS, and their asylum claim is only heard by an immigration court, located within EOIR, upon referral from the AO following their asylum interview. *Id.* at 11 ¶ 27, at 18 ¶ 57. Plaintiffs allege that collectively, they represent thousands of unaccompanied children proceeding through the U.S. immigration system. *Id.* at 8 ¶ 13.

Plaintiffs contend that Defendants have made a series of recent policy changes that harm them and their child clients, and that also conflict with the statutory framework Congress

---

[2] The following facts come from the complaint, which the Court assumes to be true at this early stage of litigation. *See Doe by Doe v. South Carolina*, Civ. No. 25-1787, 2025 WL 2375386, at *1 n.1 (4th Cir. Aug. 15, 2025) (quoting *Elrod v. Burns*, 427 U.S. 347, 250 n.1 (1976), for the proposition that "for purposes of resolving a motion for a preliminary injunction, courts take as true 'all of the well-pleaded allegations of [the] complaint and uncontroverted affidavits filed in support'").

[3] "Unaccompanied alien child" is a legal term of art defined at 6 U.S.C. § 279(g)(2). The statute defines an "unaccompanied alien child" as "a child who— (A) has no lawful immigration status in the United States; (B) has not attained 18 years of age; and (C) with respect to whom— (i) there is no parent or legal guardian in the United States; or (ii) no parent or legal guardian in the United States is available to provide care and physical custody." 6 U.S.C. § 279(g)(2). The Court will use the term "unaccompanied child" throughout this opinion to refer to noncitizen children falling within this statutory designation.

enacted explicitly to provide heightened procedural protections for unaccompanied children.[4] *Id.* at 26–28 ¶¶ 86–94, at 32–41 ¶¶ 103–49. Plaintiffs explain that previous USCIS policy provided for at least twenty-one (21) days' notice prior to an asylum interview. ECF 1, at 14–15 ¶ 40. Plaintiffs aver that preparation for an asylum interview "could take anywhere from 10 to 30 hours per client" and requires sufficient time to gather supplemental evidence, brief complex legal issues, and prepare their young clients to describe "traumatic experiences in their home country." *Id.* at 15 ¶¶ 41–44. However, Plaintiffs allege that in September 2026 they began to receive "a few days' notice—and in some cases fewer than 24 hours' notice—of their child clients' asylum interviews." *Id.* at 20 ¶ 65. Plaintiffs term this practice the "Inadequate Notice Policy" and contend that it is "result of high-level policy changes within USCIS" in the form of an internal memorandum to Defendant Edlow, the USCIS director, seeking approval to eliminate the 21-day advance notice requirement. *Id.* ¶¶ 65–66.

Plaintiffs also explain that previous USCIS policy permitted the rescheduling of an asylum interview once as a matter of right, and again upon showing of "good cause," which included reasons such as "attorney or client scheduling conflicts or the need for additional time to gather updated records and reports." *Id.* at 16 ¶¶ 48–49. However, Plaintiffs allege that "[o]n August 21, 2026, USCIS announced a new policy that only permits applicants to reschedule an asylum interview based on a showing of 'exceptional circumstances;'" a standard which Plaintiffs contend has proved much more onerous than the previous "good cause" requirement. *Id.* at 21 ¶ 67. Plaintiffs allege that USCIS has refused requests to reschedule asylum interviews based on the client's counsel being scheduled for multiple interviews "at the same time in different places" or even in more extreme situations, like when a request to

[4] In addition to the policies described below, Plaintiffs challenge a third policy they term the "Detained Docket Deadline" related to alleged orders requiring immigration judges to "complete all detained unaccompanied children's removal cases by a date certain." ECF 1, at 24 ¶ 81, at 40 ¶¶ 144–49. The Court does not discuss that policy in detail because Plaintiffs' motion for a TRO does not seek to restrain that policy. *See generally* ECF 23.

reschedule an interview was denied despite the fact that a child's counsel of record was involved in "a car crash[.]" *Id.* Plaintiffs term this policy the "Exceptional Circumstances Policy." *Id.*

Plaintiffs contend that Defendants' policies make it difficult, if not impossible, for Plaintiffs to advocate for their child clients, either because they result in inadequate time to prepare their young clients for a challenging interview, or by "double-, triple-, or even quadruple-book[ing] [counsel] for simultaneous USCIS interviews," thereby depriving their clients of the benefit of meaningful representation in their asylum proceedings. *Id.* at 26–27 ¶¶ 88, 90. Plaintiffs bring six counts against Defendants, including, as relevant here, APA arbitrary and capricious and contrary to law challenges to the Inadequate Notice Policy and the Exceptional Circumstances Policies. *Id.* at 32–38 ¶¶ 103–33.

Plaintiffs seek a TRO that would stay the Inadequate Notice Policy and the Exceptional Circumstances Policy and reinstate the prior USCIS policies of providing at least 21 days' notice prior to an asylum interview, and restore the long-standing practice of allowing rescheduling of an interview once as a matter of course, and then upon showing of good cause. ECF 23, at 2. The motion also seeks an order requiring "Defendants to file a status report with the Court within 48 hours and at regular intervals thereafter, describing the steps Defendants have taken to comply" with any order the Court may issue. *Id.* at 2–3.

