**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| THE DOOR, *et al*.<br><br>Plaintiffs,<br><br>v.<br><br>JOSEPH B. EDLOW, DIRECTOR, USCIS, *et al.*<br><br>Defendants. | Civil Action No. 8:26-cv-04326-BAH |

**DEFENDANTS' MOTION FOR RECONSIDERATION**

Under the previous administration the United States experienced an unprecedented surge of aliens at the Southwest border. Unfortunately, many of those aliens were Unaccompanied Alien Children (UACs) with no adult guardians. Sadly, many UACs were trafficked by cartels and others in an attempt to exploit vulnerabilities in our immigration system. One such vulnerability was that the surge of aliens resulted in a tsunami of asylum claims and a lack of holding facilities. UACs also raised asylum claims. Given the sheer number of asylum claims, USCIS faced a substantial backlog in interviewing aliens and processing asylum claims. In addition, those representing UACs would often request rescheduling interviews. Under previous USCIS policies, the initial request would be granted as a matter of course and future reschedulings would be readily granted for "good cause." This could result in UACs being held in HHS custody for months and months before even getting an asylum interview, at substantial cost to the Government and the UACs. And because of the *Flores* consent decree, HHS has to release UACs to "capable and willing" sponsoring adults, even if they cannot be verified as relatives. As a result, the previous

administration released around 300,000 UACs whose whereabouts could not be verified, often because they were released to "sponsors" engaged in fraud.

Under President Trump's leadership, DHS, DOJ, and HHS have prioritized reducing illegal immigration and protecting UACs. That objective has been wildly successful. Encounters at the border, including for UACs, are down to historic levels. As part of this policy, USCIS is also prioritizing the asylum claims of UACs. But because of the preexisting backlog of asylum claims, asylum interviews for UACs are still lagging behind, leaving UACs in custody or requiring release to various adults. This issue is compounded by the fact that those representing UACs can readily reschedule interviews potentially months out multiple times. Focusing on the needs of UACs, USCIS stopped allowing for automatic grants for initial rescheduling requests and required exceptional circumstances for all requests. USCIS will of course consider concerns lawyers have with double bookings and impracticalities. But that cannot justify routinely delaying interviews by long periods where UACs remain in limbo. The purpose of this policy is to quickly adjudicate UAC asylum claims so they can either be granted and placed within the United States or other proceedings can move forward with the goal of safely returning UACs to their families abroad. That may not be in the interests of the advocates seeking to halt this important policy change, but it is in the long term interests of UACs.

Respectfully, this Court's swiftly entered Temporary Restraining Order (Doc. No. 54) and disrupted that policy without adequately considering these important goals or the consequences. Defendants, by and through their undersigned counsel, therefore move for reconsideration of the Court's Temporary Restraining Order for the reasons set forth below. Defendants respectfully request that this Court grant their Motion and upon reconsideration, dissolve the Order entered on October 30, 2026, granting a temporary restraining order and stay of agency action under 5 U.S.C. § 705.

## I. Background

Between fiscal years 2021 and 2024, the United States experienced a substantial surge of aliens at the Southwest border, including a record number of children. *See* Declaration of Ted Kim, Associate Director, Refugee, Asylum and International Operations Directorate, U.S. Citizenship and Immigration Services, U.S. Department of Homeland Security, ¶ 8. (Kim Decl.) (Attached hereto at "Exhibit A"). This included at least 475,000 UACs without adult guardians.[1] Many of those UACs were trafficked by cartels and others that victimized the UACs in order to exploit vulnerabilities in the immigration system.[2] One such vulnerability was a massive increase in asylum claims, including from UACs, resulting in a substantial backlog. Kim Decl. ¶ 8. Those representing UACs would also often request rescheduling interviews. *Id.* ¶¶ 11, 15. Under previous USCIS policies, the initial request would be granted as a matter of course and future reschedulings would be readily granted for "good cause." *Id.* This could result in UACs being held in HHS custody for months and months before even getting an asylum interview, at substantial cost to the Government and the UACs. *Id.* And because of the *Flores* consent decree, HHS has to eventually release UACs to "capable and willing" sponsoring adults, even if they cannot be verified as relatives. *See Flores v. Barr*, 407 F. Supp. 3d 909, 916 (C.D. Cal. 2019) (quoting *Flores* Settlement). As a result, the previous administration released around 300,000 UACs whose

