**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**GREENBELT DIVISION**

| | |
|---|---|
| The Door, *et al.*,<br><br>*Plaintiffs,*<br>vs.<br><br>Joseph B. Edlow, *et al.*,<br><br>*Defendants.* | Case No. 8:26-cv-04326-BAH |

# MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND STAY AND OPPOSITION TO DEFENDANTS' MOTION FOR RECONSIDERATION OF TEMPORARY RESTRAINING ORDER

## TABLE OF CONTENTS

Page

**INTRODUCTION** ........ 1

**FACTUAL BACKGROUND** ........ 3

USCIS's Inadequate Notice and Exceptional Circumstances Policies ........ 4

EOIR's Detained Docket Deadline ........ 6

**ARGUMENT** ........ 9

I. Plaintiffs Are Likely to Succeed on the Merits of Their Claims ........ 10

A. USCIS's Inadequate Notice Policy and Exceptional Circumstances Policy Violate the APA ........ 11

1. USCIS's Challenged Policies Are Final Agency Actions ........ 11

2. USCIS's Challenged Policies Are Contrary to Law ........ 12

3. USCIS's Challenged Policies Are Arbitrary and Capricious ........ 13

B. USCIS's and DHS's Policies Violate The Procedural Due Process Rights of Plaintiffs' Unaccompanied Child Clients ........ 19

1. Plaintiffs' Unaccompanied Child Clients Have a Property Interest in Applying for Asylum Before USCIS ........ 19

2. The Mathews Factors Weigh in Plaintiffs' Favor ........ 21

C. EOIR's and DOJ's Detained Docket Deadline Violates the APA ........ 26

1. The Deadline Constitutes Final Agency Action ........ 26

2. The Deadline Is Arbitrary and Capricious ........ 29

II. Defendants' Policies Are Causing Ongoing Irreparable Harm to Plaintiffs and Their Unaccompanied Child Clients ........ 30

III. The Balance of Equities and the Public Interest Strongly Favor Plaintiffs ........ 32

IV. Plaintiffs Are Entitled to a Universal Stay ........ 33

**CONCLUSION** ........ 34

## INTRODUCTION

The Trump Administration has made no secret of its desire to accelerate the removal of unaccompanied immigrant children from the United States. To this end, then-White House Deputy Chief of Staff Stephen Miller organized a multi-agency effort to speed up unaccompanied children's immigration proceedings before both U.S. Citizenship and Immigration Services ("USCIS") and the immigration courts.[1] The result has been confusion and chaos as asylum adjudicators are pressed to decide children's cases on timelines that leave no room for the protections Congress guaranteed them.

The three policies challenged in this lawsuit serve the administration's goal. USCIS cut the 21-day notice it has long provided before an asylum interview to as little as 24 hours for unaccompanied children (the "Inadequate Notice Policy"), depriving children and their counsel of the time necessary to prepare for the interview, gather supplemental evidence, brief complex legal issues, and prepare testimony about the traumatic experiences that led the children to flee their home countries. USCIS also replaced its longstanding rescheduling rule—once as of right, and thereafter for good cause—with an "exceptional circumstances" standard that is virtually impossible to meet (the "Exceptional Circumstances Policy"). And the Executive Office for Immigration Review ("EOIR"), which oversees the immigration courts, has instructed immigration judges to complete all detained unaccompanied children's removal cases by a date certain on or before January 31, 2027 (the "Detained Docket Deadline" or "Deadline"). When Plaintiffs and their clients have sought continuances of accelerated hearing dates, immigration judges have responded that their hands are tied.

[1] Alexa Villareal, *Trump Ally Stephen Miller Leads Sweeping Push to Accelerate Removal of Migrant Children*, The Guardian (Sept. 19, 2026 at 6:00 ET), https://www.theguardian.com/us-news/2026/sep/19/stephen-miller-trump-migrant-children; Forbes, *"Is This A Concern for the White House?": Miller Asked About Migrant Kids Representing Themselves* (Aug. 21, 2026), https://www.youtube.com/watch?v=3c__z95YANg.

Because USCIS's policies conflict with the statutory framework Congress enacted to account for the specialized needs of unaccompanied children, deprive such children of meaningful access to the asylum process, and wreak havoc on Plaintiffs' efforts to provide effective representation, this Court stayed both the Inadequate Notice and Exceptional Circumstances Policies, restoring the status quo. ECF 54. After finding Defendants out of compliance with the stay and TRO, the Court extended its order pending resolution of this motion. ECF 63.

While acknowledging the "particular vulnerabilities" of unaccompanied children, Defendants maintain that USCIS's policies are "in the long term interests" of those children. ECF 57 at 2, 5.[2] Prompt adjudication, they argue, helps the Department of Homeland Security ("DHS") ensure that unaccompanied children "without a legal path to remain in the United States can be safely reunited with their families abroad as quickly as possible." *Id.* at 6. But many of these children fled grave danger in their home countries, including from members of their own families, and may have viable pathways to asylum or other lawful status in the United States if given a meaningful opportunity to pursue them. And removing children "as quickly as possible" cannot be squared with the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 ("TVPRA"), which requires that children's asylum claims be adjudicated in a manner that accounts for their specialized needs, *see* 8 U.S.C. § 1232(d)(8)—including the time children need to build trust with counsel before they can disclose why they fled.

For the reasons set forth in Plaintiffs' TRO motion, ECF 23-1, and below, USCIS's Inadequate Notice and Exceptional Circumstances Policies are arbitrary, capricious, and contrary to law in violation of the Administrative Procedure Act, and they violate the procedural due process rights of the unaccompanied children that Plaintiffs represent. EOIR's Detained Docket Deadline is arbitrary and capricious because EOIR rested the Deadline on factors Congress did not intend EOIR to consider, failed to consider the unique vulnerabilities of unaccompanied children and the disastrous effects the Deadline has on their ability to seek asylum, and ignored Plaintiffs' reliance

[2] All ECF citations are to the internal ECF pagination unless otherwise stated.

interests. A preliminary injunction is necessary because these policies are causing irreparable harm to Plaintiffs and their unaccompanied child clients, who risk wrongful removal to harm, abuse, or death.

## FACTUAL BACKGROUND

Congress created a distinct asylum process for unaccompanied children. Even when these children are in removal proceedings, USCIS, not an immigration judge, has initial jurisdiction over their asylum applications, 8 U.S.C. § 1158(b)(3)(C), and their claims must be adjudicated under procedures that "take into account [their] specialized needs," *id.* § 1232(d)(8). The right to apply for asylum before USCIS in the first instance ensures that unaccompanied children will have the opportunity to present their asylum claims through a non-adversarial interview with an asylum officer.

Until recently, USCIS buttressed that interview with procedural safeguards for unaccompanied children. Like all applicants before USCIS, unaccompanied children were entitled to written notice issued at least 21 days before the interview, the ability to reschedule the interview once as a matter of right and thereafter for good cause, and the opportunity to submit additional supporting evidence before and sometimes after the interview.[3] Affirmative Asylum Procedures Manual ("AAPM") § II.G.3; 8 C.F.R. § 208.9(e)(1); Ex. 1 (Raufer Decl.) ¶¶ 18, 35–38, 41, 44–46. They also received additional protections: asylum officers received specialized training to interview unaccompanied children; children could bring a trusted adult in addition to counsel; interviews presumptively took place in person and were rarely conducted while a child remained in federal custody; and USCIS gave children extra latitude to reschedule and set separate, longer timelines for completing their cases. Ex. 1 (Raufer Decl.) ¶¶ 10, 15, 25–28, 34, 40. Those protections reflect an understanding that children cannot participate meaningfully in the asylum

[3] Plaintiffs incorporate by reference the facts set forth in their Memorandum of Law in Support of their Motion for a Stay and TRO, ECF 23-1, and the declarations filed with that Motion, ECF 23-6 through 23-13.

process unless they can disclose traumatic experiences to unfamiliar adults. For most children, disclosure requires at least sufficient time to prepare and understand the process, a comfortable setting, the presence of someone they trust and, whenever possible, the support of an attorney who has developed a relationship with them and can fill gaps they cannot articulate themselves. Ex. 2 (Fortuna Report) at 19–22, 24–26; Ex. 1 (Raufer Decl.) ¶¶ 29–31, 42–43.

***USCIS's Inadequate Notice and Exceptional Circumstances Policies***

Late in the summer of 2026, USCIS abandoned those protections for unaccompanied children. Under the Inadequate Notice Policy, USCIS schedules interviews for unaccompanied children with less than 21 days' notice—sometimes with 24 hours' notice or less. ECF 57-1 ¶ 10; ECF 23-1 at 11; Ex. 3 (Donovan-Kaloust Supp. Decl.) ¶¶ 4–7; Ex. 4 (Hamill Decl.) ¶ 6; Ex. 8 (Fisher Flores Supp. Decl.) ¶ 4; Ex. 10 (Nally Supp. Decl.) ¶ 4. Under the Exceptional Circumstances Policy, USCIS will reschedule an interview only upon a showing of "exceptional circumstances."[4]

The new USCIS policies truncate and undermine the asylum process Congress intended for unaccompanied children. Because interview notices now often arrive after the deadline to submit supplemental evidence—14 days before the interview—children cannot submit corroborating evidence, and USCIS has rejected evidence submitted after that deadline. *See* 8 C.F.R. § 208.9(e)(1); ECF 23-8 (Avila-Cimpeanu Decl.) ¶¶ 25–26; Ex. 3 (Donovan-Kaloust Supp. Decl.) ¶ 9; Ex. 4 (Hamill Decl.) ¶ 6; Ex. 5 (Garcia Cantillo Decl.) ¶¶ 13, 15; Ex. 8 (Fisher Flores Supp. Decl.) ¶¶ 4, 6. Some asylum officers have explained that they cannot schedule detained children's interviews more than seven days in advance. Ex. 5 (Garcia Cantillo Decl.) ¶¶ 14–15; Ex. 3 (Donovan-Kaloust Supp. Decl.) ¶ 5. And USCIS now refers children's applications to immigration court within hours or days of the interview, foreclosing the post-interview briefing that once allowed counsel to fill gaps in a child client's testimony. Ex. 6 (Avila-Cimpeanu Supp.

[4] Detailed descriptions of these policies can be found in the Complaint, ECF 1 ¶¶ 65–79, and in Plaintiffs' Memorandum of Law in Support of their Motion for a Stay and TRO, ECF 23-1 at 11–15.

Decl.) ¶ 7; Ex. 3 (Donovan-Kaloust Supp. Decl.) ¶¶ 11, 18; Ex. 7 (Nafisi Decl.) ¶ 8; Ex. 1 (Raufer Decl.) ¶¶ 21, 46.

