# EXHIBIT 12

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MARYLAND**
**GREENBELT DIVISION**

| | |
|---|---|
| THE DOOR, *et al*;<br><br>Plaintiffs,<br>vs.<br><br>Joseph EDLOW, *et al*,<br><br>Defendants. | **Case No. 8:26-CV-04326-BAH**<br><br>**DECLARATION OF OLIVIA CASSIN IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION** |

## DECLARATION OF OLIVIA CASSIN

1. My name is Olivia Cassin. I certify under penalty of perjury that the following statement is true and correct.
2. I am over the age of 18 years old and make this declaration based upon my personal knowledge and experience. If called to do so, I could and would competently and accurately testify to these matters under oath.
3. I am currently the Legal Director of ICARE, a coalition of legal advocates which aims to expand access to legal representation for immigrant children and youth facing deportation in New York City. At ICARE, I oversee our court support efforts for unaccompanied children and youth navigating immigration proceedings in New York

City. I work to strengthen coordination, training, and access to resources across ICARE's provider network. I also design and participate in training for youth appearing *pro se* before the New York Immigration Court. With other ICARE staff, I act on a weekly basis as an informal "Friend of Court" before certain judges presiding over the juvenile dockets on master calendar days. I also spend some time every week observing the juvenile dockets at the New York City's Immigration Courts.

## I. My Work with Unaccompanied Children prior to 2025-26

4. Prior to my work at ICARE, I was an Immigration Judge ("IJ") at the New York Immigration Court at 26 Federal Plaza from 2015 until 2021. From 2021 until 2025, I was an IJ at the New York Immigration Court at 290 Broadway. I was appointed to the bench in 2015 by Attorney General Loretta Lynch.

5. IJs are administrative law judges appointed by the Attorney General, and they operate within the Executive Office for Immigration Review ("EOIR"). Operational instructions and procedures governing immigration courts, including the implementation of new regulations, training of immigration judges, and setting of priorities and time frames for adjudication of cases, are managed by the Chief Immigration Judge, while the day-to-day operations of each immigration court around the country are managed by an Assistant Chief Immigration Judge assigned to that court. Each immigration court also has a Court Administrator, whose role is to oversee the supervisory staff and staff, and meet the day-to-day needs of the court.

6. During my tenure as an IJ at 26 Federal Plaza, I presided over the non-detained juvenile docket, a specialized docket for unaccompanied minors and youth, where I witnessed first hand the particular vulnerability and special needs of immigrant children and youth, including unaccompanied minors, appearing before me.

7. While on the juvenile docket, I was required to receive specialized training on the

adjudication of cases involving minors. This training included child-friendly practices where I would specifically not wear a robe. We were trained to provide an orientation to all those in the Courtroom with language easily understood by young children. We were trained specifically on how to prioritize the best interests of children appearing before us. Immigration Judges were also provided training on the special forms of relief available to children, including special immigrant juvenile status ("SIJS") and asylum. We also received training on trauma-informed adjudication of cases and secondary trauma, as well as ongoing specialized training for IJs covering a juvenile docket. In addition, I received and provided annual continuing legal education training with the entire IJ Corps.

8. Throughout my time on the juvenile docket, there were protective measures in place for unaccompanied children. With the assistance of local EOIR leadership at 26 Federal Plaza, legal service providers as well as private law firms and members of the American Immigration Lawyers Association took turns screening and assisting all unrepresented unaccompanied and young Respondents appearing in Court on the juvenile docket. The Court permitted members of the Department of Education to assist young respondents to enroll in school. There were also representatives of NY Social Services entities providing information about health benefits. The Court Administrator permitted and encouraged this set-up, understanding the special needs of unaccompanied minors and other immigrant children. After the young Respondents met with a lawyer or legal representative, they would then appear in Court with a letter documenting the screening and requesting time to meet with the organization or lawyer who had screened their case for possible representation.

9. On November 21, 2025, at approximately 4:00 p.m., I was informed by the Court Administrator that I had been terminated from my position as an Immigration Judge. The Court Administrator urged me to open my work e-mail. I immediately realized that I

received an email informing me that my employment was terminated pursuant to Article II of the United States Constitution.  As soon as I read the e-mail, my computer access was immediately cut off.   I was unable to print my termination notice or any other documents.

