# EXHIBIT 13

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MARYLAND**
**GREENBELT DIVISION**

| | |
|---|---|
| THE DOOR, *et al*;<br><br>Plaintiffs,<br>vs.<br><br>Joseph EDLOW, *et al*,<br><br>Defendants. | **Case No. 8:26-CV-04326-BAH**<br><br>**DECLARATION OF AMIENA KHAN IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION** |

# DECLARATION OF AMIENA KHAN

1. My name is Amiena Khan. I certify under penalty of perjury that the following statement is true and correct.

2. I am over the age of 18 years old and make this declaration based upon my personal knowledge and experience. If called to do so, I could and would competently and accurately testify to these matters under oath.

3. I am a former Assistant Chief Immigration Judge (ACIJ). I began working for the Executive Office for Immigration Review (EOIR) in December 2010. I was appointed as a U.S. Immigration Judge by Attorney General Eric Holder. I initially served on the bench at the Newark, NJ Immigration Court until October, 2015 and thereafter, served at the NYC Immigration Court until December, 2025. I was selected to serve as an ACIJ in 2023. I served as the ACIJ for the 26 Federal Plaza Immigration Court NYC between October, 2023 and December 1, 2025.

4. IJs are appointed by the Attorney General. Immigration courts and IJs are managed by the Office of Chief Immigration Judge (OCIJ) within the EOIR. The EOIR is housed in the Department of Justice (DOJ). The EOIR oversees the Office of Chief Immigration Judge (OCIJ), the Board of Immigration Appeals (BIA) and the Office of the Chief Administrative Officer (OCAHO). Policies in immigration courts are managed by the Chief Immigration Judge, while the day-to-day operations of each immigration court around the country are managed by an Assistant Chief Immigration Judge (ACIJ) assigned to that court. Each immigration court also has a Court Administrator, whose role is to oversee the supervisory staff and staff, and meet the day-to-day needs of the court.
5. As an ACIJ I was responsible for overseeing 35 immigration judges, 19 attorney advisors, the Court Administrator and a supervisory team and staff of over 75 team members at the NYC court. As part of my duties, I was expected to communicate information from management at the EOIR and the OCIJ to judges, attorneys and staff. My duties also included performance evaluations, interfacing with the Department of Homeland Security (DHS), Federal Protective Services (FPS), stakeholders, ensuring that the day-to-day operations of the court ran effectively and efficiently and daily problem solving of issues as needed.
6. I also specifically oversaw the two immigration judges who covered the juvenile dockets at the court between October, 2023 and December 1, 2025. The juvenile docket is a specialized docket for unaccompanied minors and youth. There were separate dockets for detained and non-detained juveniles. In my position as ACIJ I interfaced with legal service providers covering these dockets and representatives from Acacia Center for Justice (Acacia), a federally funded non-profit, non-governmental organization that supports and partners with a national network of human rights defenders who provide legal defense to vulnerable immigrants at risk of detention and deportation.

7. Meetings with Acacia representatives, myself and the Immigration Judges (IJs) covering the juvenile dockets were held regularly to trouble shoot and problem solve issues identified by the IJs. The goal of Acacia, as I understood, was to assist in obtaining representation for unaccompanied children (UCs), to strengthen coordination with legal service providers, and provide access to resources.

8. The IJs covering the juvenile dockets would, in accordance with EOIR guidelines, regulations and the mandates provided in the Trafficking Victims Protection Reauthorization Act (TVPRA), consider continuance requests liberally for UCs for purposes of obtaining counsel. Additionally, the IJs had the decisional independence to consider motions to continue, motions to administratively close or motions to terminate cases based upon the facts of the matter before them. The IJs routinely continued or administratively closed juvenile cases with pending Special Immigrant Juvenile (SIJ) petitions before United States Citizen and Immigration Services (USCIS), juvenile cases with approved SIJs petitions but no current priority date, and terminated matters where juveniles had approved SIJ petitions and a current priority date to allow the juvenile to adjust status before USCIS.

9. The IJs covering the juvenile dockets were cognizant that some forms of immigration relief for children, like SIJ, required the filing of applications or petitions with agencies or entities outside EOIR. IJs were also required to advise children who were potentially eligible for asylum that they, if they were UCs, needed to file their asylum applications with USCIS.

10. Additionally, IJs were to consider the age and totality of the circumstances before proceeding in absentia in cases involving children. Alternatively, the IJs would place the juvenile cases on a specific juvenile status docket which the Court maintained for cases not ripe for adjudication because of a pending SIJ matter before USCIS or an approved SIJ petition without a priority date.



11. I covered the Status Dockets at 26 Federal Plaza while an ACIJ between 2024 and

November, 2025. Cases on the status docket were either continued, administratively closed or terminated. Juveniles who were designated as UCs who had pending asylum applications before USCIS had their cases either terminated or administratively closed as USCIS had initial jurisdiction in those matters. I also scheduled matters for individual merits hearings or master calendar hearings in cases where adjustment of status was sought or for USCIS referred asylum applications from the status docket onto the dockets of the IJs covering the juvenile dockets after I determined if the case was trial ready.

12. As an immigration judge I also previously covered the juvenile docket at 26 Federal Plaza from October 2015 until on or about the end of 2016. During this time I worked with EOIR in my capacity as a judge and member of the National Association of Immigration Judges to assist in the development of guidelines for adjudicating juvenile cases. I worked to obtain and prepare information on issues of abuse, neglect and abandonment including steps for IJs to take to report suspected abuse to local child protective services and clarify state mandated reporting requirements.

