**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| THE DOOR, *et al*.<br>Plaintiffs,<br><br>v.<br><br>JOSEPH B. EDLOW, DIRECTOR, USCIS, *et al.*<br><br>Defendant. | Civil Action No. 8:26-cv-04326-BAH |

**DEFENDANTS' MEMORANDUM IN SUPPORT OF OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND STAY AND REPLY TO PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR RECONSIDERATION OF TEMPORARY RESTRAINING ORDER**

Defendants, by and through undersigned counsel, and pursuant to Fed. R. Civ. P. 65, files this Memorandum in Support of their Opposition to Plaintiffs' Motion for Preliminary Injunction and Stay (ECF No. 74), and Reply to Plaintiffs' Opposition to Defendants' Motion for Reconsideration (ECF No. 54) of Temporary Restraining Order (ECF No. 63), and states as follows:

## Table of Contents

**I. INTRODUCTION** .......... 4

**II. BACKGROUND** .......... 5

**A. Inadequate Notice Policy** .......... 5

**B. Exceptional Circumstances Policy** .......... 6

**C. Policy Memorandum Scheduling Asylum Interviews for Unaccompanied Alien Children in Office of Refugee Resettlement Custody and Failure to Appear Procedures** . 7

**D. Detained Docket Deadline** .......... 10

**E. Procedural Background** .......... 11

**III. FACTS** .......... 12

**IV. LEGAL STANDARDS** .......... 13

**V. ARGUMENT** .......... 14

**A. Plaintiffs Lack Standing** .......... 14

**B. The November 24, 2026 Policy Memorandum obviates the October 30, 2026 TRO and moots Plaintiffs' Motion for Preliminary Injunction.** .......... 15

**C. Plaintiffs are unlikely to succeed on the merits** .......... 17

**i. Plaintiffs are unable to prove that the alleged USCIS's policies are Final Agency Actions** .......... 17

**ii. Plaintiffs cannot prove that USCIS's Policies are Contrary to Law.** .......... 19

**iii. Plaintiffs cannot demonstrate that USCIS's Policies are Arbitrary and Capricious** .......... 24

**1. Exceptional Circumstances Policy and 8 U.S.C. § 1158(d)(5)(A)(v) and 8 C.F.R. § 208.10** .......... 26

**2. Inadequate Notice Policy and TVPRA** .......... 29

**iv. Plaintiffs Cannot Demonstrate A Due Process Violation** .......... 31

**1. Plaintiffs do not have a Property Interest in Applying for Asylum** .......... 31

**2. The Mathews Factors Do Not Apply because Plaintiffs and their clients do not have a property interest in their asylum applications.** .......... 32

**3. Existing Procedures Satisfy Due Process.** .......... 34

**v. Plaintiffs Fail To Establish Final Agency Action Regarding EOIR** .......... 35

**1. Plaintiffs Have Not Identified A Reviewable Agency Directive relating to UACs** 35

**2. Individual Scheduling Decisions Remain Case-Specific** .......... 35

**vi. Plaintiffs cannot prove that any EOIR Detained Docket Policy is Arbitrary and Capricious.** ........ 36

**D. Plaintiffs cannot demonstrate irreparable harm** ........ 38

**E. The Balance of Equities and Public Interest Favor the Government.** ........ 39

**VI. ANY RELIEF SHOULD BE NARROWLY TAILORED** ........ 40

**V. Conclusion** ........ 40

## I. INTRODUCTION

This case concerns policy decisions entrusted by Congress to the Executive Branch. More specifically, Congress has tasked the United States Citizenship and Immigration Services ("USCIS") with creating policies concerning the scheduling and rescheduling of asylum interviews for unaccompanied alien children ("UAC"). Similarly, Congress has also entrusted the Executive Office of Immigration Review ("EOIR") with the management of their dockets in the adjudication of the legal status of UACs in the United States. The purpose of these policies is to reduce an unprecedented affirmative asylum backlog, efficiently schedule and resolve cases, and preserve valuable government resources. The policies also recognize that UACs, given their age and circumstances, are particularly vulnerable and susceptible to bad actors in the immigration system. The subject policies balance these interests, ensuring that UACs receive fair, efficient and timely adjudications of their asylum applications.

On November 24, 2026, USCIS memorialized these policies in a memorandum entitled "Scheduling Asylum Interviews for Unaccompanied Alien Children in Office of Refugee Resettlement Custody and Failure to Appear Procedures." This memorandum supersedes both the provisions of the September 27, 2026 decision memorandum entitled "Expedited Scheduling and Adjudication of Asylum Applications Filed by Unaccompanied Alien Children in Office of Refugee Resettlement Custody," regarding the scheduling of interviews of unaccompanied alien children (UACs) in the custody of the Office of Refugee Resettlement (ORR), and the determination that all scheduled asylum interviews should only be rescheduled upon a showing of "exceptional circumstances," rather than the prior more permissive process which permitted automatic rescheduling upon request, and later requests upon a showing of "good cause." Because the memorandum supersedes the policies at issue in Plaintiffs' Complaint (ECF No. 1), Request for Temporary Restraining Order (ECF No. 23-1), the Court's November 6, 2026 Order granting

Plaintiffs' request for a Temporary Restraining Order (ECF No. 63), and Plaintiffs' subject Motion for Preliminary Injunction (ECF No. 74), Plaintiffs' Motion for Preliminary Injunction should be dismissed by the Court for mootness and the TRO should be dissolved.

Alternatively, the Court must deny Plaintiffs' request for a preliminary injunction in this matter. Plaintiffs cannot establish a likelihood of success on the merits of their claims or that Plaintiffs will suffer irreparable harm should these policies remain undisturbed. Additionally, the balance of equities in this matter tips in favor of the Government because public interest does not support judicial intervention into agency scheduling decisions.

## II. BACKGROUND

### A. Inadequate Notice Policy

As provided in 8 U.S.C §1158(a)(1), any alien who is physically present in the United States or who arrives in the United States, irrespective of status, may apply for asylum. Subsection (b)(3)(C) provides that an asylum officer, not an immigration judge, shall have initial jurisdiction over any asylum application filed by a UAC. The Asylum Division of USCIS generally prioritizes the most recently filed affirmative asylum applications when scheduling affirmative asylum interviews. USCIS schedules affirmative asylum interviews according to generally set priorities: first priority are applications that were scheduled for an interview, but the interview had to be rescheduled at the applicant's request or the needs of USCIS; second priority are applications that have been pending 21 days or fewer; and third priority are all other pending applications starting with newer filings and working back towards older filings. See *Affirmative Asylum Interview Scheduling*, U.S. Citizenship & Immigration Servs., https://www.uscis.gov/humanitarian/refugees-and-asylum/asylum/affirmative-asylum-interview-scheduling (last updated Mar. 29, 2024).

There is no statutory or regulatory requirement that dictates how far before a scheduled asylum interview the Asylum Division must send a notice to the applicant. In fact, there is no legal requirement that USCIS conduct an asylum interview at all. *See Affirmative Asylum Referrals Without Interview*, 91 Fed. Reg. 47101 (July 28, 2026) (interim final rule). Due to the need for operational flexibility, interview scheduling has always been based on a loose set of practices designed to make sure that the applicant knows when and where to appear for their interview. Under those practices, USCIS generally tries to mail out interview notices at least 18 days before the scheduled interview where possible, but the asylum office has always maintained and in certain circumstances exercised its discretion to schedule interviews on a shorter timeline. https://www.uscis.gov/sites/default/files/document/guides/AAPM.pdf.