## II. LEGAL STANDARD

### A. Rule 65(b)(1)

To obtain a temporary restraining order, a plaintiff must establish four factors: (1) that they are likely to succeed on the merits; (2) that they are likely to suffer irreparable harm if preliminary relief is not granted; (3) that the balance of equities favors them; and (4) that an injunction is in the public interest. *See Frazier v. Prince George's Cnty.*, 86 F.4th 537, 543 (4th Cir. 2023) (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). When a

government entity is a party to the case, as is the case here, the third and fourth factors merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009); *Pursuing Am. Greatness v. Fed. Election Comm'n*, 831 F.3d 500, 511 (D.C. Cir. 2016).

**B. 5 U.S.C. § 705**

Section 705 of the APA permits a court to "issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings" where "required and to the extent necessary to prevent irreparable injury." 5 U.S.C. § 705. "The factors governing issuance of a preliminary injunction also govern issuance of a § 705 stay." *Casa de Maryland, Inc. v. Wolf*, 486 F. Supp. 3d 928, 950 (D. Md. 2020) (citations omitted) (quoting *Dist. of Columbia v. Dep't of Agric.*, 444 F. Supp. 3d 1, 16 (D.D.C. 2020)).

## III. ANALYSIS

The Court first addresses whether Plaintiffs have standing to bring these claims. The Court then considers the *Winter* factors for issuance of a TRO, and lastly determines whether Plaintiffs' request warrants a stay under the APA.

**A. Standing**

As a preliminary matter, the Court must assure itself of jurisdiction. "To establish Article III standing, 'a plaintiff must show (1) it has suffered an injury-in-fact that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.'" *South Carolina v. United States*, 912 F.3d 720, 726 (4th Cir. 2019) (internal quotation marks omitted) (quoting *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000)). Plaintiffs argue that they have both organizational standing as a result of direct harm to their operations, as well as third party standing on behalf of their child clients. ECF 23-1, at

22–24. Defendants argue that Plaintiffs lack standing because an organization's unilateral resource prioritization cannot give rise to an injury-in-fact, and because, in Defendants' view, "[t]he harms identified by Plaintiffs are all theoretical and speculative." ECF 32-1, at 8–9. The Court finds that Plaintiffs have standing on both grounds.

For the purposes of organizational standing, "[w]hen an action 'perceptibly impair[s]' an organization's ability to carry out its mission and 'consequent[ly] drain[s] . . . the organization's resources,' 'there can be no question that the organization has suffered injury in fact.'" *N.C. State Conf. of the NAACP v. Raymond*, 981 F.3d 295, 301 (4th Cir. 2020) (alterations in original) (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982)). The Fourth Circuit has cautioned that "an organization's uncompelled choice to expend resources" cannot form the "sole basis" of organizational standing but has found organizational standing when plaintiffs alleged that the challenged actions forced them to divert funds from their "core mission." *Republican Nat'l Comm. v. N.C. State Bd. of Elections*, 120 F.4th 390, 396–97 (4th Cir. 2024). A district court in California found that immigration legal service providers had organizational standing when, "[b]y cancelling all funding for direct legal representation of unaccompanied children, the Government 'perceptibly impair[ed]' Plaintiffs' ability to fulfill their shared organizational mission" "of ensuring persons in immigration proceedings, including the uniquely vulnerable population of unaccompanied children, have legal representation." *Cmty. Legal Servs. in East Palo Alto v. U.S. Dep't of Health & Human Servs.*, 780 F. Supp. 3d 897, 912 (N.D. Cal. 2025) (quoting *East Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 663 (9th Cir. 2021)), *appeal docketed*, Civ. No. 25-2808 (9th Cir. May 1, 2025).

At this early stage, Plaintiffs have satisfied the standard to establish organizational standing. Far from seeking to "bootstrap standing by expending [their] resources in response to actions of another" as Defendants contend, ECF 32-1, at 8 n.3 (citations omitted), Plaintiffs

have shown that the challenged policies "impede [their] efforts to carry out [their] mission[s]" in a range of concrete ways. *Lane v. Holder*, 703 F.3d 668, 674 (4th Cir. 2012) (citing *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982)). Plaintiffs have provided affidavits from attorneys within each plaintiff organization attesting to the ways in which Defendants' challenged policies have drained their resources and impaired their ability to carry out their respective missions. *See, e.g.*, ECF 23-6, at 3 ¶ 5, at 22 ¶ 66 (declaration of Jessica Richardson on behalf of The Door) (describing The Door's mission "to provide its members with comprehensive services" including legal assistance in immigration cases and explaining how The Door has been forced to "significantly limit [its] intake of new unaccompanied children clients, especially those seeking asylum" which "threatens to severely undermine the level of comprehensive, trauma-informed legal representation that . . . The Door is committed to providing"); ECF 23-9, at 2 ¶ 4, at 13 ¶ 36, at 15 ¶ 41 (declaration of Elizabeth Sanchez Kennedy on behalf of GHIRP) (describing GHIRP's mission "to build a resilient, diverse community by providing comprehensive representation and holistic legal services to immigrants in need" and explaining how GHIRP now lacks "capacity to initiate representation with new clients" and has started a "started a community-wide pro bono project" in an attempt to address the gap in representation); ECF 23-11, at 23–25 ¶¶ 52–54 (declaration of Marion Donovan-Kaloust on behalf of ImmDef) (describing how ImmDef has been forced to "turn away many referrals of children whose cases [they] would otherwise take"; to pause their work on non-asylum-seeking clients, even when time-sensitive benefits were available; and also to divert "resources away from departments that do not typically handle children's cases"). As Plaintiffs explain, their "decisions to turn away new clients, to dedicate resources to recruiting outside attorneys, and to limit other core work because of USCIS's changed policies . . . are neither voluntary nor responses to 'perceived risks or isolated events,'" but are rather "direct

effects of USCIS's obstruction of Plaintiffs' core activities." ECF 53, at 5 (quoting ECF 32-1, at 10).