[1] *See* Department of Justic, *DOJ, DHS, HHS Hold Press Conference on Efforts to Safeguard Unaccompanied Alien Children*, Press Conference Video (June 11, 2026), at :37-12:00 (Video); Office of Refugee Resettlement, Administration for Children and Families, *Summary Report on Fraud Perpetrated by Potential and Actual Sponsors in the Unaccompanied Alien Children Program*, Oct. 6, 2026, https://acf.gov/system/files/filefield_paths/CLEAN---ORR-MEMO_Final_.2-PDF.pdf (ORR Report).

[2] *See* Video at :37-3:00; DHS, *Secretary Noem & President Trump Take Sledgehammer to Human Trafficking Networks Thanks to Robust Defense of the Homeland, Crackdown on Cartels*, Jan. 22, 2026, https://www.dhs.gov/news/2026/01/22/secretary-noem-president-trump-take-sledgehammer-human-trafficking-networks-thanks (Trafficking Release).

.

whereabouts could not be verified, often because they were released to "sponsors" engaged in serious fraud. Video at 37:-3:00; ORR Report; Trafficking Release.

Since January 2025, there has been a dramatic reduction in illegal immigration at the border and a correlating decrease in the number of referrals for fear screenings. Kim Decl. ¶ 9. USCIS is, however, still working through the immense backlog of asylum applications filed by aliens who entered the United States through the Southwest border during the surge, keeping some UACs in limbo. *Id*. As a result, USCIS recently implemented procedures to expedite the processing of asylum applications filed by UACs in the custody of the Office of Refugee Resettlement (ORR). Kim Decl.¶ 10. Under these procedures, asylum officers may, at their discretion, schedule interviews for UACs in ORR custody with 24 hours to seven days' notice. *Id*. The objective is to ensure that vulnerable children receive timely decisions on their asylum claims. USCIS also revised its interview rescheduling policy. Previously, applicants could generally obtain an automatic first rescheduling and later request additional postponements upon a showing of "good cause." *Id.* ¶ 11. Under the revised approach, interview rescheduling is limited to situations involving "exceptional circumstances." *Id*. USCIS officers will of course consider overlapping schedules for attorneys and representatives of UACs, but this cannot justify automatic rescheduling or months long delays. *Id.* ¶ 17. At bottom, USCIS adopted this standard to improve efficiency, address the substantial affirmative asylum backlog, and more closely align practice with existing regulations. *Id*. ¶¶ 11, 18.

The statutory framework governing UACs frequently involves overlapping administrative and judicial proceedings. *Id.* ¶ 14. Under 8 U.S.C. § 1158(b)(3)(C), USCIS retains initial jurisdiction over asylum applications filed by UACs, including when removal proceedings are already pending. *Id*. At the same time, children may be pursuing other forms of immigration relief

before immigration courts. *Id*. Efficient coordination between the affirmative asylum process and immigration court proceedings helps avoid duplicative appearances, repeated continuances, delayed adjudications, and uncertainty regarding the proper procedural path. *Id*.

USCIS has determined that repeated interview postponements can significantly hinder the timely resolution of UAC cases. *Id.* ¶ 15. When interviews are postponed for prolonged periods, the child's affirmative asylum case may remain unresolved while parallel removal proceedings are delayed, creating administrative backlogs and extending uncertainty for the child. Based on USCIS' experience, UACs, who are mostly represented, routinely reschedule interviews for months at a time. As a result, UACs can remain in custody for longer. *Id*.