At the same time, USCIS has begun shifting to virtual interviews of unaccompanied children in ORR custody. ECF 23-9 (Sanchez Kennedy Decl.) ¶ 45; Ex. 6 (Avila-Cimpeanu Supp. Decl.) ¶ 9; Ex. 8 (Fisher Flores Supp. Decl.) ¶ 4. Historically, the agency treated in-person interviews as the default for children, recognizing that rapport and non-verbal cues are critical to eliciting a child's testimony. Ex. 1 (Raufer Decl.) ¶¶ 15–16; *see* Ex. 2 (Fortuna Report) at 23–24. But video interviews now go forward in circumstances that illustrate their risk: one detained child was interviewed by video while involuntarily committed to a psychiatric hospital, Ex. 9 (Sanchez Kennedy Supp. Decl.) ¶ 6; another was interviewed without his attorney—whose rescheduling request went unanswered—and was referred to immigration court less than 24 hours later, Ex. 8 (Fisher Flores Supp. Decl.) ¶ 5.

On October 30, 2026, this Court stayed and enjoined USCIS's Inadequate Notice and Exceptional Circumstances Policies. ECF 54 (Order Granting TRO). Nearly one week later, USCIS still had not complied with the stay and TRO. ECF 63 (Noncompliance Order). Although some asylum offices have begun granting initial rescheduling requests as a matter of right, others continue to invoke the "exceptional circumstances" standard, decline to act on requests while "awaiting guidance," or require attorneys and children to travel to asylum offices and wait for hours to request rescheduling in person. Ex. 3 (Donovan-Kaloust Supp. Decl.) ¶ 10; Ex. 4 (Hamill Decl.) ¶¶ 8–10; Ex. 6 (Avila-Cimpeanu Supp. Decl.) ¶ 6; Ex. 7 (Nafisi Decl.) ¶¶ 4–7; Ex. 10 (Nally Supp. Decl.) ¶ 7; Ex. 11 (Hough Supp. Decl.) ¶ 6. Children whose rescheduling requests go unanswered continue to be marked as having failed to appear, Ex. 6 (Avila-Cimpeanu Supp. Decl.) ¶ 6; Ex. 7 (Nafisi Decl.) ¶¶ 6–7; Ex. 16 (Smith Decl.) ¶ 14; and at least one immigration judge has deemed a child's asylum application abandoned on that basis even though it remains pending before USCIS. Ex. 7 (Nafisi Decl.) ¶ 11.

***EOIR's Detained Docket Deadline***

Until recently, EOIR also tailored unaccompanied children's removal proceedings to their specialized needs. Immigration judges on specialized juvenile dockets, trained in child-friendly and trauma-informed practices, used continuances, administrative closure, termination, and status dockets to give children time to find counsel and to allow USCIS to adjudicate asylum and other applications within its jurisdiction. Ex. 12 (Cassin Decl.) ¶¶ 6–8, 11–15; Ex. 13 (Khan Decl.) ¶¶ 8–11, 16–21; Ex. 14 (Harrington Decl.) ¶ 7. Prior EOIR guidance encouraged that approach. *See, e.g.*, Director's Memo 24-01, *Children's Cases in Immigration Court* at 4 (noting that, in general, "efficiency and fairness are served" by dismissing removal proceedings against an unaccompanied child with an asylum application pending before USCIS).[5] Immigration judges routinely granted continuances of three to six months, constrained only by calendar availability and cutoff dates more than a year in the future. Ex. 12 (Cassin Decl.) ¶¶ 13–14; Ex. 13 (Khan Decl.) ¶ 20; ECF 23-6 (Richardson Decl.) ¶ 57; ECF 23-8 ¶ 43. Plaintiffs built their children's representation programs—including staffing and caseloads—around that predictable pace. ECF 23-6 (Richardson Decl.) ¶ 57; ECF 23-8 ¶ 43; ECF 23-12 (Hough Decl.) ¶ 48; Ex. 3 (Donovan-Kaloust Supp. Decl.) ¶ 21; *see also* Ex. 14 (Harrington Decl.) ¶ 13.

Like USCIS, however, EOIR has sharply departed from historical practice, with the express goal of completing unaccompanied children's cases by a date certain—invariably on or before January 31, 2027. Immigration judges have repeatedly attributed their scheduling decisions to an EOIR directive. *See* ECF 23-6, ¶ 63; ECF 23-12, ¶ 55; Ex. 3 (Donovan-Kaloust Supp. Decl.) ¶ 12 (written order stating that child's case "has been identified as a priority case by EOIR and must be completed no later than October 31, 2026"); Ex. 7 (Nafisi Decl.) ¶ 10 (judge refusing to schedule a later hearing date because "I'm going to schedule you based on what my bosses tell me to do in

[5] *Available at* Impact Policy Tracking Project, https://immpolicytracking.org/policies/eoir-releases-guidelines-for-adjudicating-cases-involving-juveniles/#/tab-policy-documents (select "Biden Administration Action" from the left-side menu) (last visited Nov. 11, 2026). EOIR rescinded DM 24-01 in January 2025, and reinstated its prior guidance, Operating Policies and Procedures Memorandum 17-03, *Guidelines for Immigration Court Cases Involving Juveniles, Including Unaccompanied Alien Children* (Dec. 20, 2017). *See* Ex. 13 (Khan Decl.) ¶ 14.

these cases"); Ex. 9 (Sanchez Kennedy Supp. Decl.) ¶ 15 (judge reversing course on continuance after reviewing his screen and stating that he needed to "complete the case by a certain period of time"); Ex. 10 (Nally Supp. Decl.) ¶ 12 ("[T]he ACIJ says finish it by the end of the year"); Ex. 11 (Hough Supp. Decl.) ¶ 10 (Assistant Chief Immigration Judge remarking that "they want all these cases done by November or December"); *id.* ¶ 13 (judge stating he could not exercise discretion because "they" want "these cases" completed); Ex. 15 (Abad Decl.) ¶ 7 (court clerk reporting that all juvenile matters would be set before the end of the year "per instructions from EOIR Headquarters"); ECF 23-12 ¶ 52 (JFCS attorneys were told, on information and belief, that new continuance rules were conveyed by email from Assistant Chief Immigration Judge for Special Populations); *see also* Ex. 14 (Harrington Decl.) ¶ 12. This Detained Docket Deadline, as Plaintiffs refer to it, has compressed every stage of unaccompanied children's removal proceedings.[6]

Removal proceedings now begin almost as soon as an unaccompanied child arrives in the United States. Since 2025, DHS has filed charging documents against children immediately after they are placed in ORR custody, putting detained children into active removal proceedings in unprecedented numbers. ECF 23-11 (Donovan-Kaloust Decl.) ¶ 34; ECF 23-7 (Nally Decl.) ¶ 10; ECF 23-6, ¶ 59.[7] From there, immigration judges have begun applying the same scheduling rules, each with a fixed outer limit.

[6] As alleged in the Complaint, the Detained Docket Deadline targets detained unaccompanied children. ECF 1 ¶¶ 81–83. EOIR now appears to be applying the same accelerated scheduling to released children and other juveniles whose cases are heard on consolidated juvenile dockets. *See* Ex. 15 (Abad Decl.) ¶¶ 6–8; Ex. 14 (Harrington Decl.) ¶ 9 (children released into the unaccompanied refugee minor program "are being similarly fast-tracked"); Ex. 12 (Cassin Decl.) ¶ 28 (immigration judge on non-detained docket stating, "I am not allowed to do these adjournments any more"); Ex. 10 (Nally Supp. Decl.) ¶ 12.

[7] DHS initiates removal proceedings by filing a Notice to Appear with an immigration court. *See* 8 U.S.C. § 1229(a)(1). Until recently, DHS generally waited until an unaccompanied child was released from ORR custody to initiate proceedings, and Plaintiffs generally offered representation once a child was released to a sponsor in their service area. *See* ECF 23-8, ¶ 42; ECF 23-9, ¶¶ 13–14, 54; ECF 23-11, ¶¶ 15, 34; ECF 23-12, ¶ 40.

*First*, a child who wishes to seek asylum receives at most one continuance of up to three weeks to file an application with USCIS; if the application is not filed by the next master calendar hearing, the judge typically deems the claim abandoned. ECF 23-7 ¶ 35; ECF 23-8 ¶ 36; ECF 23-9 (Sanchez Kennedy Decl.) ¶ 61; ECF 23-11 ¶ 38; ECF 23-12 ¶ 53; Ex. 10 (Nally Supp. Decl.) ¶ 17; Ex. 12 (Cassin Decl.) ¶¶ 19, 25.

*Second*, while the application is pending before USCIS, judges continue the case for no more than three weeks at a time, and sometimes only for days. ECF 23-7 (Nally Decl.) ¶ 34; ECF 23-8 ¶ 43; ECF 23-9 ¶ 61; ECF 23-11 ¶ 49; ECF 23-12 ¶¶ 52–53; Ex. 12 (Cassin Decl.) ¶ 19; Ex. 10 (Nally Supp. Decl.) ¶¶ 9–11; Ex. 8 (Fisher Flores Supp. Decl.) ¶¶ 9, 12; Ex. 11 (Hough Supp. Decl.) ¶ 8.

*Third*, once USCIS refers the application, typically within hours or days of the interview, judges set an individual hearing within roughly two to four weeks. Ex. 10 (Nally Supp. Decl.) ¶¶ 10–11, 17; Ex. 3 (Donovan-Kaloust Supp. Decl.) ¶ 18; Ex. 7 (Nafisi Decl.) ¶ 12; Ex. 6 (Avila-Cimpeanu Supp. Decl.) ¶ 13; Ex. 12 (Cassin Decl.) ¶ 27; Ex. 9 (Sanchez Kennedy Suppl. Decl.) ¶ 14; Ex. 16 (Smith Decl.) ¶¶ 17–18, 21–22, 26. In some cases, judges end the case even sooner by granting DHS's motion to pretermit the application without hearing the child's testimony. Ex. 3 (Donovan-Kaloust Supp. Decl.) ¶ 20; Ex. 6 (Avila-Cimpeanu Supp. Decl.) ¶¶ 8, 15; Ex. 8 (Fisher Flores Supp. Decl.) ¶ 17; Ex. 14 (Harrington Decl.) ¶ 10. This complex, multi-agency process that once offered children's applications and testimony months of due consideration has been condensed beyond recognition, with cases going from asylum interview, to referral to immigration court, to removal order in as little as 20 days. *See* Ex. 16 (Smith Decl.) ¶ 17 & Attachments H–O (five-year-old interviewed on September 17, 2026, referred to immigration court on September 18, 2026, and ordered removed on October 7, 2026); *see also* Ex. 8 (Fisher Flores Supp. Decl.) ¶ 16 (child ordered removed within 23 days of asylum interview).