## II. My Discretion as an IJ While on the Bench

10. While I was on the bench, neither EOIR, the Office of the Chief Immigration Judge, nor the assigned Assistant Chief Immigration Judge would ever directly involve itself/themselves in the adjudication of an individual case. The role of EOIR, the Chief Immigration Judge, and the Assistant Chief Immigration Judge was to provide general guidance and oversight. There were times that an immigration judge would receive guidance about when certain cases should be completed, but such advice and guidance were limited and never binding on the immigration judge.

11. Certainly, in my experience as an immigration judge, I was always able to grant or deny a continuance or to schedule a merits hearing based on my discretion, the facts, and the individual circumstances of the case. I remember a training in or about 2018 on best practices regarding what constitutes good cause for granting a continuance.

12. During the entire time I was on the bench, IJs were afforded ample discretion in how we handled our dockets consistent with statutes, regulation, and agency guidance. This included the ability to administratively close proceedings, terminate proceedings, and continue proceedings for respondents as required per the complexities and details of each individual case. In my experience as an IJ, having the independence and ability to manage my docket was essential to ensure that I could effectively and efficiently perform my job duties as a neutral arbiter. The ability to manage my docket without interference preserved my ability to ensure I was making decisions independently. It was also essential to ensure that every respondent appearing before me was provided due process

and had a meaningful opportunity to present their case. This was especially important when working with particularly vulnerable populations, such as unaccompanied children.

13. During my time on the bench, when an immigration judge would schedule a case for either a master calendar hearing or a merits hearing, he/she was free to select a date as required by the facts of the matter. The "reset dates," the term we used to refer to the next date we scheduled in a case, were under the IJ's control and discretion. The sole exception was that management at EOIR Head Quarters determined how far in the future a hearing date could be scheduled, which at that time was over a year. For example, while I was on the bench in 2025, IJs were not able to schedule final hearings beyond the end of 2027- over a year out. In my experience, the last available reset date was never just a few months away.

14. While presiding over the juvenile docket, I saw many children appear before me both with and without counsel. The difference in case outcomes cannot be overstated. A noncitizen in removal proceedings has the burden of proving that relief should be granted; if relevant evidence is not submitted to meet the noncitizen's burden of proof, the application for relief must be denied. Children do not understand what evidence is relevant and how to present their case, and thus the assistance of counsel is often essential. In addition, it is essential that a noncitizen in removal proceedings be given adequate time to gather evidence and prepare to present that evidence to the court. Without sufficient time to gather evidence and prepare for the hearing, a noncitizen's application for relief will be denied even though the person is eligible for relief and would be granted if given adequate time to prepare. Children do not have the ability to effectively advocate for themselves. In fact, many children appearing before me were presumptively incompetent because of their age. I always kept in mind what we learned in training, for example, that the brain is not fully formed until young people are in their 20s, when the pre-frontal cortex, the area responsible for impulse control, panning and

emotional regulation, finishes its structural maturation. Keeping in mind such limitations, I often continued the cases of unaccompanied minors several times until they were able to retain counsel. A typical adjournment would often be around 6 months. I would often take into consideration the limited capacity of free legal services in our area at the time. I would also consult my practice with respect to continuances with colleagues on the same docket, and my lengths of continuances were always in line with general norms. I understood the dire need for special protections afforded to unaccompanied children in removal proceedings, and having the ability to continue cases for unrepresented children as needed was essential to ensure that these children's rights were not violated. Having counsel served not only the child, but also the court system as a whole. I also understood that for children, finding counsel was much more difficult than for adults. On a practical level, it is significantly more challenging for a young child, in particular one who is unaccompanied and without adult support, to find legal resources than for an adult. I – and all IJs on the bench - relied greatly on the ability to independently decide what a reasonable continuance would look like for an unrepresented respondent, taking into consideration their age and their case specifics.

15. IJs generally relied on the ability to terminate, to administratively close, to continue, or to place on the status docket proceedings for children who had pending relief before other agencies. Many unaccompanied children before me had a fear of returning to their home countries and had filed applications for asylum before USCIS. They also often had other types of relief pending before USCIS, primarily special immigrant juvenile status and sometimes T and U visas for survivors of trafficking and victims of crime. I would often terminate proceedings for these children in order to ensure that they had the ability to seek relief before USCIS that was not immediately available in immigration court. We had a status docket at my court where I could place matters awaiting agency action. The

ACIJs presided over the status docket, and when a case was ready for adjudication, the ACIJ would reassign the matter to my docket.

## III. Deteriorating court conditions for unaccompanied children between November 2025 and late September 2026.

16. Since I was terminated from my position in November 2025, I have remained in close contact with many of my former colleagues who remain on the bench in the Immigration Courts. I had close connections with them due to my prior role as the union representative for the National Association of Immigration Judges and after its decertification as a representative for the Association. I still communicate with them often.