13. While covering the juvenile docket during this time period I would, in the presence of DHS counsel, reach out to legal service providers on behalf of pro se UC Respondents especially when there were concerns of lack of shelter or neglect. In 2024 and early 2025, with the knowledge of DHS counsel, I continued to reach out to legal service providers to seek assistance and possible representation for young adults who had entered as UCs and there were issues of lack of shelter and concerns for the safety and well being of the young adult.

14. The immigration courts followed Operating Policies and Procedures Memorandum (OPPM) 07-01, *Guidelines for Immigration Court Cases Involving Unaccompanied Alien Children*, dated May 22, 2007 which was rescinded and replaced by OPPM 17-03: *Guidelines for Immigration Court Cases Involving Juveniles, Including Unaccompanied*

*Alien Children* on December 20, 2017. OPPM 17-03 was replaced by Director's Memo (DM) 24-0, *Children's Cases in Immigration Court*, on December 21, 2023 which was was then officially rescinded and canceled on January 29, 2025, via Policy Memorandum (PM) 25-10 issued by EOIR Acting Director Sirce Owen. PM 25-10 reinstated the earlier 2017 guidance OPPM 17-03.

15. DM 24-01 focused on a greater child centric approach for IJs adjudicating cases with children and juveniles. Given the particular vulnerability of child respondents, specialized juvenile dockets were created with an emphasis on placing particular importance on legal representation for children. Therefore, IJs were encouraged to facilitate pro bono representation in cases involving unrepresented children.

16. Under the Trafficking Victims Protection Reauthorization Act (TVPRA), United States Citizenship and Immigration Services (USCIS) has initial jurisdiction over an asylum application filed by an unaccompanied child, even if the child is in removal proceedings. See section 208(a)(2)(E) of the *Immigration and Nationality Act* (INA). The IJs covering the juvenile dockets advised the children appearing before them of relief available and considered continuances to protect the rights of UCs to file their asylum applications before USCIS.

17. I also covered the non-detained juvenile docket while seated as an IJ at the Newark, NJ Immigration Court. I solely covered the juvenile docket from on or about the summer of 2014 until October, 2015. I was required to receive specialized training on the adjudication of cases involving minors. This training was held at EOIR headquarters in Falls Church and included IJs from across the nation. The training included child-friendly practices, and review of the TVPRA and policy memoranda. We were

trained to provide an orientation to all those in the Courtroom with language easily understood by young children. We were trained specifically on how to prioritize the best interests of children appearing before us. IJs were also provided training on the special forms of relief available to children, including asylum and special immigrant juvenile status (SIJS). IJs also received training on trauma-informed adjudication of cases and secondary trauma. In addition, I received annual continuing legal education training with the entire IJ Corps as well as ongoing specialized training for IJs covering a juvenile docket.

18. While covering juvenile dockets, I routinely utilized the resources provided by EOIR to ensure that children's due process rights were protected. I also observed the collaboration between EOIR and city agencies to ensure that information regarding city resources was available to the children and families. I witnessed the coordination between DHS, Office of Refugee Resettlement (ORR) and U.S. Department of Health and Human Services (HHS) to ensure that the juveniles were provided legal protections.

19. Throughout my time overseeing and covering the juvenile dockets, there were always protective measures in place for unaccompanied children. Resources and updated lists for legal service providers were routinely provided to appointed guardians and juveniles, legal services providers assisted with legal orientation and screenings, and representatives for city services including information about school enrollment and social services were present in the court space.

20. Throughout my time covering the juvenile dockets, including the juvenile status docket in late 2024 and 2025, I was permitted to docket cases freely where there was room on the calendar. I was able to use my discretion to reset a scheduled hearing date and to

determine if the date was appropriate based upon the facts of the matter before me as represented by the attorneys and evidence. The only limitations placed upon me in rescheduling master calendar and individual hearing dates was whether there was an opening or availability on the selected date. In 2016, the individual hearing dates were often scheduled about 2 years in the future unless information was provided which would necessitate an accelerated hearing date. In 2025, hearings were scheduled on the IJs first available hearing date, which varied from IJ to IJ. The only limitations placed on the IJs rescheduling master calendar and individual hearings at 26 Federal Plaza NYC was a court wide control date of October, 2029. This court wide control date varied nationally from court to court. IJs could not reschedule cases beyond the controlled cutoff date.

21. When I covered the juvenile dockets in 2016 and the juvenile status docket in 2025 it was well understood that UCs would be provided an opportunity to obtain counsel pursuant to the regulations, and a reasonable opportunity to file an application for asylum with USCIS pursuant to the TVPRA regulations. It was understood that there was a heightened responsibility to safeguard these due process rights for pro se UC. If the child had a pending asylum application before USCIS, the court well understood that initial jurisdiction resided with USCIS. Usually, cases on the master calendar docket in which the child had a pending asylum application before USCIS were terminated, administratively closed or continued with the reset date scheduled based on the details of the case.

22. This all began to change on January 20, 2025 when EOIR and the new administration began to put the emphasis on speed at the expense of due process. Remaining IJs face increased pressure to conform to the administration's enforcement agenda or risk being

fired and losing their livelihoods. Although I am no longer on the bench, I have maintained close contact with my former colleagues who do remain with EOIR. From what I have learned in recent months, these pressures and constraints have intensified, the special needs and rights of UCs are being disregarded, and the prior practices that did afford protections to UCs have been largely eliminated.

I certify under penalty of perjury that the foregoing is true and correct to the best of my knowledge and abilities.

Executed on November 10, 2026 at New York, New York.

Amiena Khan
______________________________
Amiena Khan