**B. Exceptional Circumstances Policy**

In the summer of 2026, USCIS published an alert to provide advance notice to applicants and their representatives who may have had reliance interests in historical practices that, beginning on August 21, 2026, USCIS was going to evaluate requests to reschedule missed interviews at the exceptional circumstances standard as required by statute and regulation at 8 CFR § 208.10. https://www.uscis.gov/humanitarian/refugees-and-asylum/asylum. Under that practice, USCIS asylum officers examine the individual facts and circumstances of an alien's case to determine whether they have demonstrated exceptional circumstances. *Establishing Exceptional Circumstances for Rescheduling Affirmative Asylum Interviews*. U.S. Citizenship & Immigration Servs.,https://www.uscis.gov/humanitarian/refugees-and-asylum/asylum/establishing-exceptional-circumstances-for-rescheduling-affirmative-asylum-interviews (last updated Nov. 3, 2026). If an alien requests to reschedule before the date of the asylum interview and establishes exceptional circumstances, the asylum office will reschedule the interview for a later date and

notify the alien in writing. If the asylum office determines that the alien failed to establish exceptional circumstances, the rescheduling request will be denied in writing, and the alien must attend the interview or will be deemed by the asylum office as failing to appear. If an alien misses their interview and fails to establish exceptional circumstance within 10 calendar days, USCIS will either dismiss the alien's asylum application or refer the application to EOIR depending on the legal status of the alien and consistent with longstanding regulatory requirements. To request an exceptional circumstances finding to reschedule an interview or for failure to appear, an alien must submit a written explanation and include any available documents in support. This policy applies uniformly to all individuals requesting rescheduling of the asylum interview. *Establishing Exceptional Circumstances for Rescheduling Affirmative Asylum Interviews*, U.S. Citizenship & Immigration Servs., https://www.uscis.gov/humanitarian/refugees-and-asylum/asylum/establishing-exceptional-circumstances-for-rescheduling-affirmative-asylum-interviews (last updated -Nov. 3, 2026).

**C. Policy Memorandum Scheduling Asylum Interviews for Unaccompanied Alien Children in Office of Refugee Resettlement Custody and Failure to Appear Procedures**

On November 24, 2026, USCIS issued the Policy Memorandum entitled Scheduling Asylum Interviews for Unaccompanied Alien Children in Office of Refugee Resettlement Custody and Failure to Appear Procedures. See Exhibit 1. This memorandum provides a comprehensive background regarding the problems and challenges USCIS faces in scheduling and rescheduling interviews, including the unique welfare concerns presented by UACs, as well as update procedures to address those issues. *Id.* The Memorandum discusses the conflict between Congress's expectation that USCIS immediately move forward asylum interviews and the need to

reschedule such interviews should the alien fail to appear, and the interview needs to be rescheduled based upon exceptional circumstances.

In practice, the USCIS Asylum Division has often scheduled interviews with 21 days' notice to the alien. And, prior to August 21, 2026, when an alien failed to appear for an asylum interview USCIS allowed aliens to reschedule an asylum interview once without any justification whatsoever upon a request made before the asylum interview. USCIS also permitted unlimited reschedules after that for "good cause" if the alien contacted USCIS within 45 days of the failure to appear, or for exceptional circumstances even if the alien contacted USCIS more than 45 days after the scheduled interview date, unnecessarily drawing out the process and draining USCIS resources. USCIS applied these failure to appear procedures generally to both UAC and non-UAC cases. On August 21, 2026, USCIS issued updated procedures related to an alien's failure to appear for an interview applicable to all asylum cases before USCIS. These updated procedures more closely aligned USCIS's procedures with governing regulations, particularly as USCIS strives to reduce its unprecedented affirmative asylum backlog, efficiently schedule and resolve cases, and preserve valuable resources and finite interview slots. Under the updated procedures, where an alien fails to appear for a scheduled asylum interview, the alien must demonstrate exceptional circumstances for the failure to appear within 10 days of the missed interview in order to excuse the failure to appear. If that does not happen, the alien generally has an opportunity to continue pursuing his or her asylum application in removal proceedings before an immigration judge even if proceedings are not immediately initiated by virtue of USCIS referring the application.

These prior procedures have created an unprecedented backlog of asylum interviews and significant new issues have arisen since 1998 and 2009 that complicate the timely adjudication of asylum applications. When considering the special needs of the UAC population, the factor that

USCIS can most effectively address immediately is scheduling. Prompt adjudication reduces uncertainty, facilitates a protection decision, and allows related proceedings to either advance or moot out. USCIS can preserve the opportunity for case-specific accommodation where warranted including consideration of counsel availability, while at the same time reestablishing the importance of ensuring that UAC asylum cases are considered and efficiently resolved.

The Memorandum aims to reduce the backlog of asylum interviews while protecting the extraordinary needs of UACs by implementing the following changes: first, asylum office directors will aim to schedule interviews for UACs in ORR custody within a target timeframe of 24 hours to seven days after providing notice to the UAC and his or her legal representative, where applicable. Considering the UAC is in ORR custody and should be prepared to discuss the asylum application that he or she already filed, 24 hours to seven days' notice for an interview is reasonable, where the circumstances include participating in a non-adversarial interview with an asylum officer specially trained on non-adversarial interview techniques, children's claims, and eliciting testimony, and where USCIS may provide an interpreter in the event the UAC does not have one.

Second, the Memorandum supplements what exceptional circumstances should be considered by an asylum officer if the UAC does not appear for the asylum interview with USCIS, wither in person or virtually. Now, the asylum office will process the UAC's case according to current failure to appear procedures, noting that USCIS scheduling the same attorney of record for multiple UAC interviews on the same date and time constitutes exceptional circumstances to excuse and reschedule conflicting interviews (i.e., to facilitate proceeding with one scheduled UAC interview on the scheduled date and time, the attorney may request rescheduling of other interviews also scheduled at the same date and time).

**D. Detained Docket Deadline**

Pursuant to the regulation at 8 C.F.R. § 1003.0(b)(1)(ii), the EOIR Director has the authority to "[d]irect the conduct of all EOIR employees to ensure the efficient disposition of all pending cases, including the power, in his discretion, to set priorities or time frames for the resolution of cases; to direct that the adjudication of certain cases be deferred; to regulate the assignment of adjudicators to cases; and otherwise to manage the docket of matters to be decided by the Board, the immigration judges, the Chief Administrative Hearing Officer, or the administrative law judges." The Director may delegate this authority to the Chief Immigration Judge. 8 C.F.R. § 1003.0(b)(2)(i). Pursuant to the EOIR Director's authority, as outlined in 8 C.F.R. § 11003.0(b)(ii) and (iv), EOIR issued two policy memoranda relevant to docket management of juvenile and detained cases before EOIR.

On December 20, 2017, EOIR's Chief Immigration Judge published Operating Policies and Procedures Memorandum 17-03: *Guidelines for Immigration Court Cases Involving Juveniles, Including Unaccompanied Alien Children* ("OPPM 17-03"). See Exhibit 2, OPPM 17-03. This document provides uniform guidance to Immigration Judges who oversee proceedings involving juveniles, including unaccompanied alien children. Section IV(B) <u>Scheduling juvenile cases</u> instructs immigration judges to "conduct cases involving juvenile respondents, particularly unaccompanied alien children, on a separate docket or at a fixed time in the week or month." *Id.* at 5. Section IV(I) <u>Be aware of time</u> instructs the immigration judges to allow the parties in juvenile cases a full opportunity to present or challenge evidence, but where appropriate, the judges "should seek not only to limit the number of times that children must be brought to court but also to resolve issues of removability and relief without undue delay." *Id.* at 6. The section goes on to instruct immigration judges to consider "limiting the amount of time the child is on the stand without compromising due process for the opposing party" because "stress and fatigue can

adversely impact the ability of a younger child to participate in his or her removal proceedings." *Id.*

On September 12, 2025, the EOIR Director issued a Policy Memorandum *Case Priorities and Immigration Court Performance Measures* ("PM 25-47"). See Exhibit 3 PM 25-47. The purpose of PM 25-47 was to clarify EOIR's priorities and system of measurement to ensure that each immigration court has a standard to assess its progress in advancing the national interest. This document highlights that EOIR has always prioritized all cases involving individuals in detention or custody—without reference or distinction to UAC cases—and established reasonable timeframes for the resolution of such cases.

**E. Procedural Background**

On October 15, 2026, Plaintiffs filed the underlying Complaint bringing six Counts in this Cause of Action. *See* ECF No. 1. In Count One, Plaintiffs argue that that USCIS's "Inadequate Notice Policy" violates the APA, 5. U.S.C. § 706(2)(A), as being contrary to law and in violation of 8.U.S.C §§ 1158(a)(1) and (b)(3)(C), 8 C.F.R. § 208.9(e)(1), and 8 U.S.C. §§ 1232(c)(2), (c)(5) and (d)(8). ECF 1, p. 32. In Count Two, Plaintiffs argue that the Inadequate Notice Policy violates the APA, 5 U.S.C. § 706(2)(A), because it is arbitrary and capricious. *Id.* at p. 34. In Count Three, Plaintiffs argue that the Exceptional Circumstances Policy violates the APA for the same reasons as stated in Count One. *Id.* at p.35. In Count Four, Plaintiffs argue that the Exceptional Circumstances Policy violates the APA because it is arbitrary and capricious. *Id.* at p. 37. In Count Five, Plaintiffs argue that USCIS's policies violate the Fifth Amendment of the U.S. Constitution procedural due process as it relates to themselves and their clients. ECF 1, p. 38. In Count Six, Plaintiffs argue that EOIR's Detained Docket Deadline violates the APA, 5 U.S.C. § 706(2)(A), as being arbitrary and capricious. ECF 1, p. 40.