The harms Plaintiffs allege are also fairly traceable to the challenged policies, which together have the effect of forcing Plaintiffs to, in their own words, "drop everything, clear their schedules, coordinate next-morning transportation with the ORR[5] facility where their clients are detained, and arrange an interpreter just to give their client a shot at presenting some quantum of their claim for asylum."[6] ECF 1, at 22 ¶ 72; *see also Ass'n of Irritated Residents v. U.S. Env't Prot. Agency*, 10 F.4th 937, 943 (9th Cir. 2021) ("An injury is fairly traceable to a challenged action as long as the links in the proffered chain of causation are not hypothetical or tenuous and remain plausib[le]." (alteration in original) (internal quotations omitted) (quoting *Maya v. Centex Corp.*, 658 F.3d 1060, 1070 (9th Cir. 2011)). It is therefore likely that "the injury will be redressed by a favorable decision" enjoining the challenged policies. *South Carolina*, 912 F.3d at 726 (citations omitted).

The Court is also satisfied that Plaintiffs have third party standing to assert the rights of their child clients. "To overcome the prudential limitation on third-party standing, a plaintiff must demonstrate: (1) an injury-in-fact; (2) a close relationship between herself and the person whose right she seeks to assert; and (3) a hindrance to the third party's ability to protect his or

[5] "ORR" refers to the Office of Refugee Resettlement, which takes initial custody of any unaccompanied child encountered by federal officials. *See* ECF 1, at 5 ¶ 7, at 10 ¶ 24.

[6] Defendants argue that the harms Plaintiffs describe are "speculative" and contend that Plaintiffs "have not offered any evidence by way of declaration or affidavit to show that these injuries"—such as inability to attend a client's interview, or insufficient time to submit evidence—"have in fact occurred or are going to occur to them or their clients in the imminent future." ECF 32-1, at 9. This argument flatly ignores the declarations that Plaintiffs submitted detailing exactly those harms. *See, e.g.*, ECF 23-7, at 10 ¶ 24 (declaration of Laura Nally on behalf of Amica) (describing an evidentiary deadline for "the following business day" received at 4:00 p.m. on the Friday before a holiday weekend); ECF 23-9, at 14 ¶ 38 (Sanchez Kennedy Declaration) ("When we requested an explanation for how we possibly could be expected to appear for five simultaneous interviews, we were told that no further explanation would be provided.").

her own interests." *Freilich v. Upper Chesapeake Health, Inc.*, 313 F.3d 205, 215 (4th Cir. 2002) (citing *Powers v. Ohio*, 499 U.S. 400, 410–11 (1991)); *see also Maryland Shall Issue, Inc. v. Hogan*, 971 F.3d 199, 214–15 (4th Cir. 2020), *as amended* (Aug. 31, 2020). As explained above, Plaintiffs have established that they have suffered an injury-in-fact at an organizational level. Their attorney-client relationship with the unaccompanied children they represent is a "close relationship" for third-party standing purposes. *See Wikimedia Found. v. Nat'l Sec. Agency/Cent. Sec. Serv.*, 427 F. Supp. 3d 582, 617 n.65 (D. Md. 2019) ("Close relationships that have established third-party standing in the past include lawyer-client and doctor-patient." (citations omitted)). And, finally, unaccompanied children seeking legal status in the United States, many of whom are not yet reunited with family members or other close caregivers and have experienced significant trauma at a young age, face a sufficient "hindrance" to their ability to assert these rights on their own behalf. *See Mayor & City Council of Baltimore v. Trump*, 416 F. Supp. 3d 452, 490 (D. Md. 2019) (noting that immigrants face "obstacles in bringing [ ] suit on their own" as they may fear repercussions from the federal government); *see also* ECF 23-6, at 7 ¶¶ 22–23 (Richardson declaration) (explaining that unaccompanied children "are a vulnerable population, more likely to face trauma, exploitation, or instability" and that the "trauma they have experienced is often compounded by the prolonged detention in ORR"). The Court is satisfied that Plaintiffs have adequately alleged Article III standing.