The manner in which USCIS schedules and interviews is designed to move asylum cases forward, which is at the very core of the Asylum Division's mission, while retaining a mechanism for rescheduling in genuinely exceptional circumstances, promoting orderly adjudication and preventing UACs from being left in an extended and indeterminate immigration process. *Id.* ¶ 16. The purpose of this change is to prioritize and speed up the resolution of asylum claims for UACs given their particular vulnerabilities. *Id*.

Limiting rescheduling to exceptional circumstances ensures that rescheduling remains available for serious, case-specific issues, while preventing routine postponements from becoming an open-ended source of delay, which wastes the Asylum Division's limited adjudicative resources. Kim Decl. ¶ 17. That is especially true for the previous practice of automatically granting the first rescheduling request irrespective of need. *Id*. This standard does not eliminate USCIS's ability to consider an applicant's circumstances; rather, it focuses rescheduling decisions on whether the facts demonstrate a compelling reason to depart from the scheduled interview date. *Id*. Although individualized considerations take into account factors such as the unavailability of an attorney or

legal representative, it is generally unnecessary to wait an additional 21 days or more before the UAC can meet with an asylum officer to resolve their asylum case at a rescheduled interview. *Id.* USCIS will certainly consider rescheduling requests based on an attorney or representative having overlapping appointments for different clients. *Id.* But that should not be a basis to delay interviews for UACs by months at a time, leaving them in limbo. *Id.*

USCIS views the policy as consistent with Congress's recognition that failure to appear for a scheduled asylum interview or hearing, absent exceptional circumstances, may result in dismissal of an asylum application. *Id.* ¶ 18. The revised procedures are intended to promote predictable scheduling, efficient allocation of adjudicative resources, and prompt case resolution, while still permitting rescheduling when serious circumstances justify it.

These scheduling and rescheduling policies were intended to advance, rather than undermine, the interests of UACs and asylum seekers generally. *Id.* ¶ 12. UACs are a particularly vulnerable population, often separated from family members while their immigration cases remain pending. *Id.* Prompt asylum interviews reduce uncertainty and may shorten the time a child spends in a restrictive custodial setting. *Id.* A prompt affirmative asylum interview allows USCIS to decide whether it can grant asylum, which may resolve the child's immigration matter while avoiding further proceedings and/or an adversarial setting. *Id.* ¶ 13. If asylum cannot be granted, prompt adjudication allows the case to proceed to the next stage without prolonged procedural delay. *Id.* DHS can then help ensure that UACs without a legal path to remain in the United States can be safely reunited with their families abroad as quickly as possible. *Id.* ¶¶ 17-19. At the end of the day, the policy changes are designed to prioritize UAC asylum claims so they can be safely placed faster rather than being stuck in limbo and custody. *Id.*

Timely interview scheduling is especially important for children because the delay itself may cause harm. *Id.* ¶ 19. A child who has fled violence, persecution, trafficking, abuse, or neglect has a substantial interest in receiving a prompt determination regarding protection and immigration status. *Id*. Efficient scheduling, completion of interviews, and adjudications reduce the risk that a child's case becomes stalled between agencies, subject to a stale claim, or delayed by repeated rescheduling and continuances, unrelated to the merits of the application. *Id*. This policy is thus an important part of the administration's attempt to protect UACs, prevent abuses of the immigration system, and detertraffickers from exploiting UACs to obtain various benefits.

## II. Legal Background

The Court's ruling was interlocutory in nature because it did not result in entry of final judgment ending this litigation. Where the order at issue is interlocutory, Rule 54(b) governs whether the Court should reconsider a prior ruling. An interlocutory order "may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities." Fed. R. Civ. P. 54(b). Rule 54(b) allows district courts "broader flexibility" than Rules 59(e) and 60(b) to revise their prior orders "as the litigation develops and new facts or arguments come to light." *Carlson v. Bos. Sci. Corp.*, 856 F.3d 320, 325 (4th Cir. 2017). This is because "[t]he ultimate responsibility of the federal courts, at all levels, is to reach the correct judgment under law." *Am. Canoe Ass'n v. Murphy Farms, Inc.*, 326 F.3d 505, 515 (4th Cir. 2003). Thus, a court may revise an interlocutory order under the same circumstances in which it may depart from the law of the case: (1) "a subsequent trial produc[ing] substantially different evidence," (2) a change in applicable law, or (3) clear error causing "manifest injustice." *Canoe Ass'n*, 326 F.3d at 515.