Immigration judges now lack the discretion to depart from these limits. Court administrators in May 2026 blocked immigration judges and staff from setting hearings beyond a fixed date—generally the end of December 2026—so detained children's cases would be

completed before then. Ex. 12 (Cassin Decl.) ¶ 20; *see also* Ex. 13 (Khan Decl.) ¶ 22 (former Assistant Chief Immigration Judge describing intensifying pressure on remaining judges). Consistent with that directive, hearings previously set for 2027 or 2028 have been advanced to 2026. Ex. 10 (Nally Supp. Decl.) ¶ 13; ECF 23-7 (Nally Decl.) ¶ 36; ECF 23-9, ¶ 64; ECF 23-12, ¶ 55; Ex. 14 (Harrington Decl.) ¶ 8; Ex. 15 (Abad Decl.) ¶¶ 8, 10, 13; Ex. 17 (Parada Decl.) ¶ 11. To rush through the many cases on the juvenile docket, EOIR has recently begun transferring children's cases from local juvenile dockets to immigration judges in other states, who hear them remotely—often on short notice, with hearings advanced without written notice to counsel, and in one instance with a different judge at each of a child's four hearings over two months. Ex. 3 (Donovan-Kaloust Supp. Decl.) ¶ 15; Ex. 6 (Avila-Cimpeanu Supp. Decl.) ¶ 18; Ex. 8 (Fisher Flores Supp. Decl.) ¶¶ 8–9; Ex. 10 (Nally Supp. Decl.) ¶ 9; Ex. 14 (Harrington Decl.) ¶ 9; Ex. 11 (Hough Supp. Decl.) ¶¶ 14–15; Ex. 9 (Sanchez Kennedy Supp. Decl.) ¶ 20; Ex. 15 (Abad Decl.) ¶¶ 7, 11. And when practitioners ask for more time, immigration judges respond that their hands are tied. Ex. 10 (Nally Supp. Decl.) ¶ 11 ("I don't always have control over when I reset these. I can't go beyond a certain [indistinct] they'll just bump it up."); Ex. 8 (Fisher Flores Supp. Decl.) ¶ 9; Ex. 9 (Sanchez Kennedy Supp. Decl.) ¶ 13; Ex. 11 (Hough Supp. Decl.) ¶ 8; Ex. 14 (Harrington Decl.) ¶¶ 11–12.

Because USCIS and EOIR are accelerating cases simultaneously, Plaintiffs' attorneys are routinely booked for overlapping interviews, master calendar hearings, and trials. Ex. 9 (Sanchez Kennedy Supp. Decl.) ¶ 9 (68 asylum interviews scheduled for the same three days in December); Ex. 10 (Nally Supp. Decl.) ¶¶ 11, 17; Ex. 11 (Hough Supp. Decl.) ¶ 21. The results are predictable: Plaintiff Immigrant Defenders Law Center has received more merits removal orders against child clients in a month than in its prior ten years combined. Ex. 3 (Donovan-Kaloust Supp. Decl.) ¶ 24.

**ARGUMENT**

To obtain a preliminary injunction, Plaintiffs must show that they are "likely to succeed on the merits, that [they are] likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [their] favor, and that an injunction is in the public interest." *Winter*

*v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The same standard applies to a request for preliminary relief under the APA, 5 U.S.C. § 705. *Casa de Maryland, Inc. v. Wolf*, 486 F. Supp. 3d 928, 950 (D. Md. 2020). For the reasons discussed below, Plaintiffs have met each of these factors. The Court should therefore grant Plaintiffs' motion for a preliminary injunction and stay under 5 U.S.C. § 705, preventing Defendants from unlawfully fast-tracking unaccompanied children's immigration proceedings and ensuring that Plaintiffs and their unaccompanied child clients have meaningful access to the asylum process in accordance with the protections enshrined in the TVPRA, the INA, and the Constitution.

The Court should separately deny Defendants' motion for reconsideration, which fails to establish any error in the Court's order granting a TRO, much less clear error causing manifest injustice. ECF 57 (Reconsideration Motion) at 7–8; *U.S. Tobacco Coop. Inc. v. Big South Wholesale of Virginia, LLC*, 899 F.3d 236, 257 (4th Cir. 2018). Defendants' motion raises arguments that could have been raised in their initial opposition brief and blames the Court for failing to consider interests that Defendants never asserted. "[A] prior decision does not qualify for [clear error causing manifest injustice] by being just maybe or probably wrong; it must strike us as wrong with the force of a five-week-old, unrefrigerated dead fish. It must be dead wrong." *U.S. Tobacco Coop. Inc.*, 899 F.3d at 258 (citation omitted).

## I. Plaintiffs Are Likely to Succeed on the Merits of Their Claims.

To establish the first *Winter* prong, "[P]laintiff[s] need not establish a 'certainty of success,' but must make a clear showing that [they are] likely to succeed at trial." *Di Biase v. SPX Corp.*, 872 F.3d 224, 230 (4th Cir. 2017) (quoting *Pashby v. Delia*, 709 F.3d 307, 321 (4th Cir. 2013)). And under Section 706(2) of the APA, a district court may set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Here, Plaintiffs are likely to succeed on the merits because they can clearly show that USCIS's Inadequate Notice Policy and Exceptional Circumstances Policy are arbitrary, capricious, and contrary to law in violation of the APA; that these policies violate the due process rights of

Plaintiffs' unaccompanied child clients; and that EOIR's Detained Docket Deadline is arbitrary and capricious.

### A. USCIS's Inadequate Notice Policy and Exceptional Circumstances Policy Violate the APA.

#### 1. USCIS's Challenged Policies Are Final Agency Actions.

Both the Inadequate Notice and Exceptional Circumstances Policies are final agency actions because they "mark the consummation of the agency's decision-making process" and are actions "by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (internal citations omitted); ECF 54 at 10–11 & n.7.

Although Defendants initially denied the existence of these policies, their motion for reconsideration concedes that both policies have been implemented and does not contest that they constitute final agency action. *Compare* ECF 32-1 (Opposition to TRO) at 10, *with* ECF 57 at 1–2, 4; *see also* ECF 57-1 (Kim Decl.) ¶¶ 10–11.[8] A USCIS policy change was required to shorten the authorized notice period for unaccompanied child interviews because USCIS's generally applicable procedures otherwise require that notice be generated at least 21 or 22 days prior to an interview and be mailed "no fewer than 18 days before the scheduled interview date." AAPM § II.G.3.[9]

Authorizing a shortened notice period and requiring exceptional circumstances to reschedule asylum interviews have legal consequences, including impeding Plaintiffs' ability to

[8] Although Mr. Kim's declaration describes a shortened notice policy specific to unaccompanied children in ORR custody, released unaccompanied children have also received inadequate notice. Therefore the Inadequate Notice Policy in practice applies to both detained and released children. *See*, *e.g.*, Ex. 3 (Donovan-Kaloust Supp. Decl.) ¶ 4; Ex. 4 (Hamill Decl.) ¶¶ 4, 6; Ex. 10 (Nally Supp. Decl.) ¶ 4.

[9] Defendants' motion for reconsideration cites a different section of the AAPM to assert that notice is issued "approximately" 21 days before the interview. ECF 57 at 8 (citing AAPM § II.G.2(a)). When these sections are read together, it is clear that the reference to "approximately 21 days" in Section II.G.2(a) includes the "21 or 22 days" specified in Section II.G.3 and does not authorize shorter notice.

provide effective representation to their unaccompanied child clients and depriving unaccompanied children of their ability to submit supplemental evidence as of right, 8 C.F.R. § 208.9(e)(1), their right to counsel at the asylum interview, *id.* § 208.9(b), and a meaningful opportunity to prepare for and participate in their one and only non-adversarial asylum proceeding, 8 U.S.C. § 1158(b)(3)(C). *See* ECF 54 at 11, 15–16.

2. USCIS's Challenged Policies Are Contrary to Law.

The Inadequate Notice and Exceptional Circumstances Policies are contrary to law because they deprive Plaintiffs and their unaccompanied child clients of their regulatory right to submit supplemental evidence up to 14 days before their asylum interviews, deprive children of access to counsel, and are inconsistent with the consideration of children's specialized needs required by the TVPRA. *See* ECF 54 at 12–15.

After previously asserting that the 14-day evidence submission provision in 8 C.F.R. § 208.9(e) does not apply to unaccompanied child cases, ECF 32-1 at 13, Defendants now admit that "the 14-day deadline is still applicable as required by the CFR" and argue that "the setting of the interview date does not create a signal to begin collecting that information but a notice that the period is closing." ECF 57 at 9. This ignores the heart of the problem. Even accepting Defendants' framing, Plaintiffs and their child clients are deprived of "notice that the period is closing" when they receive notice *after* the evidence submission period has closed. USCIS's policy of authorizing 24 hours to seven days' notice prior to an interview guarantees that notice will come too late to comply with the evidence submission deadline. ECF 57-1 ¶ 10. In practice, USCIS is generally not accepting evidence submitted after the 14-day deadline, even as a matter of discretion. *See* USCIS, *ALERT: Updated Evidence Submission Policy for Affirmative Asylum Applications*, https://www.uscis.gov/humanitarian/refugees-and-asylum/asylum (last visited Nov. 11, 2026); ECF 23-8 ¶¶ 25–26; ECF 23-7 ¶¶ 24, 26; ECF 23-9 ¶ 39; ECF 23-11 ¶ 36; ECF 23-12 ¶ 29. USCIS's rapid adjudication of asylum cases also prevents Plaintiffs from submitting post-interview evidence and briefing. *See* Ex. 6 (Avila-Cimpeanu Supp. Decl.) ¶ 7. Even if *some* asylum officers accept late-submitted evidence as a matter of discretion in *some* cases, the mere

possibility of a favorable exercise of discretion cannot replace the certainty and predictability of a regulatory entitlement.

As the Court previously concluded, Defendants' challenged policies also unlawfully obstruct children's right to counsel at their asylum interview. *See* ECF 54 at 14 (citing 8 C.F.R. § 208.9(b)). Defendants do not address this conclusion in their Motion for Reconsideration. While Defendants do assert that "USCIS will of course consider concerns lawyers have with double bookings and impracticalities," ECF 57 at 2, the Exceptional Circumstances Policy itself makes no reference to unavailability of counsel, and Plaintiffs' experience in practice is that USCIS does not reschedule interviews to permit counsel to attend, even when they are booked for multiple interviews at the same time. *See* ECF 23-8 ¶ 27; ECF 23-9 ¶ 38; ECF 23-11 ¶¶ 40, 42; ECF 23-6 ¶¶ 36–37.[10]

Moreover, as discussed below, Defendants' assertion that they take into account the "specialized needs of minors" under 8 U.S.C. § 1232(d)(8) by rushing children through their asylum interviews and refusing to reschedule at the child's own request is inconsistent with Congress's clear intent that the specialized needs of children include the assistance of counsel and sufficient time to prepare their applications.

3. <u>USCIS's Challenged Policies Are Arbitrary and Capricious.</u>

The Inadequate Notice and Exceptional Circumstances Policies are arbitrary and capricious because USCIS has failed to provide a contemporaneous reasoned justification for these policies and the justifications Defendants have offered show the agency "[1] relied on factors which Congress has not intended it to consider, [2] entirely failed to consider an important aspect of the problem, [3] offered an explanation for its decision that runs counter to the evidence before the agency, or [4] is so implausible that it could not be ascribed to a difference in view or the product

[10] *See also* Ex. 9 (Sanchez Kennedy Supp. Decl.) ¶¶ 9–11 (explaining that since the TRO was issued, Plaintiff Galveston-Houston Immigrant Representation Project has received 68 new asylum interview notices, with 11 more posted online but not yet delivered, all scheduled within the same three-day period). GHIRP's staff of seven attorneys will not be able to prepare for and attend all these interviews if they are unable to reschedule them. *Id.*

of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) ("*State Farm*"). Although review under this standard is deferential, the Court "must conduct a searching and careful review to determine whether the agency's decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Appalachian Voices v. U.S. Dep't of Interior*, 25 F.4th 259, 269 (4th Cir. 2022) (internal citation omitted).