17. Since leaving the bench, I have learned about a number of alarming changes within the immigration court system. Specifically, my colleagues have informed me of a consistent administrative push to do away with IJ's ability to afford adequate protections to unaccompanied children and youth who are in immigration court proceedings.

18. I have also been working alongside legal service providers who still attempt to represent unaccompanied children. In that capacity, I have personally witnessed these alarming trends and have seen how cases of unaccompanied children are being fast-tracked in dangerous ways. Children with approved SIJS petitions from USCIS – petitions designed to protect particularly vulnerable youth who have been found to have been abused, abandoned, or neglected– have been ordered removed. Currently, children are not being afforded sufficient time in which to obtain counsel.  There is no universal representation for children despite the need and the legislative intent of the TVPRA.

19. I regularly observe both detained and non-detained juvenile dockets held at the New York Immigration Courts at Varick Street, 26 Federal Plaza and 290 Broadway. Since approximately April 2026, I have personally witnessed IJs limiting the continuances they

grant to unaccompanied children. Previously the continuances were granted in 6-month increments or as required by the facts of the matter. From what I have witnessed and learned from my former colleagues, IJs are now only permitted to provide continuances of a few weeks – from what I have seen, no more than three weeks- to unaccompanied children to allow them time to seek counsel. This is true for both detained and non-detained dockets.

20. I have heard from my former colleagues that they simply do not have the ability to continue cases past certain dates, regardless of the need to do so. They are not able to continue a case for more than a few weeks. From what I have learned from colleagues still on the bench, in May 2026 Court Administrators instructed the supervisory staff to block the ability of both IJs and support staff to reset cases for master calendar hearings or merits hearings beyond a certain date, which was about six months later. This means that IJs would have to complete all detained unaccompanied children's cases before that date, and the date I have generally been hearing has been the end of December 2026. Even if an IJ wishes to schedule a case for four weeks beyond the 6-month period, for example, they are unable to do so on the court's calendar.

21. At one recent master hearing in the Spring of 2026, I witnessed an IJ order dozens of unaccompanied children removed within one hour. The IJ either pretermitted their asylum applications, relying on recent BIA precedential decisions and often without providing an individualized analysis, or ruled that SIJS is not protection against deportation. Young children with pending and approved SIJS petitions were ordered removed, even after both family court and USCIS made determinations finding them to be in need of protection that could only be found here in the United States.

22. On September 28, 2026, the unaccompanied children's docket was moved to an entirely different court location, from 201 Varick Street to 290 Broadway. Respondents, who are unaccompanied children- and their representatives, friends of court and child advocates,

were given less than one day's notice of this change. Of course, such changes create chaos and confusion. During the same weekend, we learned that detained children were removed from their ORR selected group homes to different group homes without any notice during the same weekend.

**IV. Critical situation since late September 2026.**

23. Since the end of September 2026, the situation on the detained juvenile docket has reached a critical level. What I have observed in that time cannot be described as other than an intentional fast tracking of immigrant children's cases with a total disregard for their due process rights and special needs.

24. When I observed the detained juvenile docket at 290 Broadway on Monday, September 28, 2026, all the child Respondents and their legal representatives, friends of court and child advocates appeared by Webex. I noticed many changes from previous hearings. There was a lot of confusion, and some of the children had been relocated to new facilities with no notice to their legal representatives. Only the IJ and the attorney for the government were present in the Courtroom, along with a few observers. The IJ was not visible to the Respondent or their counsel. When one of the attorneys pointed this out to the IJ, she responded that the camera was not capable of showing everyone in the courtroom and that she had intentionally pointed the camera at the government counsel and the observers. Conducting hearings with an invisible IJ violates the guidance on best practices for remote hearings, which contemplates that participants be able to see and be seen, hear and be heard. This is particularly important in the cases of pro se immigrant children who do not know who is speaking to them. I should note that the IJ holding such hearings did not even introduce herself to the children or the trial attorney whom they could see on camera.