On October 19, 2026, Plaintiffs filed an Ex Parte Motion for Temporary Restraining Order against Retraining Order and Stay, requesting the Court to temporarily set aside USCIS's Inadequate Notice Policy and Exceptional Circumstances Policy based upon allegations that they were arbitrary and capricious and contrary to law. *See* ECF No. 23. On October 29, 2026, Defendants opposed Plaintiff's request for relief. See ECF No. 32. By Order dated October 30, 2026, the Court granted Plaintiffs' Motion for Temporary Restraining Order and Stay under the APA. *See* ECF No. 54. On November 3, 2026, Defendants filed a Motion for Reconsideration, requesting the Court to dissolve the Temporary Restraining Order. *See* ECF No. 57. By Order dated November 6, 2026, the Court issued a briefing schedule permitting Plaintiffs to file an opposition to the Motion for Reconsideration in combination with a Motion for Preliminary Injunction. *See* ECF No. 63, 4 ¶ 5. Plaintiffs filed the subject Motion for Preliminary Injunction on November 12, 2026. *See* ECF No. 74.

**III. FACTS**

Under the previous administration the United States experienced an unprecedented surge of aliens at the Southwest border. Unfortunately, many of those aliens were UACs. Sadly, many UACs were trafficked by cartels and others in an attempt to exploit vulnerabilities in our immigration system. One such vulnerability was that the surge of aliens resulted in a tsunami of asylum claims, including by UACs. Given the sheer number of asylum claims, USCIS faced a substantial backlog in interviewing aliens and processing asylum claims. In addition, UACs and their representatives would often request to reschedule interviews. Under previous USCIS policies, the initial request would be granted as a matter of course and future rescheduling would be readily granted for "good cause." This regularly resulted in UACs being held in HHS custody for months and months before even getting an asylum interview, at substantial cost to the

Government and the UACs. And the TVPRA requires HHS release UACs to "capable and willing" sponsoring adults, even if they cannot be verified as relatives. As a result, the previous administration released around 300,000 UACs whose whereabouts could not be verified, often because they were released to "sponsors" engaged in fraud.

DHS, DOJ, and HHS have prioritized reducing illegal immigration and protecting UACs. As part of this initiative, USCIS is also prioritizing the asylum claims of UACs. But because of the preexisting backlog of asylum claims, asylum interviews for UACs are still lagging behind. This issue is compounded by the fact that those representing UACs can readily reschedule interviews potentially months out multiple times. Focusing on the needs of UACs and asylum-seekers who present meritorious claims generally, USCIS stopped allowing for automatic grants for initial rescheduling requests and required exceptional circumstances for all requests. USCIS will of course consider concerns lawyers have with double bookings and impracticalities. But that cannot justify routinely delaying interviews by long periods where UACs remain in limbo. USCIS's purpose in changing the requirements for scheduling and rescheduling interviews was to quickly adjudicate UAC asylum claims so they can either be granted or other proceedings can move forward with the goal of safely returning UACs to their families abroad. That may not be in the interests of the advocates seeking to halt this important change in guidance, but it is in the long-term interests of UACs.

## IV. LEGAL STANDARDS

Federal Rule of Civil Procedure 65 authorizes a district court to grant injunctive relief in the form of either a TRO or a preliminary injunction. A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). To obtain a preliminary injunction, the movant must show that (1) "he is likely to succeed on the merits"; (2) "he is likely to suffer

irreparable harm in the absence of preliminary relief"; (3) "the balance of equities tips in his favor"; and (4) "an injunction is in the public interest." *Id.* at 20. The latter two factors "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

**V. ARGUMENT**

**A. Plaintiffs Lack Standing**

After Defendants filed their brief in response to Plaintiffs' Ex Parte Motion for Temporary Retraining Order, the First Circuit published a decision in *Greater Bos. Legal Servs. v. United States Dep't of Homeland Sec.*, No. 25-1799, 2026 WL 3257620 (1st Cir. Oct. 29, 2026), that is directly relevant to the current motions pending before this court. The key takeaway from that decision is that a group of legal service providers cannot establish standing to bring a suit under the APA by alleging that that a challenged agency policy limits the number of clients it can take on or impacts the costs of representation. *Id.* at *6.

The claims at issue in *Greater Boston Legal Services* are very similar to the ones that Plaintiffs assert here. There, as here, Plaintiffs were a group of attorneys, law firms, and a nonprofit legal services organization who represent aliens in immigration proceedings. *Greater Bos. Legal Servs. v. United States Dep't of Homeland Sec.*, No. 21-CV-10083-DJC, 2025 WL 1725826, at *2 (D. Mass. June 20, 2025), *aff'd on other grounds*, No. 25-1799, 2026 WL 3257620 (1st Cir. Oct. 29, 2026). Also identical to the present case, Plaintiffs claimed, as part of their APA claim, that an alleged policy concerning USCIS' processing of asylum applications interfered with an obligation owed to their clients by virtue of a DHS regulation (albeit 8 C.F.R. § 103.2(b)(16) rather than 8 C.F.R. § 208.9(e)). *Id.* at *5. The district court concluded that that the agency's practices, even if considered a discreet policy as alleged by Plaintiffs, did not violate the regulation because USCIS

still allowed asylum applicants to inspect relevant records during their asylum proceedings, which is all that 8 C.F.R. § 103.2(b)(16) required. *Id*. at *7.

This court should apply the same rationale and reach the same result as the First Circuit. The six legal service providers constituting the Plaintiffs in this case do not have standing to challenge the way that USCIS processes their client's asylum applications based on an alleged impact on their organizations' provision of legal services. *Greater Bos. Legal Servs*, 2026 WL 3257620, *6. First, even assuming the alleged policies exist, based on U.S. Supreme Court precedent, including *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367 (2024), when claiming standing it is "insufficient to allege that a challenged policy constrains a firm's ability to represent as many clients as it would like." *Greater Bos. Legal Servs.*, 2026 WL 3257620, at *6 . Further, the core-business-activities exception described in *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982), does not include situations where a legal services organization asserts standing "by alleging that a challenged policy increases the cost of representation or limits the size of a client roster." *Greater Bos. Legal Servs.*, 2026 WL 3257620 at *6. Finally, Plaintiffs' claimed injury is too speculative and attenuated to warrant standing because they have not established the existence of the claimed policies or combination thereof and that the asserted harm would actually occur in any specific instance. *Id*. at *4.

**B. The November 24, 2026 Policy Memorandum obviates the October 30, 2026 TRO and moots Plaintiffs' Motion for Preliminary Injunction.**

The November 24, 2026 Memorandum eliminates the conduct that gave rise to the TRO because it supersedes the policies at issue in Plaintiffs' Ex Parte Motion for Stay under the APA and Temporary Restraining Order ("Plaintiffs' Motion"). *See* ECF No. 23. Plaintiffs' Motion specifically took issue with USCIS's scheduling UAC asylum interviews with 24 hours notice, and

the circumstances considered by asylum officers when the legal representatives of UACs requested to reschedule and interview because the attorneys are double or triple booked for asylum interviews. *Id.* at 2. Plaintiffs requested a stay of those practices, arguing that they violated the APA, the TVPRA and the INA.

The November 24, 2026 Memorandum expressly supersedes and replaces the policies challenged in Plaintiffs' Motion. The Memorandum provides that USCIS will aim to schedule interviews for UACs in ORR custody with a target timeframe of 24 hours to seven days after providing notice to the UAC and his or her legal representative. This eliminated Plaintiffs' concern that they will not have enough time to meet with the UACs or gather evidence prior to a scheduled interview. The Memorandum also eliminates Plaintiffs' concern regarding the inability to reschedule an asylum interview due to unavailability of the legal representative. The new policy provides that an asylum officer will recognize as an exceptional circumstance a UAC's failure to appear for a scheduled interview when the UAC's legal representative is scheduled to appear at multiple UAC interviews occurring simultaneously.