**B. Application of the *Winter* Factors**

The Supreme Court has established four factors that must be satisfied for a court to grant a TRO or a preliminary injunction. *See Winter*, 555 U.S. at 20. "A plaintiff must make a 'clear showing' on each [*Winter*] factor to prevail." *Va. Rivers Coal., Inc. v. Chemours Co. FC, LLC*, 178 F.4th 102, 113 (4th Cir. 2026) (citing *Winter*, 555 U.S. at 22). The "clear showing" standard articulated in *Winter* presents a higher burden than showing a mere

"possibility" that each factor is satisfied. *See Real Truth About Obama, Inc. v. FEC*, 575 F.3d 342, 346 (4th Cir. 2009) ("[T]he Court in *Winter* rejected a standard that allowed the plaintiff to demonstrate only a 'possibility' of irreparable harm because that standard was 'inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief.'" (quoting *Winter*, 555 U.S. at 22)), *cert. granted, judgment vacated*, 559 U.S. 1089 (2010), *and adhered to in relevant part sub nom., The Real Truth About Obama, Inc. v. FEC*, 607 F.3d 355 (4th Cir. 2010). However, a plaintiff need not show a "certainty of success" for a TRO motion to be granted. *Ass'n of Am. Publishers, Inc. v. Frosh*, 586 F. Supp. 3d 379, 388 (D. Md. 2022) (quoting *Pashby v. Delia*, 709 F.3d 307, 321 (4th Cir. 2013)) (internal quotations omitted). The Court now turns to the four *Winter* factors.

1. <u>Likelihood of Success on the Merits</u>

Plaintiffs have established a likelihood of success on their APA claims. First, they have adequately alleged that each of the challenged policies constitutes a final agency action. *See* ECF 23-1, at 27–28. "[A]n agency action may be considered 'final' only when the action signals the consummation of an agency's decisionmaking process and gives rise to legal rights or consequences." *COMSAT Corp. v. Nat'l Sci. Found.*, 190 F.3d 269, 274 (4th Cir. 1999) (emphasis omitted) (citing *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997)).

Plaintiffs argue that the Inadequate Notice Policy is a final agency action because it "has been applied to all Plaintiffs, immediately interfering with Plaintiffs' effective representation of their clients" and because "public reporting indicates that USCIS has memorialized this policy in a written memorandum seeking to remove the 21-day notice requirement in the cases of unaccompanied children." ECF 23-1, at 27. Defendants argue that the Inadequate Notice Policy is not a final agency action because it "do[es] not exist, and there is no policy memo entitled 'Inadequate Notice Policy.'" ECF 32-1, at 11. Courts have found

final agency action based both on written memoranda and unwritten—and therefore unpublished—policies. *See Aracely, R. v. Nielsen*, 319 F. Supp. 3d 110, 138, 145–46 (D.D.C. 2018) (noting that "agency action need not be in writing to be judicially reviewable as a final action" and relying on written memoranda, among other factors, to find that plaintiffs were likely to establish the existence of an unwritten policy that was a final agency action). Therefore, the unpublished nature of the Inadequate Notice Policy does not preclude Plaintiffs from ultimately establishing that it is the consummation of Defendants' decision-making process—rather, "[c]ourts take a 'pragmatic" approach to finality."[7] *D.N.N. v. Bacon*, Civ. No. JRR-25-1613, 2025 WL 3525042, at *7 (D. Md. Dec. 9, 2025) (quoting *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 591 (2016)). Plaintiffs have also established that "legal rights or consequences" are implicated by this policy. *See infra* Section III.B.2 (discussing the likelihood of irreparable harm flowing from this policy).

[7] Moreover, although Plaintiffs allege that the memorandum only sought permission to *implement* this policy, it appears that request must have been granted since the practice is now in effect. *See* ECF 23-1, at 18. Defendants' argument that "there is no policy memo entitled 'Inadequate Notice Policy[,]'" ECF 32-1, at 11, fails to engage with the legal definition of final agency action, which does not require a written policy. *See Aracely, R.*, 319 F. Supp. 3d at 138. Defendants do not contend that the policy Plaintiffs uniformly describe experiencing is "merely tentative or interlocutory nature," *D.N.N. v. Bacon*, Civ. No. JRR-25-1613, 2025 WL 3525042, at *7 (D. Md. Dec. 9, 2025) (quoting *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997)), such that it cannot constitute a final agency decision. ECF 32-1, at 11. Defendants argue instead that the policy change detailed by attorneys who have extensive experience providing direct representation in this field simply "do[es] not exist." *Id.* If the alleged change in policy did not, in fact, occur, then Defendants should have no opposition to maintaining the status quo. Regardless, the argument that no express memorialization of a policy change exists would allow USCIS "to shield its decisions from judicial review simply by refusing to put those decisions in writing." *R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 184 (D.D.C. 2015) (internal quotations omitted). Such an attempt to sidestep the framework of judicial review set forth in the APA is not permitted. *See Am. Fed'n of State, Cnty. & Mun. Emps., AFL-CIO v. Soc. Sec. Admin.*, Civ. No. 25-1411, 2025 WL 1249608, at *52 (4th Cir. Apr. 30, 2025) (King, J., concurring) (addendum) (explaining that "[t]o satisfy the consummation element, the challenged agency action need not be formal action or reduced to writing" in part because otherwise agencies could avoid judicial review entirely (citations omitted)).