## III. Argument

### A. The Court committed clear error when it found that USCIS policies are contrary to law.

In its Order, the Court found that the USCIS policies at issue in these proceedings were likely contrary to law and thus the Plaintiffs were likely to succeed on the merits. Success on the merits is the first factor in the *Winter* analysis. *See Frazier v. Prince George's Cnty.*, 86 F.4th 537, 543 (4th Cir. 2023). The Court's finding was based on an incorrect interpretation of fact and law and established clear error.

Here, the Court's Order demands a 21-day notice requirement that is not otherwise required by law. ECF 54 at 20. USCIS policy previously noted that its automated system issued notices "approximately" 21-days before the interview. *See* USCIS, Affirmative Asylum Procedures Manual (Feb. 2025) at § II.G(2)(a), available at https://www.uscis.gov/sites/default/files/document/guides/AAPM.pdf (last visited Nov. 2, 2026). This was not a requirement of federal law but a function of that system. As no such law exists, any policy created to reduce that time could not be contrary to law.

The only deadline at issue in this matter codified in the Code of Federal Regulations is the 14-day deadline to provide supplemental evidence before the interview occurs. *See* 8 C.F.R. § 208.9(e)(1). These two deadlines are not at odds. If an applicant received notice of their interview after the 14-day deadline, USCIS policy still permits that an asylum officer "may" consider the evidence or reschedule the hearing. *See* USCIS, ALERT: Updated Evidence Submission Policy for Affirmative Asylum Applications, https://www.uscis.gov/humanitarian/refugees-and-asylum/asylum (last visited Nov. 2, 2026). This policy allows for any last-minute evidence to be admitted at the officer's discretion.

Importantly, the 14-day deadline serves merely as a restriction on the interviewee and cannot be redirected to create a restriction and new regulation on USCIS. The interviewee and their representative are aware from the time they submit their application that all evidence must be submitted prior to the interview and the setting of the interview date does not create a signal to begin collecting that information but a notice that the period is closing. Ultimately, the 14-day deadline is still applicable as required by the CFR and the asylum officer's discretion in accepting that evidence protects the interviewee.

Finally, as the Court noted, 8 U.S.C. § 1232(d)(8) requires that applicable regulations take into account the specialized needs of unaccompanied alien children. *See* ECF 54 at 14. USCIS therefore must account for the specialized need of unaccompanied child applicants to have their applications adjudicated timely and finality brought to their proceedings. By instituting policies and procedures that limit and restrict unnecessary delays in these proceedings, USCIS can timely adjudicate these cases. Indeed, "[a] child who has fled violence, persecution, trafficking, abuse, or neglect has a substantial interest in receiving a prompt determination regarding protection and immigration status. Efficient scheduling, completion of interviews, and adjudications reduce the risk that a child's case becomes stalled between agencies, subject to a stale claim, or delayed by repeated rescheduling and continuances, unrelated to the merits of the application." Kim Decl. ¶ 19. The entire point of the policy change is to ensure UAC asylum claims are prioritized so they can quickly be granted asylum or other proceedings can proceed so they can be placed or safely reunited with their family abroad. *Id.* ¶¶ 12, 17-19. It is not in UACs interests to be stuck in limbo for months due to rescheduling in HHS custody or released to "sponsors" who may be engaged in fraud. *Id.*; Orr Report; Video at :37-3:00; Trafficking Release. Thus, this Court failed to consider how this policy is designed to substantively and procedurally account for the specialized needs of

UACs. By forcing USCIS to reimpose its previous policy based on the say so of Plaintiffs, this Court supplanted USCIS's determination of what is best for UACs with Plaintiffs' determination. The regulations allow for no such thing.