First, in the last two weeks, Defendants have offered shifting justifications for the challenged policies and only post-hoc justifications for USCIS's actions. When an agency changes policy—as Defendants now acknowledge USCIS has with respect to both the Exceptional Circumstances and Inadequate Notice Policies, *see* ECF 57 at 2, 4—it "must display awareness that it is changing position and show that there are good reasons for the new policy." *Jimenez-Cedillo v. Sessions*, 885 F.3d 292, 298 (4th Cir. 2018) (citation omitted). "[T]he 'reviewing court may look only to [the agency's] *contemporaneous* justifications' for its action." *Appalachian Voices*, 25 F.4th at 269 (quoting *Dow AgroSciences LLC v. Nat'l Marine Fisheries Serv.*, 707 F.3d 462, 467 (4th Cir. 2013)). Explanations provided after the policy change occurred "'must be viewed critically' to ensure that the rescission is not upheld on the basis of impermissible '*post hoc* rationalization.'" *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 21 (2020) ("*Regents*") (citation omitted) .

Here, Defendants initially justified the Exceptional Circumstances Policy as "required by statute and regulation," citing provisions related to the standard for rescheduling an interview after an applicant fails to appear. ECF 32-1 at 5, 14 (citing 8 U.S.C. § 1158(d)(5)(A)(v) and 8 C.F.R. § 208.10). Defendants also noted that this policy is generally applicable and not specific to unaccompanied children. *Id.* at 18. After the Court held that the Exceptional Circumstances Policy is *not* required by applicable law, ECF 54 at 14, Defendants' motion for reconsideration asserted that "[f]ocusing on the needs of [UCs], USCIS stopped allowing for automatic grants for initial rescheduling requests and required exceptional circumstances for all requests." ECF 57 at 2.

Similarly, Defendants did not provide any justification for the Inadequate Notice Policy in their TRO response and instead urged the Court to discount Plaintiffs' allegation of an "internal memo circulating that shortens interview notice periods." ECF 32-1 at 11. Defendants now acknowledge they adopted a new policy to schedule unaccompanied child interviews "with 24 hours to seven days' notice," purportedly to "ensure that vulnerable children receive timely decisions on their asylum claims." ECF 57 at 4. Despite the assertion by USCIS's declarant, Ted Kim, that "[t]he challenged interview-scheduling and rescheduling practices were intended to advance, not undermine, the interests of [UCs] and asylum seekers generally," ECF 57-1 ¶ 12, he does not indicate that he served as the decisionmaker on these policies or even that he reviewed the decision memo or any materials that served as the basis for the decision to adopt them.

Second, even if the Court were to credit Defendants' post-hoc justifications, those justifications "rel[y] on factors which Congress has not intended [USCIS] to consider." *State Farm*, 463 U.S. at 43. Defendants repeatedly suggest that USCIS decided to expedite the cases of detained unaccompanied children because Defendants believe it is in a child's best interests to have the asylum application resolved while the child is in detention rather than being released to a sponsor in the community while their asylum proceedings remain pending. ECF 57 at 1–2, 9, 11. But rushing unaccompanied children through their asylum proceedings before they have a chance at release is plainly contrary to Congressional intent. The TVPRA creates a presumption of release pending unaccompanied children's immigration proceedings, requiring that unaccompanied children "be *promptly* placed in the least restrictive setting that is in the best interest of the child," usually with "a suitable family member." 8 U.S.C. § 1232(c)(2)(A) (emphasis added).[11] Moreover, Congress charged ORR, not USCIS, with making these best-interest determinations.

[11] When there is no suitable sponsor, children can be placed in foster care settings through ORR's Long-Term Foster Care program or, for victims of trafficking or other eligible children, the Unaccompanied Refugee Minor program. *See* 8 U.S.C. § 1232(c)(2)(A); ORR Policy Guide § 1.2.6, https://acf.gov/orr/policy-guidance/uac-program-policy-guide-section-1#1.2.6 (last visited Nov. 11, 2026).

8 U.S.C. §§ 1232(b)(1), (c)(2)(A). Congress also understood that children's asylum claims may take more time to develop and therefore exempted unaccompanied children from expedited removal proceedings and from the one-year filing deadline usually applicable to asylum claims. 8 U.S.C. § 1232(a)(5)(D); 8 U.S.C. § 1158(a)(2)(E). USCIS cannot substitute its judgment for that of Congress, especially on an issue that Congress explicitly removed from DHS's jurisdiction.[12] *See* 6 U.S.C. § 279(a); 8 U.S.C. § 1232(b).

Further, Defendants' revised justification that the Exceptional Circumstances Policy "more faithfully appl[ies] existing regulatory language" in 8 C.F.R. § 208.10, ECF 57-1 ¶ 11, and "is consistent with" Congressional intent in 8 U.S.C. § 1158(d)(5)(A)(v), *id.* ¶ 18, fares no better than their original argument that it was required by statute. Far from faithfully applying its statutory and regulatory obligations, USCIS has plainly misinterpreted Congress's intent. *See* ECF 54 at 14 (analyzing statutory language); *Sierra Club v. State Water Control Board*, 64 F.4th 187, 194 (4th Cir. 2023); *Sea-Land Service, Inc. v. Dep't of Transportation*, 137 F.3d 640, 646 (D.C. Cir. 1998).

Third, by focusing only on the benefits of speedy adjudication and assuming that expedited consideration is in the best interests of children, ECF 57-1 (Kim Decl.) ¶¶ 12–16, 19, USCIS

[12] Even if Defendants' purported concern about release to unsafe sponsors were a valid consideration in asylum interview scheduling—which it is not—this concern is not supported by the evidence cited. As an initial matter, the release provisions of the *Flores* Settlement Agreement were terminated as to unaccompanied children in ORR custody two years ago. *See Flores v. Garland*, Case No. 85-cv-4544, 2024 WL 3467715, at *9 (C.D. Cal. June 28, 2024); *cf.* ECF 57 at 1, 3–4. In any event, the *Flores* Settlement never required release to an unsafe sponsor. *See, e.g., Flores v. Sessions*, 862 F.3d 863, 877–78 (9th Cir. 2017) (quoting Settlement ¶ 11 and noting that the TVPRA "mirror[s] the Settlement" in ensuring children are not released to unsafe sponsors). Additionally, Defendants' citation to their own press conferences to assert that the previous administration released over 300,000 children whose whereabouts could not be verified, ECF 57 at 3–4, 11, is both incorrect and irrelevant. This assertion is based on numbers related to the issuance of a Notice to Appear, not whether the child was in danger, and says nothing as to children currently in detention. *See, e.g.,* Melissa Goldin, *FACT FOCUS: Claims That More Than 300,000 Migrant Children Are Missing Lack Context*, Associated Press (Oct. 2, 2024, at 3:29 PM PST), https://apnews.com/article/fact-check-misinformation-migrant-children-missing-7ab0cea2fd2238346197429e952baa8b; *see also supra* n.7 (noting reasons for historic practice of waiting to issue Notice to Appear to unaccompanied children). Further, the existence of a small percentage of prior instances of fraud cannot support Defendants' blanket conclusion that releasing children to vetted parents or other family members in the United States is always dangerous but returning them to family in the countries they fled is presumptively safe. ECF 57 at 1–2, 6, 9, 12; ECF 57-1 ¶ 13.

"entirely failed to consider" multiple critical aspects of the problem. *State Farm*, 463 U.S. at 43. USCIS's articulated justifications failed to consider that its rushed scheduling policies could preclude grants of asylum to children who could have established their eligibility if given adequate time to prepare. More specifically, USCIS failed to consider the impact of its new scheduling policies on a child's ability to build sufficient trust with counsel to disclose past traumatic events, prepare for the interview, obtain and submit necessary evidence,[13] including mental health evaluations if appropriate, and meaningfully participate in the interview with the presence of trusted counsel. *See* Ex. 2 (Fortuna Report) at 19–22, 24–26; *see also id.* at 26 ("When short notice prevents this preparation and support [with counsel], it creates a substantial and foreseeable risk that the child will misunderstand questions, give an incomplete or disorganized story, experience acute distress, and be unable to make sound decisions."). Nor did USCIS consider the impact of its policies on the ability of legal service providers such as Plaintiffs to effectively represent their clients and to take on new unaccompanied child clients, undermining Congress's strong preference that unaccompanied children have the assistance of counsel in their immigration proceedings. 8 U.S.C. § 1232(c)(5).

USCIS further failed to consider the acute risks to children's mental health of forcing them to participate in interviews about traumatic experiences without adequate preparation or support from a trusted adult. Ex. 2 (Fortuna Report) at 24–25. USCIS has extensive experience with the applications of unaccompanied children and is aware of these issues. *See* Ex. 1 (Raufer Decl.) ¶¶ 25–34, 42–43. Disregarding all these factors in favor of a blinkered focus on efficiency was arbitrary and capricious.

Nor is there any indication that USCIS considered "serious reliance interests that must be taken into account" or "alternatives that are within the ambit of the existing policy." *Regents*, 591 U.S. at 30 (citations omitted); *see also* ECF 23-1 at 31. Plaintiffs made decisions about staffing

[13] Defendants' initial incorrect assertion that 8 C.F.R. § 208.9(e) does not apply to cases of unaccompanied children, ECF 32-1 at 13, is further evidence that USCIS did not consider the interaction between its Inadequate Notice and Exceptional Circumstances Policies and applicable regulatory deadlines for evidence submission.

and allocation of resources based on a standard, minimum notice period and the opportunity to reschedule for cause. *See, e.g.*, ECF 23-6 ¶¶ 26–28; ECF 23-7 ¶¶ 14–15; ECF 23-8 ¶¶ 18–20, 27; ECF 23-9 ¶¶ 21–22, 24; ECF 23-11 ¶¶ 17, 21, 36; ECF 23-12 ¶¶ 28–29. Plaintiffs also made commitments to represent their child clients and cannot simply abandon them because representing children in USCIS asylum interviews has become too resource-intensive. Despite Defendants' repeated emphasis on the best interests of unaccompanied children and reducing uncertainty and prolonged detention, USCIS did not consider an alternative policy of expediting interviews only at the request of a child or their counsel when the child wishes a faster adjudication.