25. Importantly, the IJ gave extremely short continuances to the child Respondents, the majority of whom were appearing pro se. Most of the child Respondents who had

appeared at a previous master calendar hearing were told that they had one week to fill out an asylum application or the IJ would consider them to have waived their right to apply for asylum. Many of these children had not previously had an opportunity to file an asylum application with USCIS, and IJs proceeded to adjudicate the asylum applications without giving children an opportunity for an interview with USCIS.. The majority of the cases were adjourned from September 28, 2026, to October 5th or 12th, 2026. Lawyers from the US Committee for Refugees and Immigrants appeared as Friends of Court for some of the Respondents. They had not even met most of the Respondents. Nevertheless, the IJ gave the lawyers extremely short adjournments of one or two weeks to meet with the detained children and prepare asylum applications on their behalf. I know from experience that it takes at least several meetings with a child respondent to even gain their trust and for young respondents to feel comfortable discussing some of the most painful episodes of their lives.

26. While observing the juvenile dockets over the past six to eight weeks, I noticed that the IJs rarely explain their actions to the Respondent. On the occasions when they do provide an explanation, they do not do so in a manner designed to make children active participants in their own cases. In the rush to complete the cases, the immigrant children are lost. They are referred to by the last three numbers of their Alien Number, rarely by their names. Judges do not explain next steps, other than to instruct detained children as young as 7 years old, who do not speak English and may not know how to read or write, to complete the asylum application form by answering every question fully and in English.

27. The fast-tracking of cases of detained and non-detained immigrant youth continued through and worsened during October 2026. On the detained docket during the week of October 26, 2026, the immigration judge I observed heard the cases of numerous youth who had just been referred to the court from the asylum office. She scheduled final

merits hearings for all the respondents for dates in mid-November, providing only 2 or 3 weeks for the attorneys and their young clients to prepare for these hearings. In my experience, it is completely unreasonable for an IJ to expect an attorney to prepare a case for trial in that time period, especially for an unaccompanied child.

28. On the non-detained docket, I observed an immigration judge at 26 Federal Plaza order approximately nine (9) young respondents removed in approximately one hour. Most respondents were in the process of applying for SIJS. Their cases ranged from seeking predicate orders in family court which are necessary for young people to apply for SIJS, to respondents with approved I-360 petitions for SIJS awaiting the availability of a visa. In denying motions for a continuance or termination of proceedings, the judge stated "I am not allowed to do these adjournments any more." This suggests that she had orders from EOIR to deny continuances even where in the past she would have found good cause for a continuance.

29. Equally concerning was the judge's frequent invitation to the assigned DHS counsel to make unilateral motions. In nearly every case the judge asked: "Department, any motions?", to which the attorney for DHS invariably asked the judge for a removal order on the ground that there are no applications before the court and no immediate path to lawful status.

30. In cases where respondents had applied for asylum, including cases of unaccompanied children with asylum applications pending before the asylum office, DHS moved to pretermit the applications under the applicable case law and, in a very cursory manner, stated that the persecutors are private actors and that respondents have not met their burden to show that the government is unable or unwilling to protect respondents. The

judge gave children 30 days to oppose the DHS's motions. In my experience, it is unreasonable to ask a child to defend against this kind of motion without an opportunity to develop the record and it violates the TVPRA for the judge to make a determination on an unaccompanied child's asylum application while the application is pending before USCIS.

31. In addition, I was informed that week by court personnel at 26 Federal Plaza that there are going to be additional changes to which judges will hear the detained juvenile dockets. I was told that judges sitting in New York will start hearing cases of young respondents detained in other states. I am concerned that this constant reassignments of cases is going to create more chaos and hardship for respondents and their representatives. I have read new reports of attorneys having to appear before a new judge with little or insufficient advance notice.

32. From my observations of the juvenile docket at the New York Immigration Courts, I have come to the conclusion that EOIR is directing the Immigration Judges to complete the cases of unaccompanied minors as soon as possible and more specifically by a date near the end of 2026. I have witnessed Immigration Judges scheduling multiple merits hearings in November and December 2026. I recall an instance when a Respondents' counsel asked the judge for a merits hearing date in 2027 because they have too many cases scheduled in the final months of 2026. The judge offered counsel several dates before and after Thanksgiving or Christmas and eventually when counsel did not accept those dates, the Judge scheduled the merits hearing for a date in November 2026.

33. What I have observed over the past several months on the juvenile dockets in New York is a complete disregard for the TVPRA and for the due process rights of unaccompanied children. It is my belief that EOIR has a policy of fast-tracking these cases. I am deeply

concerned for the safety and welfare of all unaccompanied children in removal proceedings because EOIR is quickly and imminently moving their cases forward in a way that prevents IJs from considering their claims for immigration relief.

*I certify under penalty of perjury that the foregoing is true and correct to the best of my knowledge and abilities.*

Executed on this 10th day of November, 2026 in New York, New York.



Olivia Cassin