Defendants authority for issues the November 24, 2026 Memorandum is based upon *Dep't of Homeland Sec. v. Regents of the Univ. of California,* 591 U.S. 1 (2020). USCIS relies on *Regents,* for its two-step framework illustrating the options an agency may exercise in correcting its previous actions. In *Regents*, the Supreme Court explained that "a court may remand for the agency to do one of two things: First, the agency can offer 'a fuller explanation of the agency's reasoning *at the time of the agency action*.' ... Alternatively, the agency can 'deal with the problem afresh' by taking *new* agency action." 591 U.S. at 20 (alterations in original) (citations omitted). When an agency offers a fuller explanation, "the agency may elaborate later on [its] reason (or reasons) but may not provide new ones." *Id*. at 20-21.

Because the operative policy underlying Plaintiffs' claims has been withdrawn, the factual and legal circumstances that justified interim injunctive relief have materially changed. The extraordinary relief embodied in the TRO is therefore no longer necessary or appropriate.

**C. Plaintiffs are unlikely to succeed on the merits**

**i. Plaintiffs are unable to prove that the alleged USCIS's policies are Final Agency Actions**

Plaintiffs cannot show that the contested policies are a "final" agency action subject to APA review, *see* 5 U.S.C. § 704, because they neither (1) conclude a decision-making process; nor (2) determine "rights and obligations" or impose "legal consequences." *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997). There is no final agency action where, as here, an agency statement merely advises "the public of the agency's construction of rules which it administers." *Ass'n of Flight Attendants-CWA, AFL-CIO v. Huerta*, 785 F.3d 710, 713 (D.C. Cir. 2015); *Indep. Equip. Dealers Ass'n v. EPA*, 372 F.3d 420, 427 (D.C. Cir. 2004) ("an agency merely express[ing] its view of what the law requires of [it]" does not constitute "final agency action"). No allegation here demonstrates finality. Despite Plaintiffs' allegations, in the Motion for Reconsideration, Defendants did not concede that the Inadequate Notice or Exceptional Circumstances policies constitute final agency actions. *See* ECF No. 74-1, 13. The policies are not subject to review by this Court under the APA because they are not final agency actions.

Plaintiffs have not directed the Court to any fact suggesting that the policies are final agency actions. Plaintiffs have not made any plausible allegations that the policies were a final directive, decision memorandum, or other authoritative agency action showing that the alleged practices were formally adopted as binding USCIS policy. Referencing a tweet purporting to show a deliberative draft of a memorandum does not pass muster. ECF 1, 20. Nor do Plaintiffs allege facts establishing that any identified official exercised final delegated authority to adopt a

nationwide, binding policy governing interview scheduling, rescheduling, or evidentiary submissions. *See Jake's Fireworks, Inc. v. United States Consumer Product Safety Commission*, 105 F.4th 627, 631 (4th Cir. 2024) (citing *Abbott Labs. v. Gardner*, 387 U.S. 136, 151 (1967)). The policies are not the consummation of USCIS's decision making processes set out in the agency's governing statutes and regulations and do not represent the culmination of USCIS's consideration of scheduling UAC asylum interviews, determining exceptional circumstances for rescheduling interviews, or permitting representatives of UACs to present evidence at the interviews. *Jake's Fireworks, Inc.*, 105 F.4d at 631. Rather, the changes to guidance are operational adjustments within USCIS's existing authority to schedule and manage affirmative asylum interviews, made in response to the substantial asylum backlog and the need to resolve UACs' cases efficiently while accounting for their distinct circumstances.

USCIS has long exercised discretion over the timing of asylum interviews and whether to reschedule them. The challenged adjustments did not alter any statute, regulation, or binding legal standard governing eligibility for asylum. *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 809-10 (2003). Nor did they eliminate the opportunity for UACs to seek asylum, receive representation, submit evidence, or request rescheduling. Rather, USCIS authorized asylum offices, in appropriate cases, to schedule interviews for UACs in ORR custody on an expedited basis. The evaluation of rescheduling requests under an exceptional-circumstances standard is generally applicable and unconnected to UAC interview scheduling. *See* ECF No. 57-1 ¶¶ 10-11, 17. These measures are case-management decisions concerning the administration of existing procedures, not final agency actions establishing new legal rights or obligations.

The adjustments reflect USCIS's obligation to balance multiple considerations inherent in administering the affirmative asylum process. Congress has afforded UACs distinct procedural

protections, including USCIS's initial jurisdiction over their asylum applications. *See* 8 U.S.C. § 1158(b)(3)(C). But those protections do not require USCIS to leave UACs' claims unresolved indefinitely or to preserve a particular scheduling practice in all circumstances. To the contrary, prompt adjudication advances the interests Congress sought to protect by reducing prolonged uncertainty, avoiding unnecessary time in restrictive custodial settings, and allowing children who qualify for protection to receive a timely decision. ECF No. 57-1 ¶¶ 12-13, 19.

Plaintiffs also have not alleged any facts that the policies alter the legal landscape for UACs such that Plaintiffs are unable to provide effective counsel to their clients or that UACs are deprived of their ability to submit evidence supporting their claims. *See* ECF No. 74-1, 13-14, ¶1. The policies do not deprive UACs of assistance of counsel in preparation of and during asylum interviews and the policies did not eliminate Plaintiffs' ability to seek rescheduling of interviews in order to submit supplemental evidence or otherwise. These post-filing document submission issues cannot possibly be viewed as altering legal rights and outcomes because no matter the USCIS policy or practice, an alien establishes his or her eligibility for asylum through credible testimony or corroborating evidence when the adjudicator so requests. 8 U.S.C. § 1158(b)(1)(B).

**ii. Plaintiffs cannot prove that USCIS's Policies are Contrary to Law.**

Plaintiffs allege that USCIS's policies are contrary to law because the TVPRA requires USCIS's policies to be consistent with the consideration of UAC's specialized needs. *See* ECF No. 74-1, 14, ¶ 2. But neither the TVPRA nor the INA prescribe a 21-day minimum notice period for asylum interviews, guarantee automatic rescheduling, require unrestricted continuances, or otherwise mandate the scheduling practices Plaintiffs seek to impose.

USCIS's prior procedures stated that its automated scheduling system schedules interviews and issues generally generated interview notices "approximately" 21 days before the scheduled

interview. *See* USCIS, Affirmative Asylum Procedures Manual (Feb. 2025) at § II.G(2)(a) – II.G(3), available at https://www.uscis.gov/sites/default/files/document/guides/AAPM.pdf (last visited Nov. 2, 2026). That timeframe reflected the operation of USCIS's then-existing scheduling system, not a statutory or regulatory entitlement to 21 days' advance notice. Because federal law does not require USCIS to provide 21 days' notice, the agency's adjustment of its scheduling procedures cannot be contrary to law. Plaintiffs assert that since § II.G(3) states that the automated system generated notice of the interview within "21 or 22 days", this automation created a requirement that notice be generated at least 21 prior to an interview. This description is merely an explanation of the automation and general expectation and did not create a right. The only requirement outlined in the section is "within three (3) business days of the Notices being printed and no fewer than 18 days before the scheduled interview date, Asylum Office personnel mail the Interview Notice to the applicant and any representative of record." This requirement only guaranteed when an Interview Notice would be sent and not when it would be received. Additionally, the section also allows for exceptions to the requirement at the discretion of the Director as long as the applicant received adequate notice and no definition of "adequate notice" is illustrated. As the exception notes, the Director is authorized to change the notice requirements and expectations laid out in the section for "special circumstances." The historic backlog of cases to be adjudicated undoubtedly establishes that such an exception departs from that prior operational practice.

Plaintiffs additionally assert that the inadequate notice policy is contrary to law as notice under 14 days prevents them from providing supplemental evidence at least 14 days before the interview. This remains untrue. The 14-day deadline to submit supplemental evidence is not a starting gun to collect evidence but a notice point that evidence may not be accepted after such a

point. As 8 C.F.R. § 208.9(e)(1) notes, the asylum officer may still consider evidence submitted after the 14-day deadline. While Plaintiffs have attached and cited to several declarations to their motion, they present few instances of evidence being rejected. In one instance, notice of the hearing was given beyond 14 days and the representative failed to provide evidence in the statutory timeline. See ECF No. 74-5, ¶ 9. The evidence was untimely submitted, and it was not a violation of law to refuse the evidence. The additional declarations reference general concerns of a 14 day policy but fail to cite specific examples of evidence being submitted and denied by the asylum officer. See ECF Nos. 74-5, ¶ 6; 74-6, ¶ 13, 15; 74-9, ¶ 6.