Plaintiffs argue that the Exceptional Circumstances Policy is a final agency action because "it has been published on the USCIS website, is framed in binding terms, and it has been implemented across the country, as shown in Plaintiffs' experiences from New York to Texas to California."[8] ECF 23-1, at 27. Courts have found plaintiffs are likely to establish final agency action in similar circumstances. *See J. Z. v. U.S Dep't of Homeland Sec.*, Civ. No. 26-01510 (AHA), 2026 WL 3015634, at *4 (D.D.C. Oct. 7, 2026) (finding plaintiff was likely to establish final agency action when, among other things, the defendants had "publicly announced the decision on their website"); *Am. Fed'n of Tchrs. v. Dep't of Ed.*, 779 F. Supp. 3d 584, 610 (D. Md. 2025) (explaining that "[a]n 'agency pronouncement will be considered binding as a practical matter if it either appears on its face to be binding, or is applied by the agency in a way that indicates it is binding'" and finding final agency action where, among other things, defendants had applied the policy "as if it [were] binding" (quoting *Gen. Elec. Co. v. EPA*, 290 F.3d 377, 383 (D.C. Cir. 2002))). And, as explained *infra*, at Section III.B.2, the legal rights of both Plaintiffs and their clients are impacted by this policy.

Plaintiffs have also established a likelihood of success on the merits of their claim that these policies are contrary to law. *See* ECF 23-1, at 32; *see also* 5 U.S.C. § 706(2)(A) (directing courts to "hold unlawful and set aside agency action . . . found to be . . . not in accordance with law").[9] Agencies are required to follow their own regulations, and when they fail to do so,

[8] Defendants again argue that this policy is not final because it "do[es] not exist" and "there is no policy memo entitled . . . 'Exceptional Circumstance Policy.'" ECF 32-1, at 11. However, as Plaintiffs observe, "[t]he Exceptional Circumstances Policy is published on the USCIS website and discussed in Defendants' opposition, so it is unclear how Defendants can credibly assert it does not exist." ECF 53, at 7; *see also* ECF 32-1, at 5 (describing the process "[t]o request an exceptional circumstance finding to reschedule an interview or for failure to appear" and citing the USCIS webpage containing the policy).

[9] Because the Court finds that Plaintiffs are likely to succeed on the merits of these "contrary to law" claims, located at Counts I and III, it does not reach their alternative argument that Defendants' actions were arbitrary and capricious, located at Counts II and IV. *See* ECF 1, at 32–38 ¶¶ 103–33.

their "actions are generally invalid" under the *Accardi* doctrine. *Nader v. Blair*, 549 F.3d 953, 962 (4th Cir. 2008) (citing *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 268 (1954)). USCIS regulations provide for the submission of evidence in support of an asylum application, "at least 14 calendar days in advance of the interview date." 8 C.F.R. § 208.9(e)(1).[10] Plaintiffs contend that the combination of the Inadequate Notice Policy and the Exceptional Circumstances policy "deprives Plaintiffs of the procedural protections guaranteed by regulation" by "notifying Plaintiffs and their unaccompanied child clients of their interviews *after* the 14-day deadline has passed and refusing to reschedule interviews to accommodate evidence submissions." ECF 23-1, at 32 (emphasis in original). The Court agrees.

Plaintiffs additionally contend that the Inadequate Notice Policy fails to follow the statutory mandate to "'take into account the specialized needs of unaccompanied [noncitizen] children' in both 'procedural and substantive aspects' of their cases." ECF 23-1, at 33 (alteration in original) (quoting 8 U.S.C. § 1232(d)(8)). The Court agrees that the minimal notice that Plaintiffs describe is incompatible with these statutory requirements. *See, e.g.*, ECF 23-8, at 8 ¶ 16 (declaration of Roxana Avila-Cimpeanu on behalf of the Florence Project) (describing the importance of a "slower pace" in preparing very young children for their asylum interviews to allow their attorneys to "locate and interview family members . . . who can shed light on the child's history" as well as to allow multiple meetings with clients who are "psychologically unable to share the full extent of their experiences after having just met with [Florence Project] staff for the first time and while still detained"); ECF 23-12, at 8 ¶ 27 (declaration of Sarah Hough on behalf of JFCS) ("Of paramount importance in doing asylum work for unaccompanied children is one simple factor—time."). Defendants contend that

---

[10] That regulatory provision also provides that asylum officers may exercise discretion to consider evidence received within the 14-day period. 8 C.F.R. § 208.9(e)(1). However, Plaintiffs contend that current USCIS policy prevents such an exercise of discretion. ECF 23-1, at 32 n.11.

USCIS is already taking the specialized needs of unaccompanied children into account by employing child-sensitive techniques during the asylum interview itself. ECF 32-1, at 13. However, the statute calls for such sensitivity in "both procedural *and* substantive aspects of handling unaccompanied alien children's cases." 8 U.S.C. § 1232(d)(8) (emphasis added). The use of sensitivity when addressing the substance of an unaccompanied child's asylum claim therefore does not absolve USCIS from its obligation to account for the specialized needs of unaccompanied child applicants in the procedure leading up to the interviews as well.