Simply put, the Court's finding that USCIS's policies at issue are contrary to law does not adequately account for what the applicable law actually allows. USCIS's now-enjoined policies align with the strictures of the relevant law, and the Court's stay of said policies was erroneous.

**B. The Court cannot impose its own notion of what procedure is proper.**

The Court may dislike USCIS's policies but, as noted, they are in accordance with applicable law—and courts are not empowered to impose upon federal agencies their own idea of what procedure would be best or proper. *Vermont Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.* ("*Vermont*"), 435 U.S. 519, 549 (1978).

While "[a]gencies are free to grant additional procedural rights in the exercise of their discretion," courts are "generally not free to impose them if the agencies have not chosen to grant them." *Id.* at 524; *cf. id.* ("This is not to say necessarily that there are no circumstances which would ever justify a court in overturning agency action because of a failure to employ procedures beyond those required by the statute. *But such circumstances, if they exist, are extremely rare*.") (emphasis added). To be sure, the Supreme Court has "emphasized that the formulation of procedures was basically to be left within the discretion of the agencies to which Congress had confided the responsibility for substantive judgments." *Id.* Courts should "not stray beyond the judicial province to explore the procedural format or to impose upon the agency its own notion of which procedures are 'best' or most likely to further some vague, undefined public good." *Id.* at 549.

The Court has strayed beyond its province by staying a lawful policy, as applied to more than the Plaintiffs, by forcing USCIS to return to the prior policy. As explained above, the Court's Order demands a 21-day notice requirement that is not otherwise required by law, and the 14-day deadline is still applicable and appropriately applied under the policies. Upon reconsideration, the Court should leave the "formulation of [the relevant] procedures . . . within the discretion of the agenc[y] to which Congress had confided the responsibility for substantive judgments." *Id.* at 524. Accordingly, the Court should dissolve its October 30, 2026 Order.

**C. The Equities Favor Reconsideration**

In granting a Temporary Restraining Order, this Court credited Plaintiffs claims of irreparable harm. But this Court downplayed the other side of the ledger. The evidence presented in this motion demonstrates that the equites cut sharply against any injunctive relief and require dissolving the TRO. As explained, the surge of illegal immigration from 2021 to 2024 included at least 475,000 UACs without guardians. Video at :37-3:00; ORR Report. Many of those UACs were trafficked by cartels and victimized. *Id.*; Trafficking Release. The massive surge in illegal immigration resulted in a massive backlog of asylum claims, including for UACs. Kim Decl. ¶ 8. That backlog, combined with the previous USCIS policy of granting initial rescheduling requests and readily granting further requests, would result in substantial delays in UACs even getting asylum interviews. Kim Decl. ¶¶ 8, 11, 15. As a consequence, UACs could be held in HHS custody for months. *Id.* Worse yet, UACs who were held too long often had to be released to "sponsoring" adults who used fraud to get the UACs released. Video at 37:-3:00; ORR Report; Trafficking Release. The previous administration thus lost track of 300,000 of these released UACs. *Id.*

USCIS's procedures are designed to quickly provide asylum interviews for UACs and to otherwise prioritize their claims. Kim Decl. ¶ 10. The objective is to ensure that vulnerable children

receive timely decisions on their asylum claims. *Id.* ¶ 12. Prompt asylum interviews reduce uncertainty and may shorten the time a child spends in a restrictive custodial setting. *Id*. It allows USCIS to decide whether it can grant asylum, which may resolve the child's immigration matter while avoiding further proceedings and/or an adversarial setting. *Id.* ¶ 13. If asylum cannot be granted, prompt adjudication allows the case to proceed to the next stage without prolonged procedural delay. *Id*. DHS can then help ensure that UACs without a legal path to remain in the United States can be safely reunited with their families abroad as quickly as possible. *Id.* ¶¶ 17-19. At the end of the day, the policy changes are designed to prioritize UAC asylum claims so they can be safely placed faster rather than being stuck in limbo and custody. *Id.*