Finally, the explanations Defendants have provided "run[] counter to the evidence before the agency" and in some cases are "so implausible that [they] could not be ascribed to a difference in view or the product of agency expertise." *State Farm*, 463 U.S. at 43. Defendants assert that their policies advance the interests of unaccompanied children because they "help[] reduce prolonged uncertainty" and "where the child remains in custody, can help avoid an unnecessary restrictive custodial situation." ECF 57-1 ¶ 12; *see also id.* ¶¶ 13, 15–16, 19. But USCIS cannot plausibly claim to know what serves the best interests of the unaccompanied child when it refuses *the child's own request* to reschedule. To the contrary, Plaintiffs' evidence demonstrates that USCIS's policies are causing substantial harm to children's emotional well-being, as well as their ability to cultivate an effective working relationship with counsel and develop and prepare to present their asylum claims.

The implausibility of Defendants' explanations is underscored by USCIS's implementation of the Exceptional Circumstances Policy in practice, both before and after the issuance of this Court's temporary restraining order. It has become substantially more difficult for attorneys to even receive a response to their rescheduling request prior to the date of the interview, creating significant uncertainty and stress and forcing Plaintiffs, similarly situated legal service providers, and their child clients to travel hours to asylum offices even when an interview is ultimately rescheduled. *See* ECF 23-7 ¶¶ 20, 22; ECF 23-12 ¶¶ 34, 36–37; ECF 23-6 ¶¶ 36–38; Ex. 3 (Donovan-Kaloust Supp. Decl.) ¶¶ 6, 10; Ex. 7 (Nafisi Decl.) ¶¶ 4–7; Ex. 8 (Fisher Flores Supp.

Decl.) ¶¶ 5–6; Ex. 10 (Nally Supp. Decl.) ¶¶ 4–5; Ex. 4 (Hamill Decl.) ¶¶ 5, 7–10.; Ex. 16 (Smith Decl.) ¶¶ 7–14; *see also* ECF 23-11 ¶ 21 (describing prior practice).

Similarly, Defendants do not explain why USCIS cannot efficiently process cases while abiding by its prior 21-day notice requirement. There is no logical connection between reduced notice and efficient processing of applications. One application could be pending for a year and then scheduled for an interview on 24 hours' notice. Another application could be filed in the prior month and scheduled for an interview 21 days out. Additionally, if a child is unsuccessful at their asylum interview because they have insufficient time to prepare or submit supplemental evidence, they are referred for further proceedings before EOIR, further prolonging the limbo, uncertainty, and stress that Defendants claim to wish to avoid.

### B. USCIS's and DHS's Policies Violate The Procedural Due Process Rights of Plaintiffs' Unaccompanied Child Clients.

Plaintiffs' unaccompanied child clients have been "deprived of a protected [ ] property interest" in an asylum interview conducted in accordance with the TVPRA "without constitutionally sufficient process." *Brown v. Stapleton*, 142 F.4th 252, 255 (4th Cir. 2025).

Plaintiffs have third-party standing to challenge Defendants' policies affecting the asylum interview on behalf of their unaccompanied child clients. ECF 54 at 8–9. Under third-party standing doctrine, attorney plaintiffs may assert the constitutional rights, including due process rights, of their clients. *U.S. Dep't of Lab. v. Triplett*, 494 U.S. 715, 720 (1990). Defendants' policies, which deprive Plaintiffs' unaccompanied child clients of their due process right to participate fully in their asylum interviews, fall "squarely within this principle." *Id.*

#### 1. <u>Plaintiffs' Unaccompanied Child Clients Have a Property Interest in Applying for Asylum Before USCIS.</u>

The right to procedural due process requires a "constitutionally protected property interest in [a benefit] … Although clothed in due process protection by the Constitution, 'property interests' are the creatures of independent positive law." *Mallette v. Arlington Cnty. Employees'*

*Supplemental Ret. Sys. II*, 91 F.3d 630, 634 (4th Cir. 1996). Property interests protected by the Fifth Amendment may be derived from such "positive law" as statutes, regulations, *id.* at 635–36, or even "rules and understandings, promulgated and fostered by state officials." *Perry v. Sindermann*, 408 U.S. 593, 602 (1972). To establish a property interest in a benefit, a person must "have a legitimate claim of entitlement to it." *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972). An unaccompanied child's right to seek asylum before USCIS is a constitutionally protected property interest. *Immigrant Defs. L. Ctr. v. U.S. Dep't of Homeland Sec.*, No. CV 21-0395, 2025 WL 1191572, at *15 (C.D. Cal. Mar. 14, 2025) ("[U]naccompanied children are statutorily entitled to apply for affirmative asylum before an asylum officer in the first instance, see 8 U.S.C. § 1158(b)(3)(C). These statutory entitlements are constitutionally protected property interests."). Unaccompanied children have a legitimate claim of entitlement to have their asylum applications adjudicated consistent with the TVPRA. *See* 8 U.S.C. §§ 1158(b)(3)(C); 8 U.S.C. 1232.[14]

As described above, Defendants' Inadequate Notice and Exceptional Circumstances Policies—together with Defendants' shift to virtual interviews, their refusal to accept supplemental evidence or post-interview briefing, and their unwillingness to reschedule to ensure that counsel can be present—all work to strip children of their ability to effectively share their testimony, including their traumatic histories, at an Asylum Office interview. These constitutionally inadequate policies and procedures deprive children of their right to meaningfully present their claims to USCIS in the first instance. *See Brown,* 142 F.4th at 255.

---

[14] By amending 8 U.S.C. § 1158 to ensure unaccompanied children have the right to seek asylum in the first instance before an asylum officer and not before EOIR, Congress intended to protect those children who are "apprehended by immigration authorities, [ ] usually know[] nothing about U.S. courts or immigration policies and frequently do[] not speak English." 154 Cong. Rec. S 10886 (daily ed. Dec. 10, 2008) (statement of Sen. Feinstein).

2. <u>The *Mathews* Factors Weigh in Plaintiffs' Favor.</u>

Once the Court finds that the government has deprived a party of its constitutionally protected property interest, it must determine whether the existing procedures are constitutionally adequate by applying the three-factor framework under *Mathews v. Eldridge*, 424 U.S. 319 (1976). The *Mathews* framework balances: (1) the weight of the property interest; (2) the risk of erroneous deprivation under the current process and the value of additional safeguards; and (3) the government interest at stake, taking into account the administrative burden and other societal costs that would be associated with requiring, as a matter of constitutional right, additional protections. *Id.* at 335. Each of these factors favors Plaintiffs.

**a. *Unaccompanied Children Have A Significant Interest In Their Right To Apply For Asylum Before USCIS in the Manner Contemplated by the INA and TVPRA.***

Unaccompanied children's interest in applying for asylum in a non-adversarial setting before USCIS is significant because it constitutes their only opportunity to present their claims in a manner consistent with the TVPRA's child-centered principles. *See e.g.*, *Immigrant Defs. L. Ctr.*, 2025 WL 1191572, at *16 ("[T]he right to apply for affirmative asylum … involve[s] weighty private interests." (quoting *Bridges v. Wixon*, 326 U.S. 135, 154 (1945))). As the TVPRA recognizes, unaccompanied children are a particularly vulnerable group who face unique challenges in presenting their claims for asylum. *See* 8 U.S.C. 1232(d)(8). These children have often experienced trauma that inhibits their ability to recall and describe their experiences; they may lack sufficient language skills to comprehend what is being asked of them and effectively articulate their claims; or they may struggle to "understand an unfamiliar process, follow complex questions, put events in order, recognize any confusion they are experiencing, and know how to ask for clarification or a break." Ex. 2 (Fortuna Report) at 18–19; *see* Ex. 1 (Raufer Decl.) ¶ 29.

Accordingly, a non-adversarial interview that takes into account their unique vulnerabilities, ensures support by trusted counsel, permits them to submit supplemental evidence, and gives them adequate time to prepare, is crucial to ensuring a full and fair opportunity to present

their claims. Ex. 2 (Fortuna Report) at 19–24; *see, e.g.*, *id.* at 23 (research demonstrates that rapport-building, open-ended questioning, and supportive behavior from interviewer improves the accuracy and quality of children's responses); Ex. 1 (Raufer Decl.) ¶¶ 28–31, 42–43. Hostile cross-examination in immigration court, by contrast, undermines the conditions necessary for disclosure. *See* Ex. 6 (Avila-Cimpeanu Supp. Decl.) ¶ 14.

#### ***b. USCIS's Policies Risk Erroneously Denying Unaccompanied Children a Meaningful Opportunity to Present Their Asylum Claims During Their Interviews.***

For several reasons, USCIS's policies expose unaccompanied children to an intolerable risk that they will be erroneously deprived of their interest in a specialized asylum proceeding.

***Inability to Prepare for Interviews.*** First, the policies deny them adequate notice, which lies at the core of due process. *See Todman v. Mayor & City Council of Baltimore*, 631 F. Supp. 3d 314, 328 (D. Md. 2022), *aff'd*, 104 F.4th 479 (4th Cir. 2024). For notice to pass constitutional muster, it must be "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314–15 (1950). The "opportunity to present their objections," cannot be understood without ensuring that the opportunity is "tailored to the capacities and circumstances of those who are to be heard." *Goldberg v. Kelly*, 397 U.S. 254, 268–69 (1970).

USCIS's policy of providing fewer than 21 days' notice and as little as 24 hours' notice before an interview is not "reasonably calculated" to afford unaccompanied children a fair opportunity to prepare for their interviews and be heard. For the asylum interview to fulfill its purpose under the TVPRA, unaccompanied children require time to develop their claims, which includes building rapport and working with counsel, gathering evidence, and preparing to present testimony—none of which is feasible with notice of one or just a few days. Ex. 2 (Fortuna Report) at 20–22. The need for additional time is particularly profound for detained children, who are often required by immigration judges to apply for asylum within their first few weeks in ORR

custody. *See* ECF 23-8 ¶ 36; ECF 23-11 ¶ 38; ECF 23-12 ¶ 53; Ex. 10 (Nally Supp. Decl.) ¶ 17. Adequate notice is also necessary to facilitate language access to the interview, where necessary. Because many unaccompanied children are not conversant in English and speak rare or indigenous languages with few available interpreters, adequate notice is necessary to obtain reliable interpretation for children not just "to be heard," but to be understood. *See* ECF 23-8 ¶ 19; ECF 23-7 ¶¶ 15, 29; ECF 23-11 ¶ 12; Ex. 3 (Donovan-Kaloust Supp. Decl.) ¶ 8; *see also* Ex. 2 (Fortuna Report) at 24.