Further, Plaintiffs misconstrue 8 C.F.R. § 208.9(e) as imposing an affirmative obligation on USCIS to provide at least fourteen, or effectively 21, days' advance notice of an asylum interview because Plaintiffs assume they have a "regulatory right to submit supplemental evidence up to 14 days before [UACs] asylum interviews." ECF No. 74-1, 14. The regulation makes no such statement. By its terms, § 208.9(e) establishes a soft deadline governing an applicant's submission of additional supporting evidence before a scheduled interview. It does not prescribe when USCIS must schedule an interview, create a minimum notice period, or require USCIS to postpone an interview whenever the applicant seeks to develop or supplement the record.

The regulation's history and purpose confirms that reading. When DHS promulgated the 14-day provision, it explained that the deadline was designed to provide asylum officers with adequate time to review any additional evidence before the interview. *See Asylum Application, Interview, and Employment Authorization for Applicants*, 85 Fed. Reg. 38,532, 38,535 (June 26, 2020). DHS further explained that an applicant's request to submit additional evidence after the applicable deadline would be subject to an asylum officer's discretion and to the extent that it required a delay in processing, would be treated as an applicant-caused delay. *Id.* Thus, the

provision was intended to facilitate timely and orderly adjudication by ensuring that asylum officers have sufficient opportunity to review materials before conducting the interview, not to create a new procedural entitlement to postpone interviews or to require USCIS to provide a particular amount of advanced interview notice.

Plaintiffs' interpretation would invert the regulation. Under their theory, a deadline directed to applicants would become a constraint on USCIS's scheduling authority, requiring the agency to provide enough advance notice to allow an applicant to submit additional materials before the soft deadline. But nothing in the text of § 208.9(e) or its published rulemaking supports that result. Critically, an applicant is expected to submit a complete asylum application, including the factual basis for the claim and available supporting materials, when the application is filed. *See* 8 C.F.R. § 208.3(a) (requiring submission of a completed application); *see also* 8 C.F.R. § 208.9(e) (addressing only "additional supporting evidence" submitted after the application). Applicants are, accordingly, not expected to gather all of the evidence for their case between the date they file their application and the date of their interview. Section 208.9(e) accordingly concerns only "*additional* supplemental evidence," not evidence that an applicant or representative elected not to include with the initial application. The need for such material ordinarily arises when meaningful time passes between filing and interview and relevant circumstances change, such as a material development in country conditions, newly available corroborating evidence, a change in the applicant's health or personal circumstances, or another development bearing on the claim. In that setting, the fourteen-day deadline gives the asylum officer adequate time to review the new material before the interview. *See Asylum Application, Interview, and Employment Authorization for Applicants*, 85 Fed. Reg. 38,532, 38,535 (June 26, 2020). No such need for

supplemental evidence arises in a situation where the UAC is interviewed within days or weeks of their initial asylum application as argued by Plaintiffs.

Nor does this position preclude USCIS from addressing the unusual case in which genuinely material, newly available evidence arises after filing. USCIS retains discretion to consider case-specific circumstances, including whether additional materials may appropriately be accepted or whether rescheduling is warranted. But that discretionary, individualized authority does not convert § 208.9(e) into a guarantee that every applicant will receive a post-filing period to develop evidence before an interview may occur. It has always been up to the asylum officer to consider the credibility and persuasiveness of the existing record evidence and request supplementary evidence if needed. 8 U.S.C. § 1158(b)(1)(B)(ii).

Likewise, nothing about USCIS's scheduling, rescheduling, or evidence-submission procedures deprives an applicant of the right to be represented by counsel. The governing regulation provides that an asylum applicant "may have an attorney or representative present at the interview," at no expense to the Government. 8 C.F.R. § 208.9(b). That right permits an applicant to retain counsel and have counsel participate in the asylum interview. It does not guarantee that USCIS will schedule an interview only at the convenience of a particular attorney, provide a specified preparation period before every interview, or grant a continuance whenever counsel seeks additional time.

The challenged procedures preserve the ability of UACs to be represented. They neither bar counsel from appearing at interviews nor prohibit counsel from communicating with clients, preparing applications, submitting timely materials, making statements or comments on the evidence, or asking follow-up questions at the conclusion of an interview. *See* 8 C.F.R. § 208.9(b), (d)(1). Nor do the procedures categorically preclude rescheduling. USCIS retains authority to

consider case-specific requests to reschedule based on serious circumstances, including the unavailability of an attorney or representative and overlapping appointments. *See* ECF No. 57-1 ¶ 17.

Plaintiffs instead seek to transform the regulatory right to representation into a right to have every interview scheduled on terms preferred by counsel. But the right to counsel at an asylum interview does not require USCIS to ensure the availability of a particular attorney on any date selected by that attorney, especially where the applicant may be represented by another qualified attorney or accredited representative. A scheduling conflict may warrant individualized consideration, but it does not itself establish that the applicant has been denied the opportunity to be represented.

**iii. Plaintiffs cannot demonstrate that USCIS's Policies are Arbitrary and Capricious.**

An agency's action is "arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 43 (1983). The scope of review under the "arbitrary and capricious" standard is "narrow[,]" and "a court is not to substitute its judgment for that of the agency[,]" even if it disagrees with the agency's decision. *Id.* Rather, the Court must "consider whether the decision was based on a consideration of the relevant factors" or "whether there has been a clear error of judgment." *Id.*

Plaintiffs cannot establish that USCIS's scheduling and rescheduling procedures are arbitrary or capricious. The INA and TVPRA do not prescribe a minimum interview-notice period, guarantee an automatic opportunity to reschedule, or otherwise mandate the particular case-

management practices Plaintiffs seek. USCIS retains substantial discretion to administer the timing of asylum interviews and to evaluate rescheduling requests, subject to the governing statutes and regulations. In exercising that discretion, USCIS reasonably sought to balance prompt adjudication of UACs' asylum claims, the efficient use of limited adjudicative resources, and the individualized circumstances that may warrant rescheduling. *See* ECF No. 57-1 ¶¶ 10-19. Likewise, the exceptional-circumstances standard preserves a mechanism for individualized exceptions. USCIS has not eliminated rescheduling; instead, it evaluates whether the facts present a compelling, case-specific basis to depart from the scheduled interview date, the result of which wastes an interview slot highly coveted by asylum-seekers across the country. *Id.* ¶¶ 11, 17.

Plaintiffs point to five statutory provisions and one regulation that they claim USCIS is or will violate by virtue of its scheduling and rescheduling practices. Yet, none of those statutory and regulatory provisions has to do with scheduling or rescheduling asylum interviews. First, 8 U.S.C. § 1158(a)(1) simply provides that an alien in the United States may apply for asylum. Plaintiffs have not alleged that USCIS is prohibiting its clients from applying for asylum and therefore this claim fails. *See Refugee & Immigrant Ctr. for Educ. & Legal Servs. v. Mullin*, 174 F.4th 81, 109 (D.C. Cir. 2026) (cert. granted in part 2026 WL 3453847 Nov. 13, 2026) (distinguishing between the right to apply for asylum and subsequent processing of the application). Second, 8 U.S.C. § 1158(b)(3)(C) provides that USCIS has initial jurisdiction over asylum applications filed by UACs. It is an undisputed fact that USCIS is exercising initial jurisdiction by processing Plaintiffs' clients' asylum claims, just not in Plaintiffs' preferred manner. Next, 8 CFR § 208.9(e)(1) provides that where USCIS has jurisdiction over an application pursuant to 8 CFR § 208.2(a)(1)(i) and the applicant comes across additional evidence after filing their application, the applicant should submit it either 14 days before any interview or later at the asylum officer's discretion. This

provision does not apply to Plaintiffs' clients' applications, which USCIS considers under 8 U.S.C. § 1158(b)(3)(C), not 8 C.F.R. § 208.2(a)(1)(i). But even if it did, nothing about that regulation creates a rule about USCIS' initial scheduling of an interview, where an asylum officer will "elicit all relevant and useful information bearing on the applicant's eligibility for asylum." 8 C.F.R. § 208.9(b). As recognized by statute, an applicant can meet his or her burden of proof to establish eligibility for asylum through credible testimony alone or through a post-interview corroborating evidence submission where the adjudicator deems it appropriate. 8 U.S.C. 1158(b)(1)(B)(ii).