Plaintiffs further argue that the Exceptional Circumstances Policy "is contrary to law because it effectively denies unaccompanied children their right to counsel of their choosing" by, among other practices, double-booking a child's counsel of record and forcing counsel to choose which client to accompany. ECF 23-1, at 33; *see also* 8 C.F.R. § 208.9(b) (providing that an asylum applicant "may have counsel or a representative present" at their asylum interview); *Romero v. Bondi*, 150 F.4th 332, 347 (4th Cir. 2025) (determining that a petitioner "was denied a fundamentally fair removal hearing by the ineffective representation of her former counsel"). Defendants rely on a statutory provision providing for the dismissal of asylum applications if the applicant fails to appear "for any scheduled interview or hearing on their application 'in the absence of exceptional circumstances'" to argue that "the statute contemplates agency assessment of exceptional circumstances in administering interview and hearing schedules." ECF 32-1, at 15 (quoting 8 U.S.C §1158(d)(5)(A)(v)). However, that subsection provides in full that:

> in the case of an applicant for asylum who fails *without prior authorization* or in the absence of exceptional circumstances to appear for an interview or hearing, including a hearing under section 1229a of this title, the application may be dismissed or the applicant may be otherwise sanctioned for such failure.

8 U.S.C §1158(d)(5)(A)(v) (emphasis added). The statute therefore also contemplates the provision of prior authorization to reschedule asylum interviews as a distinct administrative tool—separated by the disjunctive "or" from the consideration of "exceptional circumstances."

*Id.* To the extent Defendants argue that the Exceptional Circumstances Policy is compelled by statute, the argument is unavailing. Plaintiffs have thus established a likelihood of success on these APA claims.

2. Irreparable Harm

The second *Winter* factor requires a showing of irreparable harm. "To establish irreparable harm, the movant must make a 'clear showing' that it will suffer harm that is 'neither remote nor speculative, but actual and imminent.'" *Mountain Valley Pipeline, LLC v. 6.56 Acres of Land, Owned by Sandra Townes Powell*, 915 F.3d 197, 216 (4th Cir. 2019) (quoting *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 812 (4th Cir. 1991)). Additionally, to be considered irreparable, the harm must be such that "it cannot be fully rectified by the final judgment after trial." *Maryland v. Noem*, 823 F. Supp. 3d 560, 570 (D. Md. 2026) (internal quotations omitted) (quoting *Mountain Vally Pipeline, LLC*, 915 F.3d at 216).

Plaintiffs argue that they and their unaccompanied child clients are experiencing irreparable harm as a result of Defendants' challenged policies. ECF 23-1, at 24–26. Plaintiffs contend that these policies have forced them "to forgo numerous fundamental components of their representation of unaccompanied children seeking asylum," thereby injuring their "core activities." *Id.* at 25. They additionally argue that "each instance of such fundamental governmental interference with Plaintiffs' ability to effectively represent their child clients is an irreparable harm." *Id.* Plaintiffs contend that many of their unaccompanied child clients have been, and will continue to be, forced "to proceed with asylum interviews without adequate preparation, without supplemental evidence to corroborate their asylum claims, and under medically dangerous conditions." *Id.* at 26. In Plaintiffs' view, these harms serve to deprive their child clients "of the ability to present a full application and to prepare for their one shot to tell their story in a non-adversarial context." *Id.* Defendants argue that Plaintiffs have not

established irreparable harm because "their alleged anticipated harm" is remote and speculative. ECF 32-1, at 16.

The Court is satisfied that Plaintiffs have established irreparable harm to themselves and to their clients. Plaintiffs describe a dire confluence of circumstances that prevent the meaningful representation of highly vulnerable children moving through the immigration system, which harms both Plaintiffs' core mission and the interests of their young clients. *See* ECF 1, at 21–22 ¶¶ 69–70 (describing how Plaintiffs may receive days'—or hours'—notice of an unaccompanied child's asylum interview, for which counsel may be double-booked, yet unable to reschedule under USCIS's policies). An unaccompanied child only has one chance to have a non-adversarial asylum adjudication. *See* 8 U.S.C. § 1158(b)(3)(C) (providing that the AO "shall have initial jurisdiction over any asylum application filed by" an unaccompanied child); 8 C.F.R. § 208.14(c)(1) (providing that following an asylum interview, if the AO does not grant the application, it "shall refer the application to an immigration judge" for removal proceedings if the applicant otherwise lacks legal status in the United States). That opportunity is rendered meaningless if an unaccompanied child's counsel is denied the opportunity to adequately prepare the child—or even to be physically present with them. *See* ECF 23-8, at 10 ¶ 23 (Avila-Cimpeanu declaration) (describing a case in which the Florence Project received 24 hours' notice of an asylum interview, the attorney of record was already scheduled for two immigration court hearings, and the client "was also scheduled for an EOIR hearing the same day, which was set to take place less than two hours after the noticed interview time").

As Plaintiffs note, "a final judgment cannot go back in time and enable Plaintiffs to provide effective representation to unaccompanied children at interviews that have already occurred" under the conditions caused by the challenged policies. ECF 53, at 6. Harm of this nature "cannot be fully cured by later remedial action[,]" especially given that Plaintiffs do not seek monetary damages. *Assoc. of Cmty. Cancer Ctrs. v. Azar*, 509 F. Supp. 3d 482, 501 (D.

Md. 2020) (citations omitted); *see also Handsome Brook Farm, LLC v. Humane Farm Animal Care, Inc.*, 700 F. App'x 251, 263 (4th Cir. 2017) (noting that irreparable harm may occur "when monetary damages are unavailable or unquantifiable" (citations omitted)). And as the Court explained *supra*, at note 6, the real-life experiences Plaintiffs describe in their sworn declarations can hardly be characterized as speculative. Plaintiffs have therefore established that they and their clients are suffering ongoing irreparable harm.