USCIS has determined that repeated interview postponements can significantly hinder the timely resolution of UAC cases. *Id.* ¶ 15. When interviews are postponed for prolonged periods, the child's affirmative asylum case may remain unresolved while parallel removal proceedings are delayed, creating administrative backlogs and extending uncertainty for the child. *Id.* Based on USCIS' experience, UACs, who are mostly represented, routinely reschedule interviews for months at a time. *Id*. The manner in which USCIS schedules and interviews is designed to move asylum cases forward, which is at the very core of the Asylum Division's mission, while retaining a mechanism for rescheduling in genuinely exceptional circumstances, promoting orderly adjudication and preventing UACs from being left in an extended and indeterminate immigration process. *Id.* ¶ 16. The purpose of this change is to prioritize and speed up the resolution of asylum claims for UACs given their particular vulnerabilities. *Id*. By enjoining this change in policy, the Court has deprived USCIS and UACs of those benefits and imposed an arcane policy on everyone. While that might benefit the advocates challenging the policy, it clearly does not serve the long term interests of UACs, harms Defendants, and disserves the public interest.

**D. The scope of the Court's October 30, 2026 Order is unlawful.**

The Court's Order stays "USCIS's policy of providing less than 21 days' notice of asylum interviews to unaccompanied child applicants"—without any limitation as to the applicable scope. ECF No. 54 at 20. The Court's Order is therefore impermissibly broad because its applicability extends beyond the particular Plaintiffs in this case. Thus, even if this Court were to still find that some form of equitable relief is warranted, the Court must narrowly tailor that relief to the specific Plaintiffs before the Court, rather than issuing sweeping, nationwide injunctive relief or a universal stay under APA § 705. Such relief cannot be squared with *CASA*. *Trump v. CASA, Inc.* ("*CASA*"), 606 U.S. 831 (2025).

Plaintiffs sought a stay pursuant to APA § 705, and injunctive relief returning the status quo. *See* ECF No. 1 at 41. But both kinds of relief are subject to the same equitable principles. That is because § 705 was designed "to reflect existing law . . . and not to fashion new rules of intervention for District Courts." *Sampson v. Murray*, 415 U.S. 61, 68 n.15 (1974). And when a court crafts equitable relief, it is bound to issue at most "complete relief *between the parties*." *CASA*, 606 U.S. at 851 (quoting *Kinney-Coastal Oil Co. v. Kieffer*, 277 U.S. 488, 507 (1928)). The Court cannot evade the strictures of temporary restraining orders by simply relying on the APA. *See Immigrant Defs. L. Ctr. v. Noem*, 145 F.4th 972, 995 (9th Cir. 2025) (applying equitable principles including *CASA* to 705 stays)

Accordingly, "the question is not whether an injunction offers complete relief to everyone potentially affected by an allegedly unlawful act; it is whether an injunction will offer complete relief to *the plaintiffs before the court*." *Id*. at 852 (emphasis added). Here, Plaintiffs can reschedule interviews and request more time for interviews without requiring USCIS to restore its previous policy for every UAC asylum interview. As such, if the Court does not dissolve its October 30,

2026 Order, it should at least narrow the scope of its Order to the specific Plaintiffs and their clients.

## IV. Conclusion

For the above reasons, the Court should grant this motion to reconsider and dissolve its October 30, 2026 Order.

Dated: November 3, 2026

Respectfully submitted,

Kelly O. Hayes
United States Attorney

*/s/ Dayna Kipnis*
Dayna Kipnis, Bar number: 13673
Assistant U.S. Attorney
U.S. Attorney's Office, District of Maryland
36 S. Charles Street, 4th Fl.
Baltimore, MD 21201
Dayna.Kipnis2@usdoj.gov
(410) 209-4800