***Inability to Submit Evidence.*** Second, as described above, USCIS's policies prevent unaccompanied children and their counsel from submitting supplemental evidence within the 14-day window required by USCIS. In addition, post-interview evidence or brief submission is nearly impossible because USCIS often refers unaccompanied children to EOIR within hours of an interview. *See* ECF 23-11 ¶ 51; ECF 23-8 ¶ 34; ECF 23-13 ¶ 38; Ex. 16 (Smith Decl.) ¶¶ 17–18 & Attachments H–I; Ex. 8 (Fisher Flores Supp Decl.) ¶ 16. In the asylum context, both subjective and objective evidence have been recognized as essential to prove an applicant's claim. *Cf. Diahn v. Blanche*, 175 F.4th 291, 302 (4th Cir. 2026). For unaccompanied children in particular, corroborating evidence, including declarations from family members and parents detailing persecution and expert reports or other documents describing country conditions and past harm, are key to fully developing claims and filling in gaps where the child is unable to articulate that information in the interview. *See* ECF 23-8 ¶¶ 16, 19; ECF 23-6 ¶¶ 26, 30; ECF 23-12 ¶ 27; Ex. 1 (Raufer Decl.) ¶¶ 42–43. USCIS's Inadequate Notice and Exceptional Circumstances Policies prevent child applicants from timely submitting such evidence and, as a result, deprive them of the opportunity to present a full record in support of their claims. *See* ECF 23-11 ¶¶ 36–37, 44; ECF 23-12 ¶ 38. USCIS must then adjudicate their claims based on an incomplete record. *See* Ex. 6 (Avila-Cimpeanu Supp. Decl.) ¶ 8; ECF 23-7 ¶ 40; Ex. 1 (Raufer Decl.) ¶¶ 42–43.

***Inability to Access Counsel.*** Third, USCIS's policies deprive unaccompanied children of meaningful access to counsel, which is a cornerstone of their opportunity to be heard. *See Powell v. Alabama*, 287 U.S. 45, 68–69 (1932) ("The right to be heard would be, in many cases, of little

avail if it did not comprehend the right to be heard by counsel."). Access to counsel is especially significant in the case of unaccompanied children, who need assistance navigating a complex legal system. Ex. 1 (Raufer Decl.) ¶ 28. Yet USCIS's Exceptional Circumstances Policy obstructs access to that assistance. Pursuant to this Policy, USCIS has refused to reschedule interviews to accommodate counsel's presence, even when an attorney is booked for simultaneous interviews. *See* ECF 23-9 ¶ 38. Since this Court granted the TRO, USCIS has refused to reschedule interviews in additional instances, including where an attorney had to attend the funeral of a family member and sought to reschedule an interview for the first time. ECF 61-5 (Araya Decl.) ¶¶ 5–6. By disregarding the inability of a child's attorney to attend—let alone prepare for—the interview, USCIS turns notice into "a mere gesture." *Mullane*, 339 U.S. at 315.

***Shift to Virtual Interviews.*** Fourth, Defendants' shift to conducting virtual asylum interviews for children in ORR custody also creates a significant risk that unaccompanied children will be deprived of a meaningful opportunity to be heard. *See* Ex. 9 (Sanchez Kennedy Decl.) ¶¶ 5–6 & Ex. A; Ex. 8 (Fisher Flores Supp. Decl.) ¶¶ 4–5; Ex. 6 (Avila-Cimpeanu Supp. Decl.) ¶¶ 9–11. Virtual teleconferencing or "VTC" is "rarely a substitute for actual presence [] even in an age of advancing technology, watching an event on the screen remains less than the complete equivalent of actually attending it." *United States v. Lawrence*, 248 F.3d 300, 304 (4th Cir. 2001). Where credibility determinations are paramount, this circuit has recognized that several unavoidable characteristics of VTC hearings make them an ill-suited medium for judges to reliably evaluate an applicant's credibility. *Rusu v. U.S. I.N.S.*, 296 F.3d 316, 322 (4th Cir. 2002).

USCIS has historically recognized that virtual interviews are not sufficient when adjudicating asylum claims, especially in the case of unaccompanied children. *See* Ex. 1 (Raufer Decl.) ¶¶ 14–17. Children, especially young children and children with developmental delays, often struggle to communicate clearly. *See* ECF 23-8 ¶ 16; ECF 23-7 ¶ 14; Ex. 2 (Fortuna Report) at 23–24. Moreover, children come to their asylum interviews already scared and anxious, especially if they are suffering from post-traumatic stress symptoms. *See* ECF 23-11 ¶ 44; ECF 23-12 ¶ 33. An asylum officer's job is to read these various cues and find ways to connect with

the child and make them comfortable. *See* Ex. 1 (Raufer Decl.) ¶ 16. Asylum officers cannot properly do so when the interview is virtual, making it hard to "[identify or evaluate] signs of confusion or distress." Ex. 2 (Fortuna Decl.) at 23. The child, in turn, feels even more disconnected, nervous, and isolated, and, as a result, is unable to fully and meaningfully participate in their interview from behind a screen. *See* ECF 23-9 ¶¶ 45–50; Ex. 6 (Avila-Cimpeanu Supp. Decl.) ¶¶ 9–11. Scheduling a virtual interview without first determining if it is appropriate for a particular child applicant risks an adverse determination based on misunderstandings or misreadings of a child's testimony. *See* Ex. 2 (Fortuna Report) at 23; *see also Rusu,* 296 F.3d at 322.[15] In some cases, Defendants have used virtual interviews as a basis to bypass notice to counsel, compounding the due process violations in this practice. *See* 23-9 ¶¶ 45–47; Ex. 8 (Fisher Flores Decl.) ¶¶ 4–6.

***c. A Return to Prior Procedures Does Not Undermine USCIS's Interests.***

USCIS does not have an interest in "unlawful agency action." *League of Women Voters of the U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) ("*Newby*"); *Urquilla Ramos v. Trump*, 821 F. Supp. 3d 603, 631 (S.D.W.Va. 2026). To the extent the agency asserts an interest in the speedy resolution of asylum cases, that interest does not overcome unaccompanied children's constitutionally protected interest in a non-adversarial asylum interview before USCIS. *See Garcia Vasquez v. Mullin*, No. 1:26-CV-3011 (LMB/LRV), 2026 WL 3120655, at *6 (E.D. Va. Oct. 16, 2026) ("[C]ourts in this circuit" have repeatedly "conclude[d] that the noncitizen's interest in avoiding the risk of erroneous removal substantially outweigh the modest administrative burden of [procedural safeguards]."). Moreover, restoring the agency's longstanding practices does not

[15] In one extreme example, a child who had been the victim of severe sexual abuse was forced to participate in a virtual interview the day after she was discharged from the hospital due to a heart condition. ECF 23-6 ¶¶ 48–50. Despite the child crying, clutching her heart and asking to end the interview, the asylum officer pressed on. *Id.* A supervisor came to the virtual room, admonished the attorney for explaining the young girl's heart condition, and pressed the child—through the screen—to carry on. *Id.*

impose fiscal or administrative burdens on USCIS and, as the Court has already concluded, serves the public interest. *See* ECF 54 at 17–18; *see also Mathews*, 424 U.S. at 347 ("[T]he final factor to be assessed is the public interest."). Here, Plaintiffs are not seeking additional procedural safeguards beyond what USCIS itself previously deemed necessary to protect children's rights—only that USCIS cease the implementation of new policies that strip these children of their procedural due process rights. All three *Mathews* factors therefore weigh in Plaintiffs' favor.

### C. EOIR's and DOJ's Detained Docket Deadline Violates the APA.

Bookending the effort to accelerate proceedings for unaccompanied children is EOIR's policy for the immigration courts: a directive that immigration judges complete detained unaccompanied children's cases by a date certain on or before January 31, 2027.[16] EOIR has not made the Deadline public, *see* ECF 23-7 ¶ 34, but Plaintiffs' evidence documents both the directive and uniform scheduling rules that implement it. Like the USCIS policies, EOIR's Deadline is final agency action, and it is arbitrary and capricious under the APA.

#### 1. <u>The Deadline Constitutes Final Agency Action.</u>

The Detained Docket Deadline satisfies both prongs of the *Bennett* test for final agency action. When an agency has not written down its policy, courts find finality—the first *Bennett* prong—where officials acknowledge the policy and the agency's conduct shows that the policy is being implemented. *See Escobar Molina v. U.S. Dep't of Homeland Sec.*, 811 F. Supp. 3d 1, 44–47 (D.D.C. 2025); *Amadei v. Nielsen*, 348 F. Supp. 3d 145, 166 (E.D.N.Y. 2018) (citing defendant agency's behavior as evidence of a final policy). The record here reflects both types of evidence.

To begin, immigration judges and court staff have tied children's hearing schedules to a completion date that they describe as coming from EOIR or from court administrators, not from the judge presiding over the case. *See* ECF 23-12 ¶ 55 (judge stating that all cases were to be "complete" by the end of the year); ECF 23-6 ¶ 63; Ex. 3 (Donovan-Kaloust Supp. Decl.) ¶ 12

[16] As discussed *supra* at n. 6, EOIR appears to have recently expanded its Detained Docket Deadline to reach non-detained unaccompanied children and even juveniles who are not designated "unaccompanied" but whose cases are on a single juvenile docket.

(written order stating that case "has been identified as a priority case by EOIR and must be completed no later than October 31, 2026); Ex. 10 (Nally Supp. Decl.) ¶ 12; Ex. 11 (Hough Supp. Decl.) ¶ 10; Ex. 15 (Abad Decl.) ¶ 7; Ex. 7 (Nafisi Decl.) ¶ 10; Ex. 9 (Sanchez Kennedy Supp. Decl.) ¶ 15. A former immigration judge reports that court administrators have blocked judges and staff from setting hearings past a fixed date. Ex. 12 (Cassin Decl.) ¶ 20.

Consistent with that directive, immigration judges across the country are applying the same scheduling restrictions and describing them as mandatory. Once USCIS refers a child's application for asylum to the immigration court, judges set an individual hearing within roughly two to four weeks or, in some cases, grant DHS's motion to pretermit the application without hearing the child's testimony. *See* ECF 23-11 ¶ 51; ECF 23-12 ¶ 52; Ex. 3 (Donovan-Kaloust Supp. Decl.) ¶¶ 18, 20; Ex. 6 (Avila-Cimpeanu Supp. Decl.) ¶¶ 8, 13, 15; Ex. 7 (Nafisi Decl.) ¶ 12; Ex. 8 (Fisher Flores Supp. Decl.) ¶ 17; Ex. 9 (Sanchez Kennedy Supp. Decl.) ¶ 14; Ex. 10 (Nally Supp. Decl.) ¶¶ 10, 17; Ex. 14 (Harrington Decl.) ¶¶ 8, 10; Ex. 12 (Cassin Decl.) ¶ 27. And when Plaintiffs and other practitioners seek more time, immigration judges consistently respond that they cannot grant continuances longer than three weeks in detained children's cases. *See* ECF 23-12 ¶¶ 52, 53; ECF 23-11 ¶ 49; ECF 23-7 ¶ 34; ECF 23-9 ¶¶ 60–61; ECF 23-8 ¶ 43; ECF 23-6 ¶¶ 60–61; Ex. 8 (Fisher Flores Supp. Decl.) ¶¶ 9, 12; Ex. 10 (Nally Supp. Decl.) ¶¶ 9, 11; Ex. 11 (Hough Supp. Decl.) ¶ 8; Ex. 12 (Cassin Decl.) ¶ 19 (former immigration judge reporting that judges "are now only permitted to provide continuances of a few weeks"). As a former immigration judge who regularly observes the New York juvenile dockets described it, the new case scheduling practices reflect "an intentional fast tracking of immigrant children's cases." Ex. 12 (Cassin Decl.) ¶ 23.