**1. Exceptional Circumstances Policy and 8 U.S.C. § 1158(d)(5)(A)(v) and 8 C.F.R. § 208.10**

Congress expressly recognized the need for speed in asylum processing to avoid perverse incentives to flood a backlogged system with non-meritorious claims solely to obtain work authorization after 180 days of pendency under 8 U.S.C. § 1158(d)(2). Thus, Congress required any interview or hearing on the asylum application be held within 45 days of filing "absent exceptional circumstances" and that final administrative adjudication of an asylum application be completed within 180 days of filing "absent exceptional circumstances." 8 U.S.C. § 1158(d)(5)(A)(ii)-(iii). To adhere to those timelines, Congress also required that an applicant establish exceptional circumstances for not appearing at his or her interview as initially scheduled. 8 U.S.C. § 1158(d)(5)(A)(v). Although that provision does not itself prescribe the standard for every interview-rescheduling request, it confirms that Congress recognized exceptional circumstances as an appropriate basis for deviations from ordinary asylum-processing timelines. USCIS's use of that standard to assess requests to depart from a scheduled interview date is therefore consistent with, rather than contrary to, Congress's concern for timely resolution of asylum applications.

The implementing regulation similarly recognizes the relevance of exceptional circumstances when an asylum applicant does not appear for a scheduled interview. *See* 8 C.F.R. § 208.10. That regulation provides for dismissal (or referral without interview) of an asylum application when the applicant fails to appear for a scheduled interview without prior authorization. *Id.* The regulation also proscribes how USCIS administers that "prior authorization," which is that a failure to follow-through with the interview as initially scheduled "will be excused if the applicant demonstrates that such failure was the result of exceptional circumstances." *Id.* By virtue of the regulation, the agency declared that it would grant "authorization" to not appear for an interview as scheduled if exceptional circumstances are shown, thus creating a single standard for evaluating situations in which the agency cannot proceed as expeditiously on the application as desired. *See* 8 U.S.C. § 1158(d)(5)(A)(v) (providing consequences for applicants who fail to appear for an interview "without prior authorization or in the absence of exceptional circumstance."); *see also* 8 U.S.C. § 1158(d)(1) (granting the Attorney General and DHS Secretary authority to establish procedures for the consideration of asylum applications) 1158(d)(5)(B) (authorizing the Attorney General and DHS Secretary to provide conditions or limitations on the consideration of an application by regulation).

Plaintiffs' assertion that Defendants have offered "shifting" and impermissible post-hoc justifications mischaracterizes the record. *See* ECF No. 74-1 at 15-16. Defendants have consistently explained that the scheduling and rescheduling adjustments serve related objectives: timely adjudication of UACs' asylum applications; reduction of unnecessary delays, uncertainty, and restrictive custodial placements; efficient administration of a significant affirmative-asylum backlog; and case-specific consideration of circumstances that may warrant rescheduling. *See* ECF No. 57 at 1-6; ECF No. 57-1 ¶¶ 10-19.

Those reasons are complementary, not inconsistent. USCIS's reliance on the exceptional-circumstances framework is consistent with its broader judgment that automatic or routine rescheduling can unnecessarily delay adjudication, waste limited resources and undermine backlog reduction efforts, and prolong uncertainty. *See* ECF No. 57-1 ¶¶ 11, 15-19. Similarly, USCIS's efforts to expedite interviews for UACs in ORR custody reflect the same concern for prompt, orderly resolution of claims. *Id.* ¶¶ 10, 12-16, 19. That the policies serve both administrative and child-welfare interests does not make either rationale a post-hoc rationalization.

Plaintiffs also incorrectly conflate an explanation of the legal framework with an assertion that a particular procedure is compelled by statute or regulation. Defendants' position is that the INA and its implementing regulations recognize the importance of timely asylum adjudication and use the exceptional-circumstances standard in addressing the consequences of failure to appear. *See* 8 U.S.C. § 1158(d)(5)(A)(v); 8 C.F.R. § 208.10; ECF No. 57-1 ¶ 18. That framework supports, but does not mean that Congress expressly dictated, USCIS's decision to use an exceptional-circumstances standard when evaluating advance requests to reschedule interviews. The absence of a statutory mandate for Plaintiffs' preferred automatic-rescheduling and 21-day-notice procedures confirms USCIS's discretion to adjust its case-management practices.

In any event, the relevant question is whether USCIS articulated a rational connection between the procedures adopted and the agency's legitimate objectives. It did. USCIS reasonably determined that permitting expedited scheduling where appropriate and requiring a case-specific showing before rescheduling would help move UAC's cases toward resolution, while retaining discretion to account for genuinely serious circumstances. *See* ECF No. 57-1 ¶¶ 10-19. Plaintiffs' disagreement with the weight USCIS assigned to timeliness, docket management, individualized

exceptions, and other considerations does not establish that the agency changed its rationale or acted arbitrarily.

**2. Inadequate Notice Policy and TVPRA**

Plaintiffs contend that USCIS's expedited-interview scheduling procedure is contrary to the TVPRA because shortened notice allegedly fails to account for UAC's specialized needs. *See* ECF No. 74-1 at 14-15. But the TVPRA does not impose a 21-day minimum notice requirement, mandate that every interview be scheduled only after a fixed preparation period or otherwise prescribe the interview-scheduling procedures Plaintiffs seek to require.

USCIS reasonably determined that prompt asylum interviews may advance the interests of UACs, particularly children in ORR custody. While Plaintiffs incorrectly characterize USCIS's expedited scheduling procedures as preferring to adjudicate a UAC's asylum application while the child remains in ORR custody rather than permit the UAC's release to a suitable sponsor, *see* ECF No. 74-1 at 16-17, USCIS has made no such determination. The challenged procedures concern the prompt administration of asylum interviews within USCIS's jurisdiction. They do not alter ORR's independent placement and release responsibilities, *see* 8 U.S.C. § 1232(c)(2), or condition a UAC's release on completion of the child's asylum proceedings.[1]

At the same time, Congress's prompt-placement directive does not require USCIS to delay adjudication of a pending asylum application. A child's placement status and the adjudication of the child's asylum application are distinct matters administered by different agencies under

---

[1] Congress assigned ORR responsibility for the care and placement of UACs. *See* 6 U.S.C. § 279(b)(1)(A). Under 8 U.S.C. § 1232(c)(2)(A), ORR must "promptly place" a UAC "in the least restrictive setting that is in the best interest of the child." The statute further provides that ORR must place the child with an appropriate sponsor. *Id.* Congress thus established a child-welfare framework under which ORR, not USCIS, makes individualized placement and release determinations.

separate statutory authorities. USCIS reasonably may seek to adjudicate an application promptly, including when a child is still in ORR custody, without assuming that custody should continue until a decision issues. *See* ECF No. 57-1 ¶¶ 10, 12-19.

Prompt adjudication may benefit UACs in either setting. If a UAC is released to a suitable sponsor, a timely asylum decision reduces the uncertainty associated with a prolonged unresolved immigration matter. If a UAC remains in ORR custody because placement with a sponsor is not yet appropriate or available, timely adjudication can reduce the period during which the UAC's claim remains pending. In either circumstance, expedited processing does not substitute USCIS's judgment for ORR's statutory placement determination. Rather, it advances USCIS's separate responsibility to adjudicate claims within its jurisdiction efficiently and with due regard for the circumstances of UACs.

Plaintiffs' argument therefore conflates two distinct propositions: that ORR must promptly place UACs in the least restrictive appropriate setting, and that USCIS must delay asylum interviews until a UAC is released or until a particular amount of time has passed. The former is a statutory obligation imposed on ORR; the latter appears nowhere in the TVPRA or the INA. Nothing in § 1232(c)(2)(A) forbids USCIS from scheduling a prompt interview, establishes a minimum pre-interview notice period, or requires USCIS to retain prior rescheduling practices. USCIS's interest in timely adjudication is fully compatible with ORR's continuing, independent obligation to seek appropriate and prompt placement for each child.