3. The Remaining *Winter* Factors

The final two factors—balance of equities, and public interest—merge when the government is a party. *City of Columbus v. Kennedy*, 796 F. Supp. 3d 123, 139 (D. Md. 2025) (citing *Nken*, 556 U.S. at 435). Defendants argue that these factors weigh against the grant of a TRO because such an order would "displace USCIS's operational judgment concerning how to manage affirmative-asylum interviews[.]" ECF 32-1, at 17. Plaintiffs argue that "[t]he government and public cannot claim 'public interest in the perpetuation of unlawful agency action.'" ECF 23-1, at 34 (quoting *City of Columbus*, 796 F. Supp. 3d at 174). Given the Court's conclusion regarding their likelihood of success in establishing that the challenged actions are contrary to law, the Court agrees with Plaintiffs on that ground. *See Am. Fed'n of Tchrs. v. Bessent*, 779 F. Supp. 3d 482, 505 (D. Md. 2025) ("There is generally no public interest in the perpetuation of unlawful agency action. And there is a strong public interest in curing the effects of the government's unlawful acts." (citations omitted) (cleaned up)).

Although, as Defendants contend, the government holds an interest in adjudicating asylum claims, that interest can be met in a manner consistent with Congress's statutory mandate to "take into account the specialized needs of unaccompanied alien children," 8 U.S.C. § 1232(d)(8), as it apparently was prior to the implementation of the challenged policies. Plus, it is difficult to maintain that the public has an interest in the perpetuation of a chaotic system that may result in vulnerable children being wrongfully removed to places where they may

suffer abuse, or even death. *See Nken*, 556 U.S. at 436 ("Of course there is a public interest in preventing aliens from being wrongfully removed, particularly to countries where they are likely to face substantial harm.").[11] Moreover, at this stage, Plaintiffs only seek a temporary restraining order which will, by necessity, expire 14 days after its issuance (unless extended) and thereby provide Defendants the opportunity for additional briefing to respond with any arguments to the contrary they identify. *See* Fed. R. Civ. P. 65(b)(2).

**C. Section 705 Stay**

A stay under Section 705 of the APA is a form of relief that is distinct from a TRO under Rule 65.[12] *See Coal. for Humane Immigrant Rights v. Noem*, 805 F. Supp. 3d 48, 105

---

[11] The *Nken* Court was assessing the propriety of a stay pending resolution of an appeal involving the removal of undocumented immigrants and warned that the fact that the public lacks an interest in wrongful removals "is no basis for the blithe assertion of an 'absence of any injury to the public interest' when a stay is granted." *Nken*, 556 U.S. at 436. But the *Nken* Court, which was faced with the argument that pausing the removal of undocumented immigrants results in "no offsetting injury" to the government, was careful to note that "[t]he interest in prompt removal may be heightened by the circumstances as well—if, for example, the alien is particularly dangerous, or has substantially prolonged his stay by abusing the processes provided to him." *Id.* The case at bar presents a different scenario, as the Court has acknowledged and considered the government's legitimate interest in adjudicating asylum claims. Plus, it is difficult to credibly argue that unaccompanied children, often just a few years old, *see* ECF 23-6, at 7 ¶ 22, pose a threat to public safety or are somehow scheming to abuse the asylum process. Thus, the Court does not rest its finding on the final *Winter* factors on any assertion that the government suffers no "offsetting injury" compared to Plaintiffs', *Nken*, 556 U.S. at 436 (citation omitted), but instead finds that any harm to the government is minimal and that the public interest is better served by an orderly and fair asylum process for children and their advocates.

[12] This distinction permits the Court's order to be nationwide in scope, despite the Supreme Court's decision in *Trump v. CASA, Inc.* ("*CASA*") prohibiting district courts from entering nationwide injunctive relief. *See* 606 U.S. 831, 851 (2025) (determining that courts may not award preliminary injunctive relief to nonparties). A district court in Maine, noting that "*CASA* declined to 'resolve[ ] the distinct question whether the [APA] authorizes federal courts to vacate federal agency action,'" found authority under the APA to enter a preliminary injunction "based in part on a finding that the government's application approvals likely violated the APA" that "need not be limited to [p]laintiffs." *Am. Hosp. Assoc. v. Kennedy*, 820 F. Supp. 3d 30, 47 (D. Me. 2025) (quoting *CASA*, 606 U.S. at 847 n.10 (alteration in original)); *see also City of Columbus*, 796 F. Supp. 3d at 176 (noting that "Justice Kavanaugh's concurrence highlighted that, even after *CASA*, 'plaintiffs may ask a court to preliminarily set aside a new agency rule' 'in cases under the Administrative Procedure Act.'" (quoting *CASA*, 606 U.S. at 869 (Kavanaugh, J., concurring) (cleaned up))); *Ass'n of Am. Univs. v. Dep't of Defense*, 792