These acknowledgments of the directive, together with the consistent course of conduct that implements them, show that the Deadline reflects the consummation of EOIR's decision-making rather than the independent scheduling choices of individual judges. *See Escobar Molina*, 811 F. Supp. 3d at 44–47.

The Deadline also satisfies *Bennett*'s second prong because it has legal consequences for both Plaintiffs and EOIR. Agency action satisfies *Bennett*'s second prong when it determines the agency's own rights or obligations or those of its personnel. *See Maryland v. Patel*, --- F. Supp. 3d ---, 2026 WL 2389783, at *13–14 (D. Md. Aug. 17, 2026) (FBI's order to redirect funds satisfies the second *Bennett* prong because the decision "determined an agency's own 'rights or obligations' or those of its personnel" (citing *Bennett*, 520 U.S. at 178)); *Philadelphia Yearly Meeting of Religious Soc'y of Friends v. U.S. Dep't of Homeland Sec.*, No. CV 25-0243-TDC, 2026 WL 280089, at *3 (D. Md. Feb. 3, 2026) (collecting cases). In particular, "'where agency action withdraws an entity's previously-held discretion' in an area subject to its coverage, it effectively binds the entity and thus constitutes a final agency action." *Id.* at *4 (quoting *Texas v. Equal Emp. Opportunity Comm'n*, 933 F.3d 433, 442 (5th Cir. 2019)).

That is how the Deadline works here. Immigration judges have long exercised discretion over continuances and hearing dates, *see* Ex. 12 (Cassin Decl.) ¶¶ 11–13; Ex. 13 (Khan Decl.) ¶ 20, but they now tell practitioners that they cannot grant continuances beyond three weeks, *see* Ex. 10 (Nally Supp. Decl.) ¶ 9; Ex. 7 (Nafisi Decl.) ¶ 10; ECF 23-11 ¶ 49; ECF 23-7 ¶ 34; Ex. 11 (Hough Supp. Decl.) ¶ 8, Ex. 12 (Cassin Decl.) ¶ 19; Ex. 14 (Harrington Decl.) ¶ 11 (judges stating they no longer have discretion to provide unaccompanied children with more time). And when a judge does set a later date, the hearing may be moved up to meet the Deadline. *See* Ex. 11 (Hough Supp. Decl.) ¶ 8; Ex. 8 (Fisher Flores Supp. Decl.) ¶ 9; Ex. 10 (Nally Supp. Decl.) ¶ 11; *see also* Ex. 12 (Cassin Decl.) ¶ 20.

This lack of discretion has serious legal consequences for Plaintiffs and their clients, who are now forced to compress into a few weeks the client preparation, evidence collection, and motion practice that previously took months. *See* ECF 23-9 ¶ 66; ECF 23-6 ¶¶ 64, 65; ECF 23-7 ¶ 35; Ex. 7 (Nafisi Decl.) ¶ 22; Ex. 8 (Fisher Flores Supp. Decl) ¶¶ 15–17. Children are proceeding on incomplete records, without adequate time to prepare to testify and face cross-examination, and sometimes without their primary attorney. *See* ECF 23-7 ¶¶ 35, 40; ECF 23-11 ¶ 52; ECF 23-9 ¶ 66; Ex. 7 (Nafisi Decl.) ¶ 22; Ex. 8 (Fisher Flores Supp. Decl.) ¶ 16; Ex. 6 (Avila-Cimpeanu

Supp. Decl.) ¶¶ 7–8, 13; Ex. 10 (Nally Supp. Decl.) ¶¶ 15–16; Ex. 3 (Donovan-Kaloust Supp. Decl. ¶¶ 19–20; Ex. 9 (Sanchez-Kennedy Supp. Decl.) ¶¶ 25–27. The Detained Docket Deadline is therefore final agency action subject to judicial review under the APA.

2. The Deadline Is Arbitrary and Capricious.

The Deadline is arbitrary and capricious under the *State Farm* factors. *See State Farm*, 463 U.S. at 43. *First*, to the extent the Deadline reflects a decision to accelerate children's removal proceedings regardless of their individual circumstances, it rests on a factor Congress did not intend EOIR to consider. *See State Farm*, 463 U.S. at 43; *see also* ECF 57 at 2, 4–5 (noting efforts by HHS, DOJ, and DHS to prioritize unaccompanied child cases and the importance of "coordination between the affirmative asylum process and immigration court proceedings"). EOIR has a legitimate interest in efficient adjudication, but the Deadline's fixed completion date goes far beyond that when it targets unaccompanied children for hasty adjudication that risks depriving them of the right to find counsel, gather evidence, or prepare to testify. Congress struck a different balance for unaccompanied children. It exempted them from the one-year filing deadline for asylum applications, 8 U.S.C. § 1158(a)(2)(E); granted USCIS initial jurisdiction over their asylum applications, *id.* ¶ 1158(b)(3)(C); and directed that their applications be governed by regulations that take into account their specialized needs and address "both procedural and substantive aspects" of their cases. *Id.* § 1232(d)(8).

*Second*, EOIR "entirely failed to consider an important aspect of the problem": the Deadline's effect on children's ability to seek asylum. *State Farm*, 463 U.S. at 43. "[C]onsideration of the effects on bona fide asylum seekers is of paramount importance." *Casa de Maryland, Inc. v. Wolf*, 486 F. Supp. 3d 928, 965 (D. Md. 2020) (noting government non-opposition to this proposition). That principle carries added weight here, where Congress explicitly guaranteed heightened procedural and substantive safeguards—including the right to counsel, to the greatest extent practicable—to unaccompanied children seeking asylum. *See* 8 U.S.C. § 1232(c)(5), (d)(8). There is no indication that EOIR considered how a near-term fixed completion date—which would unavoidably limit the discretion of immigration judges to consider

the needs of each case before them and grant continuances accordingly—would affect children who need time to build trust with counsel, gather evidence, and prepare to testify in an adversarial proceeding.

*Third*, and finally, EOIR did not account for the "serious reliance interests" that its longstanding practice engendered. *Regents*, 591 U.S. at 30 (quoting *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 212 (2016)). Prior to the Detained Docket Deadline, Plaintiffs accepted clients based on their understanding that EOIR would grant reasonable continuances sufficient to develop a child client's asylum claims, gather supporting evidence, and prepare the child for testimony and cross-examination. *See* ECF 23-9 ¶¶ 55–56; ECF 23-11 ¶¶ 27–31; ECF 23-8 ¶¶ 43–44. They set caseloads accordingly. *See* ECF 23-8 ¶¶ 31, 59; Ex. 6 (Avila-Cimpeanu Supp. Decl.) ¶ 17; Ex. 3 (Donovan-Kaloust Supp. Decl.) ¶ 21; Ex. 14 (Harrington Decl.) ¶ 13. Under the Deadline, however, Plaintiffs receive only a few weeks' notice before a trial, often on the heels of an expedited USCIS process, and in some cases cannot attend their clients' hearings because of agency-created scheduling conflicts. *See* ECF 23-9 ¶¶ 58–59, 61, 66; ECF 23-12 ¶¶ 64, 65; ECF 23-7 ¶¶ 35, 40; ECF 23-8 ¶ 45; Ex. 10 (Nally Supp. Decl.) ¶¶ 14–18. EOIR's failure to consider Plaintiffs' reliance interests before fundamentally transforming the immigration process for unaccompanied children was arbitrary and capricious. *See Regents*, 591 U.S. at 30; *Encino Motorcars, LLC*, 579 U.S. at 221; *League of Women Voters of the U.S. v. U.S. Citizenship & Immigr. Servs.*, 839 F. Supp. 3d 292, 347–48 (D. Md. 2026).

## II. Defendants' Policies Are Causing Ongoing Irreparable Harm to Plaintiffs and Their Unaccompanied Child Clients.

The Court has already concluded that the "dire confluence of circumstances that prevent the meaningful representation of highly vulnerable children moving through the immigrations system" "'cannot be fully cured by later remedial action.'" ECF 54 at 16 (quoting *Ass'n of Cmty. Cancer Ctrs. v. Azar*, 509 F. Supp. 3d 482, 501 (D. Md. 2020)). The confluence of circumstances is no less dire at this juncture, particularly given the reality that USCIS's policies directly feed into

EOIR's implementation of the Detained Docket Deadline. *See, e.g.*, Ex. 6 (Avila-Cimpeanu Supp. Decl.) ¶ 13; Ex. 7 (Nafisi Decl.) ¶ 11; Ex. 8 (Fisher Flores Supp. Decl.) ¶ 16. Absent further injunctive relief, USCIS would be free to revive its unlawful policies, forcing Plaintiffs to forgo numerous fundamental components of their representation of unaccompanied children and depriving their young clients of effective representation at fast-tracked asylum interviews. Moreover, USCIS continues to violate the TRO. ECF 63 at 1–2 (finding noncompliance); *cf. Costa v. Bazron*, 464 F. Supp. 3d 132, 142 (D.D.C. 2020) ("If compliance with the terms of a TRO were sufficient to defeat entry of a preliminary injunction, few—if any—cases would make it past the TRO stage. That is true even when . . . a defendant has acted conscientiously and in good faith."). Plaintiffs have further alleged that USCIS is violating the Fifth Amendment rights of their unaccompanied child clients, and "the denial of a constitutional right constitutes irreparable harm." *Doe 1 v. Off. of the Dir. of Nat'l Intel.*, 180 F.4th 536, 549 (4th Cir. 2026) (citations omitted).

EOIR's Detained Docket Deadline irreparably harms Plaintiffs by impeding their core activity of effectively representing their unaccompanied child clients. A merits hearing on an asylum application is an adversarial proceeding that requires time-intensive preparation and a meaningful opportunity to develop arguments in a particularly nuanced area of the law. *See, e.g.*, *Quintero v. Garland*, 998 F.3d 612, 632 (4th Cir. 2021) (finding that, in asylum cases, immigration judges have a particularly important duty to develop the record because "the law of asylum is one of the most complex areas [of immigration law]"). The Deadline condenses that process into a matter of weeks. *See, e.g.*, Ex. 10 (Nally Supp. Decl.) ¶ 17; Ex. 11 (Hough Supp. Decl.) ¶ 21. Plaintiffs do not "have the time, staff, or resources to gather evidence and build the record to present a full asylum case to the immigration judge on such a quick timeline [as EOIR is imposing]." ECF 23-6 ¶ 64; *see also* Ex. 7 (Nafisi Decl.) ¶ 16; Ex. 10 (Nally Supp. Decl.) ¶ 17; Ex. 11 (Hough Supp. Decl.) ¶¶ 20–21; Ex. 3 (Donovan-Kaloust Supp Decl.) ¶ 19. In the coming weeks and months, Plaintiffs face a deluge of hearings for which "[i]t is not possible to adequately prepare a child client," especially given the unique sensitivity and care required when representing a child in adversarial proceedings. Ex. 10 (Nally Supp. Decl.) ¶ 15; Ex. 7 (Nafisi Decl.) ¶¶ 18–19.