USCIS's expedited-interview scheduling procedure is not arbitrary and capricious because it reasonably balances the specialized needs of UACs with the agency's responsibility to timely adjudicate their asylum applications. The TVPRA does not mandate a 21-day notice period or require USCIS to preserve prior scheduling practices; it requires procedures that take account of

UAC's specialized needs. *See* 8 U.S.C. § 1232(d)(8). USCIS reasonably concluded that prompt interviews can reduce prolonged uncertainty and facilitate timely resolution of UAC's claims, while retaining case-specific discretion to set interview dates and consider requests for rescheduling. *See* ECF No. 57-1 ¶¶ 10, 12-19. Nor does prompt scheduling conflict with Congress's direction that ORR place children promptly in the least restrictive setting consistent with their best interests. *See* 8 U.S.C. § 1232(c)(2)(A). USCIS does not make placement or release decisions, and its scheduling procedures neither require continued ORR custody nor delay ORR's independent obligation to pursue appropriate sponsor placement. The procedure thus reflects a reasoned approach to USCIS's separate adjudicatory responsibilities, rather than disregard for Congress's child-specific framework.

#### iv. Plaintiffs Cannot Demonstrate A Due Process Violation

##### 1. Plaintiffs do not have a Property Interest in Applying for Asylum

Plaintiffs quote *Mallette v. Arlington*, 91 F.3d 630 (4th Cir. 1996) out of context. In that case, the plaintiff was a retired county employee who appealed the denial of her service-related disability retirement benefits claiming that the county violated her due process rights by failing to provide her with adequate notice of a hearing. *Id.* The court held that a county ordinance endowed the plaintiff with a legitimate claim of entitlement to her retirement benefits and thus she had a property interest in her application protected by the due process clause of the Fourteenth Amendment. *Id.* at 634.

In the present case, under 8 U.S.C. § 1158, the decision to grant asylum rests in the discretion of the Attorney General or the Secretary of Homeland Security. Even if a UAC meets the statutory definition of a refugee, the Government is never legally obligated to grant asylum. *See Arabzada v. Donis*, 725 F. Supp. 3d 1, 19 (D.D.C. 2024) ("there is no constitutional right to

political asylum itself." (quoting *Maldonado-Perez v. I.N.S.*, 865 F.2d 328, 332 (D.C. Cir. 1989)); *see also Hamal*, 2020 WL 2934954, at *4 n.4 (D. D.C. June 3, 2020). ("Generally, there is no property right in an immigrant visa."). In *Arabzada*, the plaintiff sought relief under the APA and Mandamus, alleging unreasonable delay of adjudication of her I-589 asylum application. 725 F. Supp. 3d at 1. The plaintiff argued that the unreasonable delay of the adjudication of her asylum application was an unconstitutional violation of her right to due process under the Fifth Amendment. *Id.* at 18. The court disagreed, finding that the plaintiff did not have a cognizable liberty or property interest in her asylum application. *Id.* The court determined that the plain language of 8 U.S.C. § 1158(d)(7) expressly disclaims any substantive or procedural rights under the statute. *See* 8 U.S.C. § 1158(d)(7) ("Nothing in this subsection shall be construed to create any substantive or procedural right or benefit that is legally enforceable by any party against the United States or its agencies or officers or any other person.").

**2. The <u>Mathews</u> Factors Do Not Apply because Plaintiffs and their clients do not have a property interest in their asylum applications.**

The Court need not reach application of the *Mathews* factors because Plaintiffs and their clients have no cognizable liberty or property interest in their asylum application. But, assuming the Court agrees with Plaintiffs that UACs possess a property interest in their asylum applications, the three-factor framework under *Mathews v. Eldridge*, 424 U.S. 319 (1976), does not favor Plaintiffs in this case.

Plaintiffs' application of *Mathews* in an immigration context is misplaced. *Mathews* involved a challenge to the constitutional validity of administrative procedures established by the Secretary of Health and Human Services in determining the termination of social security disability benefits. *Id.* The Court held that an evidentiary hearing is not required prior to the termination of

disability benefits and that the agency's administrative procedures fully comported with due process. *Id.* at 349. This Court has only applied the *Mathews* framework in immigration cases where an alien is detained under 8 U.S.C. § 1226, and not in cases where an alien is contesting the procedure in which their asylum application is adjudicated. *See Miranda v. Garland*, 34 F.4th 338 (4th Cir. 2022) (finding the district court abused its discretion in evaluating erroneous deprivation of private interest of alien in freedom from detention pending removal under *Mathews*).

And even assuming Plaintiffs and their clients have cognizable liberty or property interests in their asylum applications, the procedures in place are sufficient. In the asylum context, there are only "minimal procedural due process" protections and all that is required is an eventual opportunity for a "meaningful or fair evidentiary hearing with a reasonable opportunity to be present" before the Government decides the outcome of the application. *Arabzada*, 725 F. Supp. 3d at 19. And courts have held that the Government's choices in scheduling or conducting immigration proceedings do not violate due process. *Id.*; *see also Morgan v. Gonzales*, 445 F.3d 549, 552 (2d Cir. 2006) (finding no due process right to a continuance of immigration proceedings); *Mudric v. Att'y Gen. of the U.S.*, 469 F.3d 94, 99 (3d Cir. 2006) ("[F]ederal immigration laws do not vest in aliens a constitutional right to have their immigration matters adjudicated in the most expeditious manner possible.");; *Lixandru v. U.S. Att'y Gen.*, 359 F. App'x 102, 108 (11th Cir. 2009) ("In the absence of a cognizable due process right to have his asylum application adjudicated in a timely manner, [petitioner's] due process claim must fail."); *Matter of A-K-R-*, 29 I. & N. Dec. 839, 842 (BIA 2026) (no due process violation where immigration judge denied alien additional time to prepare application for relief from removal).

Accordingly, the *Mathews* framework does not apply to this case because the Plaintiffs are not in detention, and they have not identified case or statute that supports their contention that

UACs have a property interest in their asylum applications such that they are entitled to due process rights under the Fifth Amendment of the U.S. Constitution.

**3. Existing Procedures Satisfy Due Process.**

All applicants requested to appear before USCIS to answer questions about the asylum application that they previously filed with USCIS have an opportunity to meet with USCIS at a different date and time if they cannot show up as a result of circumstances out of their control. *See* 8 U.S.C. § 1229a(e)(1) (in the immigration context, exceptional circumstances refers to those circumstances "beyond the control of the alien"). It goes without saying that the scope of circumstances that are beyond the control of a UAC in a custodial setting are greater than those of an average, adult asylum applicant. Thus, the reschedule policy does, in fact, accommodate the unique needs of UACs pursuant to the TVPRA and does not come anywhere close to running afoul of the Constitution. Plaintiffs may dislike USCIS's policies but, as noted, they are in accordance with applicable law—and courts are not empowered to impose upon federal agencies their own idea of what procedure would be best or proper. *Vermont Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.* ("*Vermont*"), 435 U.S. 519, 549 (1978).

Plaintiffs have absolutely no basis to assert a legal right to a lag time in adjudicating their client's asylum applications. Defendants, in exercising discretion to schedule UAC interviews on an expedited basis, fundamentally disagree that requiring several weeks' delay before a UAC can meet with a USCIS officer is in every UAC's best interest. But even to the extent that mandating such delays present Plaintiffs' ideal state, the agency's choice of a different operational path does not implicate a due process concern. While "[a]gencies are free to grant additional procedural rights in the exercise of their discretion," courts are "generally not free to impose them if the agencies have not chosen to grant them." *Id.* at 524; *cf. id.* ("This is not to say necessarily that there are no circumstances which would ever justify a court in overturning agency action because

of a failure to employ procedures beyond those required by the statute. *But such circumstances, if they exist, are extremely rare*.") (emphasis added). To be sure, the Supreme Court has "emphasized that the formulation of procedures was basically to be left within the discretion of the agencies to which Congress had confided the responsibility for substantive judgments." *Id.* Courts should "not stray beyond the judicial province to explore the procedural format or to impose upon the agency its own notion of which procedures are 'best' or most likely to further some vague, undefined public good." *Id.* at 549. Therefore, USCIS's use of expedited scheduling, coupled with case-specific consideration of exceptional circumstances, does not itself establish a constitutional violation.

**v. Plaintiffs Fail To Establish Final Agency Action Regarding EOIR**

**1. Plaintiffs Have Not Identified A Reviewable Agency Directive relating to UACs**

Plaintiffs allege that the Detained Docket Deadline constitutes a final agency action under *Bennett* because "officials acknowledge the policy and the agency's conduct shows that the policy is being implemented." *See* ECF No. 74-1, 28. Plaintiffs have not identified a published rule, but rely largely on anecdotal statements, isolated comments, and scheduling observations. *Id*.