(D.D.C. 2025) (refusing to impose a bond requirement because plaintiffs sought "a stay under APA section 705, which is neither a preliminary injunction nor a temporary restraining order"), *rev'd on other grounds*, 185 F.4th 1275 (D.C. Cir. 2026).[13] However, the same factors govern the issuance of both stays under the APA and TROs. *See Casa de Maryland, Inc.*, 486 F. Supp. 3d at 950 (quoting *Dist. of Columbia*, 444 F. Supp. 3d at 16) (collecting cases). This Court has found the relief under Section 705 and Rule 65 to be intertwined, explaining that "just as vacatur would likely be the appropriate remedy at the final judgment stage under the APA, 5 U.S.C. § 706—the proper provisional remedy under Rule 65 and § 705 is a stay of the [g]overnment's" challenged actions. *Maryland v. U.S. Dep't of Agric.*, 770 F. Supp. 3d 779, 818 (D. Md. 2025) ("*Maryland v. USDA*"), *reversed on other grounds*, 151 F.4th 197 (4th Cir. 2025). A stay under Section 705 may be appropriate even where the challenged action has already occurred. *See id.* at 792, 818–19 (considering a challenge to the government's termination of probationary employees when such termination had already occurred, and granting a stay under both Rule 65 and Section 705).

---

F. Supp. 3d 143, 182 (D. Mass. July 18, 2025) (finding that "a stay under the APA" is not "subject to the same limitations espoused in *CASA*"); *African Comtys. Together v. Venturella*, Civ. No. 25-cv-6366 (PKC), 2026 WL 2949409, at *16 (S.D.N.Y. Sept. 30, 2026) (finding itself bound under Second Circuit precedent to vacate agency action that violated the APA since *CASA* did not resolve the question of vacatur under the APA). Defendants do not argue to the contrary and do not mention *CASA* in their response. *See generally* ECF 32 (including no mention of *CASA* or the permissibility of nationwide injunctive relief); *see also* ECF 53, at 14 (noting that "Defendants do not dispute that . . . the ordinary and most appropriate remedy under 5 U.S.C. § 705 is a universal stay of these policies, not limited to the named Plaintiffs").

[13] The Court notes that here Plaintiffs seek both an APA stay and a TRO, but given that Defendants do not request a bond, *see generally* ECF 32, and any bond imposed would be nominal, the Court finds that no bond is necessary. *See City of Columbus*, 796 F. Supp. 3d at 177 ("Because the Court is issuing a stay under § 705, not a preliminary injunction, the Court declines to require a bond."); *see also Maryland v. Noem*, 823 F. Supp. 3d at 572 (setting a nominal bond of $100 and quoting *Maryland v. United States Dep't of Agric.*, 770 F. Supp. 3d 779, 820 (D. Md. 2025) for the proposition that "[a]lthough the risk of harm to the Government is not remote, the potential cost of an improvidently granted TRO on the federal government is too complex to calculate in this expedited proceeding").

The Court finds that a stay under Section 705 is warranted. As explained above, Plaintiffs have satisfied the factors necessary to warrant issuance of a TRO—the same factors that govern the issuance of a Section 705 stay. *See Casa de Maryland, Inc.*, 486 F. Supp. 3d at 950. Although Defendants have already enacted the challenged policies, a stay in these circumstances is consistent with the Court's authority to vacate agency action that violates the APA. *See Am. Hosp. Assoc. v. Kennedy*, 820 F. Supp. 3d 30, 47 (D. Me. 2025) (noting that "courts have long understood the APA to authorize vacatur and the Supreme Court has yet to dictate otherwise" when issuing preliminary injunctive relief under Section 705 (citing *Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799, 839 (2024) (Kavanaugh, J., concurring))); *see also Maryland v. USDA*, 770 F. Supp. 3d at 792, 818–19 (granting Section 705 stay where challenged action had already occurred).

## IV. <u>CONCLUSION AND ORDER</u>

For the foregoing reasons, Plaintiffs' motion for a temporary restraining order is **GRANTED**. It is this 30th day of October, 2026, at 12:00PM ORDERED that:

(1) Plaintiffs' motion for a stay under the APA and temporary restraining order, ECF 23, is GRANTED;

(2) USCIS's policy of providing less than 21 days' notice of asylum interviews to unaccompanied child applicants (as defined by 6 U.S.C. § 279(g)(2)) and their counsel ("Inadequate Notice Policy") is hereby STAYED under 5 U.S.C. § 705;

(3) Defendants shall reinstate USCIS's policy of generating written notice at least 21 days prior to a scheduled asylum interview and promptly sending such notice to applicants and their counsel;

(4) USCIS's policy requiring "exceptional circumstances" to reschedule an asylum interview ("Exceptional Circumstances Policy") is hereby STAYED under 5 U.S.C. § 705;

(5) Defendants, their agents, representatives, and all persons or entities acting in concert with them shall reinstate USCIS's prior policy of allowing applicants to reschedule their asylum interviews once as a matter of course and again for good cause, taking into consideration counsel's ability to be present with their client at the interview, manage scheduling conflicts, gather and submit evidence, and prepare their client; the child's ability to attend the interview; and whether the child and/or counsel received inadequate notice under the Inadequate Notice Policy;

(6) Defendants shall file a status report within forty-eight (48) hours describing all steps Defendants have taken to comply with this order; AND

(7) This Order shall EXPIRE at 12:00PM on Friday November 13, 2026, unless the Court orders otherwise.

Dated: October 30, 2026

Brendan A. Hurson
United States District Judge