Plaintiffs' "staff are suffering under the extreme pressure to complete multiple cases on impossible timelines," leading to burnout, attrition, and diminished well-being. *See* Ex. 10 (Nally Supp. Decl.) ¶ 14; Ex. 11 (Hough Supp. Decl.) ¶ 22; Ex. 3 (Donovan-Kaloust Supp. Decl.) ¶ 16.

Because of EOIR's policy, Plaintiffs' unaccompanied child clients are afforded little-to-no time to prepare for an adversarial proceeding with life-or-death stakes. *See, e.g.*, Ex. 10 (Nally Supp. Decl.) ¶¶ 17–18; Ex. 11 (Hough Supp. Decl.) ¶ 17; Ex. 7 (Nafisi Decl.) ¶¶ 21–22; Ex. 8 (Fisher Flores Supp. Decl.) ¶¶ 20–21; *see also* Ex. 2 (Fortuna Report) at 24–25. These children risk receiving a removal order at a proceeding in which they were denied effective representation—an outcome that has already occurred in multiple cases. *See, e.g.*, Ex. 7 (Nafisi Decl.) ¶¶ 14–15; Ex. 8 (Fisher Flores Supp. Decl.) ¶¶ 16–18; Ex. 11 (Hough Supp. Decl.) ¶¶ 17–18; Ex. 6 (Avila-Cimpeanu Supp. Decl.) ¶ 19; Ex. 12 (Cassin Decl.) ¶¶ 21, 28; Ex. 3 (Donovan-Kaloust Supp. Decl.) ¶¶ 24, 26; Ex. 16 (Smith Decl.) ¶¶ 17–19; *see also M.M.M. ex rel. J.M.A. v. Sessions*, 347 F. Supp. 3d 526, 535 (S.D. Cal. 2018) ("[D]epriving [children] of their right to seek asylum" constitutes irreparable harm); ECF 54 at 14 (citing *Romero v. Bondi*, 150 F.4th 332, 347 (4th Cir. 2025) (determining that petitioner "was denied a fundamentally fair removal hearing by the ineffective representation of her former counsel")). And as with USCIS's policies, final judgment after trial cannot go back in time and enable Plaintiffs to provide effective representation to unaccompanied children at hearings that have already occurred. *See* ECF 54 at 14; *Ass'n of Cmty. Cancer Ctrs.*, 509 F. Supp. 3d at 501 (D. Md. 2020) (finding irreparable harm where "damage done by [agency's] violation of the APA cannot be fully cured by later remedial action").

## III. The Balance of Equities and the Public Interest Strongly Favor Plaintiffs.

The balance of equities and public interest factors "'merge when,' as here, 'the Government is the opposing party.'" *Karem v. Trump*, 960 F.3d 656, 668 (D.C. Cir. 2020) (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)). These factors weigh heavily in Plaintiffs' favor. Absent preliminary relief, Plaintiffs and their unaccompanied child clients face an unlawfully fast-tracked asylum procedure that prevents effective representation and harms vulnerable children. "[T]here

is generally no public interest in the perpetuation of [such] unlawful agency action." *City of Columbus v. Kennedy*, 796 F. Supp. 3d 123, 174 (D. Md. 2025) (quoting *Newby*, 838 F.3d at 12). That conclusion applies with particular force here, as Plaintiffs seek in part to vindicate Fifth Amendment rights, and "upholding constitutional rights surely serves the public interest." *Newsom ex rel. Newsom v. Albermale Cnty. Sch. Bd.*, 354 F.3d 249, 261 (4th Cir. 2003). Moreover, Plaintiffs seek relief grounded in the "substantial public interest in having government agencies abide by the federal laws that govern their existence and operations." *Newby*, 838 F.3d at 12 (citation and quotation marks omitted).

In seeking reconsideration, Defendants invoke an interest in administrative efficiency and unfounded generalizations about the interests of unaccompanied children, irrespective of children's specific situations or the professional judgment of their counsel. To the extent Defendants assert "an interest in adjudicating asylum claims," they remain unable to show why "the public has an interest in the perpetuation of [the] chaotic system" that they have implemented. ECF 54 at 17. Moreover, Defendants continue to fail to engage with Plaintiffs' extensive accounts of the harm their policies inflict. *Cf.* ECF 57 at 12 (suggesting, incredibly, that the TRO "might benefit the advocates challenging the policy" while failing to "serve the long term interests of UACs."). The balance of the equities and the public interest thus weigh heavily in Plaintiffs' favor.

## IV. Plaintiffs Are Entitled to a Universal Stay.

In requesting reconsideration, Defendants challenge the scope of the TRO on two grounds, both of which are unfounded. *First*, Defendants argue without merit that the scope of the Court's order is impermissibly broad. However, as the Court has found, relief issued pursuant to Section 705 of the APA "'need not be limited to [p]laintiffs." ECF 54 at 18 n.12 (quoting *Am. Hosp. Assoc. v. Kennedy*, 820 F. Supp. 3d 30, 47 (D. Me. 2025), and citing *City of Columbus*, 96 F. Supp. 3d at 176). Defendants are wrong to argue that this relief cannot be squared with the Supreme Court's decision in *Trump v. CASA, Inc.*, 606 U.S. 831 (2025). "*CASA* does not control the scope of relief available under 5 U.S.C. § 705." *Ctr. for Taxpayer Rts. v. Internal Revenue Serv.*, 190 F.4th 990, 1011 (D.C. Cir. 2026) (citation and quotation marks omitted). The Court is well within

its authority to issue a Section 705 stay of Defendants' unlawful policies pending final resolution of this matter. *See, e.g.*, *id.*; *League of Women Voters of the U.S. v. U.S. Citizenship & Immigr. Servs.*, 839 F. Supp. 3d 292, 350–51 (D. Md. 2026); *Am. Fed'n of Tchrs. v. Dep't of Educ.*, 779 F. Supp. 3d 584, 622–23 (D. Md. 2025).

*Second*, Defendants raise a separate objection to what they consider the Court's violation of the principle in *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council*, according to which, in general, "administrative agencies should be free to fashion their own rules of procedure." 435 U.S. 519, 543 (1978) (internal quotation marks omitted). But *Vermont Yankee* concerns an agency's formulation of "new procedures for the regulatory process," *Am. Radio Relay League, Inc. v. Fed. Commc'ns Comm'n*, 524 F.3d 227, 239 (D.C. Cir. 2008), which this case does not implicate. It does not displace the Court's authority to set aside agency action under 5 U.S.C. § 706(2), to determine that agency action falls short of constitutional muster, or to determine that an agency has failed to follow its own procedures affecting individual rights. *See, e.g.*, *Advocs. for Highway & Auto Safety v. Fed. Motor Carrier Safety Admin.*, 429 F.3d 1136, 1150 (D.C. Cir. 2005); *Am. Radio Relay League*, 524 F.3d at 243; *Morton v. Ruiz*, 415. U.S. 199, 235–36 (1974). Plaintiffs ask the Court to order the agencies to revert to a lawful status quo and to adhere to their own governing law.[17]

## CONCLUSION

Congress gave unaccompanied children a distinct pathway to apply for asylum. For years, USCIS and EOIR implemented that framework through practices that gave children time to find counsel, gather evidence, and explain why they fled their home countries. Defendants' policies subordinate that framework to the goal of resolving children's cases as quickly as possible, *see* ECF 57 at 6, and the record shows the cost: children interviewed without counsel or supporting evidence, tried within weeks of referral, and ordered removed before their claims can be fully

[17] Even if *Vermont Yankee* were somehow applicable, the Supreme Court explicitly exempted situations like this one, in which a "constitutional constraint" limits an agency's latitude in creating rules of procedure. *Vermont Yankee*, 435 U.S. at 543.

presented. Preliminary relief would restore Congress's intended framework while this case proceeds.

For the foregoing reasons, Plaintiffs respectfully request that this Court deny Defendants' motion for reconsideration and enter the accompanying Proposed Order, which would (1) extend the Court's stay of USCIS's Inadequate Notice Policy and Exceptional Circumstances Policy under 5 U.S.C. § 705 until final judgment; (2) preliminarily enjoin Defendants USCIS and DHS from denying unaccompanied children rights and benefits conferred under the Immigration and Nationality Act, as amended by the TVPRA, and the Due Process Clause of the Fifth Amendment to the United States Constitution; (3) stay EOIR's Detained Docket Deadline under 5 U.S.C. § 705; (4) order Defendants USCIS and EOIR to update internal guidance and template notices to help ensure compliance with this Preliminary Injunction and to provide additional instructions to asylum office staff and immigration judges, respectively, with updated guidance and procedures consistent with this Preliminary Injunction; (5) order Defendant USCIS to provide clear instructions as to how to make requests to reschedule interviews under this Order and promptly respond to requests to reschedule under this Order, within 24 hours whenever possible; (6) order Defendants to provide monthly Status Reports describing all steps taken to comply with the Preliminary Injunction.

Dated: November 12, 2026

Respectfully submitted,

TRIAL IMPACT PROJECT

*/s/ Sara Haji*
Sara Haji, *pro hac vice*
Marjorie J. Menza, *pro hac vice*
523 W. 6th Street, Suite 450
Los Angeles, CA 90014
Telephone: (213) 542-5241
shaji@trialimpact.org
mmenza@trialimpact.org

NATIONAL IMMIGRATION LAW CENTER

CENTER FOR GENDER & REFUGEE STUDIES

*/s/ Melissa Crow*
Melissa Crow (Bar No. 15622)
1901 Pennsylvania Avenue, NW
Suite 900, PMB 228
Washington, DC 20006
Telephone: (202) 355-4471
crowmelissa@uclawsf.edu

*/s/ Robert Pauw*
Robert Pauw, *pro hac vice* motion pending

*/s/ Kevin Siegel*
Kevin Siegel, *pro hac vice*
P.O. Box 34573
Washington, DC 20043
Telephone: (202) 216-0261
Fax: (202) 216-0266
siegel@nilc.org

NATIONAL CENTER FOR YOUTH LAW

*/s/ Mishan Wroe*
Mishan Wroe, *pro hac vice*
Diane de Gramont, *pro hac vice*
Neha Desai, *pro hac vice*
428 13th Street, Floor 5
Oakland, CA 94612
Telephone: 510.920.8098
mwroe@youthlaw.org
ddegramont@youthlaw.org
ndesai@youthlaw.org

c/o Gibbs Houston Pauw
1000 Second Avenue, Suite 1600
Seattle, WA 98104
Telephone: (206) 682-1080
rpauw@ghp-law.net

NATIONAL IMMIGRATION LAW CENTER

*/s/Lynn Damiano Pearson*
Lynn Damiano Pearson, *pro hac vice*
Hannah K. Comstock, *pro hac vice*
3450 Wilshire Blvd. #108 – 62
Los Angeles, CA 90010
Telephone: (213) 639-3900
Fax: (213) 639-3911
damianopearson@nilc.org
Comstock@nilc.org