**2. Individual Scheduling Decisions Remain Case-Specific**

To the extent that Plaintiffs are referring to EOIRs scheduling practices, EOIR has taken steps to tackle the backlog of immigration court proceedings by setting benchmarks for completion of cases on EOIR's Dedicated Docket pursuant to PM 25-47 Case Priorities and Immigration Court Performance Measures ("PM 25-47"). PM 25-47 directs immigration judges to prioritize case adjudication based upon categories provided in Appendix A of the PM, none of which are specific to UACs. The PM specifically states that it does not limit the discretion afforded to immigration judges under the law and does not mandate or direct a specific outcome in any particular case.

To the extent that PM 25-47 is the Detained Docket Deadline policy to which Plaintiffs refer, it is not a final agency action because it is not a consummation of EOIR's decision making authority nor is it an action determining the rights of UACs or from which legal consequences will flow, as stated by the *Bennett* test. Plaintiffs assert that immigration judges' "acknowledgement of the directive, together with the consistent course of conduct that implements them, is proof that the policy reflects the consummation of EOIR's decision making rather than the independent scheduling choices of individual judges." *See* ECF No. 74-1, 29. That statement is directly contradicted by the language of the PM where it provides that "immigration judges retain discretion over their dockets to reschedule cases in furtherance of this PM, **if they so choose**." (emphasis added). Also, the PM ensures that it will not interfere with the rights of any alien by instructing that even if a case that comes before the immigration court is designated as a priority, the PM does not "limit the discretion afforded to an immigration judge under applicable law, nor is it intended to mandate or direct a specific outcome in any particular case."

**vi. Plaintiffs cannot prove that any EOIR Detained Docket Policy is Arbitrary and Capricious.**

Plaintiffs cannot prove that any Detained Docket policy is arbitrary and capricious because they are unable to show that EOIR "has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *State Farm*, 463 U.S. at 43 citing *SEC v. Chenery Corp.,* 332 U.S. 194, 196 (1947).

The provisions cited by Plaintiffs reflect Congress' judgment that UACs warrant certain accommodations during the immigration process, but none of the cited provisions prohibit EOIR

from managing its docket, establishing case-processing priorities, or setting target completion dates. EOIR's docketing practices do not impede the flexibility that Congress afforded to UACs which include an exemption from the one year asylum filing deadline and maintaining initial jurisdiction of UAC asylum applications with USCIS. EOIR has no jurisdiction over a UACs asylum application under the TVPRA.

Second, the policy does not hinder UAC's ability to seek asylum as asserted by Plaintiffs. On the contrary, the policy assists UACs in obtaining the relief sought in their asylum applications by prioritizing the adjudication of such cases without undue delay while remaining committed to principles of due process. PM 25-47 ("the timely completion of all cases consistent with due process remains a matter of the utmost importance for the agency.").

Third, Plaintiffs' alleged reliance interests are neither substantial nor legally protected. Continuances in immigration proceedings are discretionary and have never been guaranteed, making any expectation of extended preparation periods inherently contingent. 8 C.F.R. § 1003.29 ("The Immigration Judge *may* grant a motion for continuance for good cause shown.") (emphasis added). Attorneys' decisions to accept particular caseloads based on anticipated continuances do not create an entitlement to continuation of prior agency practices. EOIR reasonably determined that the need for efficient adjudication of detained cases, reduction of backlogs, and prompt resolution of claims outweighed any reliance interests arising from discretionary scheduling practices. Accordingly, the agency's policy change was neither arbitrary nor capricious under *DHS v. Regents of Uni. Of Cal.*, 591 U.S. 1 (2020) or *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211 (2016).

**D. Plaintiffs cannot demonstrate irreparable harm**

Any alleged irreparable injury stemmed from implementation of the now-rescinded policy. Plaintiffs cannot establish a likelihood of future injury based on a policy that no longer governs agency operations. Absent an ongoing or imminent threat of harm traceable to the challenged memorandum, prospective injunctive relief is unwarranted.

Alternatively, Plaintiffs will not be irreparably harmed in the absence of a preliminary injunction because their alleged anticipated harm is not "actual and imminent," but rather "remote and speculative." *Does 1-26 v. Musk*, 2025 WL 840574, at *26 (D. Md. Mar. 18, 2025); *Sterling Com. Credit--Michigan, LLC v. Phoenix Indus. I, LLC*, 762 F. Supp. 2d 8, 14 (D.D.C. 2011) (the irreparable injury "must be both certain and great; it must be actual and not theoretical"). A finding of irreparable harm must be grounded on something more than conjecture, surmise, or a party's "unsubstantiated fears[.]" *Williams v. Maryland*, 2011 WL 3422825, at *9 (D. Md. Aug. 3, 2011). A mere "possibility" is "too lenient[;]" Plaintiffs must instead establish that irreparable harm is "likely." *Winter*, 555 U.S. at 22. Without showing irreparable harm, Plaintiffs are not entitled to a preliminary injunction. *Id.*

Plaintiffs fail to establish that their purported harm is certain and great and of such imminence that there is a clear and present need for equitable relief. Their allegations establish, at most, that certain interview notices have been issued on shortened timelines, that some rescheduling requests have been denied or allegedly unanswered, and that Plaintiffs have faced staffing and scheduling challenges in managing their caseloads. But Plaintiffs do not show that any identified client will be denied a meaningful opportunity to pursue asylum, that USCIS has barred counsel from participating in an interview, that an interview outcome cannot be addressed through ordinary administrative or immigration-court processes, or that a particular client faces an imminent and noncompensable injury attributable to the challenged practices.

Similarly, Plaintiffs' alleged harm is neither irreparable nor attributable to the Detained Docket Deadline itself. The policy does not prevent representation, foreclose the presentation of asylum claims, or eliminate available case-management tools, including motions for continuances where good cause exists. Plaintiffs' assertions that they lack sufficient time and resources reflect organizational and staffing challenges, not a legally cognizable injury caused by EOIR. Moreover, generalized concerns about compressed preparation timelines and future scheduling demands are speculative and do not establish that any particular client will be unable to present a full and fair case. Any burden associated with adjusting to faster adjudication schedules is insufficient to constitute irreparable harm, particularly where the agency has a substantial interest in the prompt resolution of detained cases. Any risk that a particular respondent may receive an adverse decision stems from the individualized facts of that case, not from the scheduling policy itself. Moreover, allegations that some UACs have had limited preparation time do not establish that EOIR's policy generally results in ineffective representation or erroneous removal orders, particularly where immigration judges retain authority to manage proceedings and ensure fundamental fairness.

**E. The Balance of Equities and Public Interest Favor the Government.**

Finally, granting a stay would be contrary to the public interest. The balance of harms and the public interest elements of the injunctive relief test merge when the government is the opposing party, *Nken*, 556 U.S. at 435, and Courts must "pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312-13 (1982). Granting the relief sought does not serve public interest, as it would merely place Plaintiffs in status quo of managing a docket with not enough time and or resources and displace USCIS's operational judgment concerning how to manage affirmative-asylum interviews, allocate limited interviewing resources, sequence cases, and address its pending caseload, and

EOIR's ability to grant discretion to immigration judges on how to effectively manage their dockets.

### VI. ANY RELIEF SHOULD BE NARROWLY TAILORED

Any relief granted by the Court in this matter should extend no further than necessary to redress any injury proven by Plaintiffs. Nationwide relief in this matter is inappropriate where narrower relief would suffice. Plaintiffs are seeking judicial management of asylum interview scheduling, continuance standards, and internal agency guidance and operations. Such relief exceeds traditional equitable limits.

### V. Conclusion

WHEREFORE, Defendant respectfully requests that the Court Dissolve the October 30, 2026 TRO and DENY Plaintiffs' Motion for Preliminary Injunction and Stay as Moot.

Respectfully submitted,

Kelly O. Hayes
United States Attorney

*/s/ Dayna Kipnis*

Dayna Kipnis, Bar number: 13673
Assistant U.S. Attorney
U.S. Attorney's Office, District of Maryland
36 S. Charles Street, 4th Fl.
Baltimore, MD 21201
Dayna.Kipnis2@usdoj.gov
(410) 209-4800

**CERTIFICATE OF SERVICE**

I hereby certify that on this 24th day of November, 2026, a copy of the foregoing Motion and accompanying documents was served to all parties of record via CM/ECF.

_*Dayna Kipnis*_______________
Dayna Kipnis
Assistant United States Attorney