OOD
PM 25-47
Effective: September 12, 2025

To: All of EOIR
From: Sirce E. Owen, Acting Director
Date: September 12, 2025

SIRCE OWEN Digitally signed by SIRCE OWEN Date: 2025.09.12 10:40:14 -04'00'

## CASE PRIORITIES AND IMMIGRATION COURT PERFORMANCE MEASURES

| | |
|---|---|
| PURPOSE: | Clarify and reaffirm EOIR case priorities and performance measures |
| OWNER: | Office of the Director |
| AUTHORITY: | 8 C.F.R. § 1003.0(b) |
| CANCELLATION: | *Case Priorities and Immigration Court Performance Measures* |

To serve the national interest, EOIR must achieve the effective and efficient enforcement of our Nation's immigration laws. Through this Policy Memorandum (PM), EOIR clarifies its priorities and system of measurement to ensure that each immigration court has a standard to assess its progress in advancing the national interest. This PM is effective immediately, and it applies prospectively to all new cases filed and to all immigration court cases reopened, recalendared, or remanded. This PM supersedes and replaces the January 17, 2018, Executive Office for Immigration Review (EOIR) memorandum entitled "Case Priorities and Immigration Court Performance Measures" (2018 Memorandum), and it supplements both PM 19-13, *Use of Status Dockets* (Aug. 16, 2019) and PM 20-07, *Case Management and Docketing Practices* (Jan. 31, 2020).

### I. Background

On December 5, 2017, the Attorney General issued a memorandum to all EOIR employees entitled "Renewing Our Commitment to the Timely and Efficient Adjudication of Immigration Cases to Serve the National Interest." The Attorney General's memorandum outlined several principles to ensure that the adjudication of immigration cases serves the national interest, including addressing a then-approximately 650,000 case backlog before the immigration courts.

In response, the EOIR Director issued the 2018 Memorandum, which laid out EOIR's specific priorities and measures for adjudicating cases that would support the achievement of those principles. A few months later, EOIR individualized the metrics from the 2018 Memorandum and added additional individualized case completion goals for Immigration Judges. Shortly thereafter,

EOIR further increased its efforts to consolidate and institutionalize agency policy regarding case management and docketing practices by issuing the case completion guidelines in PM 20-07.

Subsequently, on October 19, 2021, EOIR leadership revoked all individualized performance metrics for Immigration Judges. EOIR leadership did not formally rescind or replace the portions of the 2018 Memorandum and PM 20-07 unrelated to individualized performance metrics for Immigration Judges.[1] However, notwithstanding their continued validity, during the period between October 19, 2021, and January 19, 2025, EOIR leadership issued numerous policies, which undermined the goals of the 2018 Memorandum and PM 20-07, and failed to take appropriate steps to effectuate those Memoranda. In part, due to those actions (or inactions), the EOIR immigration court backlog grew to historical levels.

Beginning January 20, 2025, however, EOIR has taken numerous steps to tackle that backlog and restore the integrity of EOIR adjudications for the public that EOIR serves. Now, to further align EOIR's operations with Executive Branch policies and priorities, this PM refocuses the agency on a primary mission: timely and fairly adjudicating immigration cases. Accordingly, this PM builds upon PM 20-07, supersedes and replaces the 2018 Memorandum, and supplements PM 19-13.

## II. Case Prioritization

Pursuant to this PM, any case that is subject to a completion benchmark listed in Appendix A, or subject to another established completion benchmark, *see*, *e.g.*, PM 25-41, *Updates to the Dedicated Docket* (Aug. 19, 2025) (setting benchmarks for completing cases on EOIR's Dedicated Docket), is a priority case for the agency.

Since its creation in 1983, EOIR has prioritized all cases involving individuals in detention or custody, regardless of the custodian. *See* PM 20-07 at 2 (discussing the history of prioritizing detained cases). Likewise, EOIR has prioritized all cases subject to a statutory or regulatory deadline, as well as cases subject to a federal court-ordered deadline. *See, e.g., id.* at 3 (discussing statutory deadlines for credible fear reviews and reasonable fear reviews). Those case categories should continue to be prioritized in addition to cases listed in Appendix A or subject to another established completion benchmark.

Repeated changes in case prioritization decrease adjudicative efficiency and imperil EOIR's ability to track case data over time, hindering the agency's ability to serve its mission and the American people. Thus, these case prioritization categories are expected to remain stable and consistently effectuated moving forward. However, as developments warrant, other priority designations may

---

[1] The 2018 Memorandum also formed a basis for PM 19-13 as its definition of a status case was formally adopted into that PM, and it was included as an Appendix to that PM. On October 4, 2022, the EOIR Director issued Director's Memorandum 23-01, which rescinded PM 19-13. It is not entirely clear if the EOIR Director intended to rescind the 2018 Memorandum as well, but there is no record of any formal revocation of it. In any event, on March 21, 2025, PM 19-13 was reinstated, which would have also reinstated the 2018 Memorandum as its Appendix, even if it had been rescinded. *See* PM 25-27, *Cancellation of Director's Memorandum 23-01 and Reinstatement of Policy Memorandum 19-13* (Mar. 21, 2025). The instant PM now supersedes and cancels the 2018 Memorandum and, accordingly, supplements PM 19-13 in its place. The instant PM retains the same definition of a status case used in PM 19-13 and the 2018 Memorandum.

be additionally established, and other categories of cases may be tracked regardless of whether they reflect a priority designation.

The designation of a category of cases as a priority is an indication that such cases should be completed expeditiously and without undue delay consistent with due process. Because the designations outlined in this PM apply prospectively, nothing in this PM requires rescheduling currently docketed cases, and immigration courts may maintain those dockets as scheduled. Nevertheless, Immigration Judges retain discretion over their dockets to reschedule cases in furtherance of this PM, if they so choose. The designation of priority cases is also not intended to diminish or reduce the significance of other cases. Indeed, the timely completion of *all* cases consistent with due process remains a matter of the utmost importance for the agency. Finally, the designation of a case as a priority is not intended to limit the discretion afforded an Immigration Judge under applicable law, nor is it intended to mandate or direct a specific outcome in any particular case.

## III. Immigration Court Performance Metrics

EOIR will implement the immigration court performance metrics ("court-based performance metrics") listed in Appendix A of this PM.

Almost every trial court system in the United States uses performance or case completion metrics to ensure that it is operating efficiently and appropriately.[2] Recognizing the importance of establishing performance measures, the National Judicial College, in association with the Department of Justice, has outlined several essential principles for managing cases including "[p]romulgation and monitoring of time standards for the overall disposition of cases. . . ."[3] Performance measures are common, well-established, and necessary mechanisms for evaluating how well a court is performing its core role of adjudicating cases, and EOIR is no exception to the rule.

It is not novel or unique to apply performance measures to EOIR's immigration courts.[4] Indeed, EOIR has in multiple instances implemented evaluative case processing metrics alongside case

---

[2] In the federal system, for example, the Civil Justice Reform Act of 1990 requires semiannual reporting of the number of certain types of civil cases and motions pending beyond a particular date with the intent of reducing litigation delays in federal district courts. *See* 28 U.S.C. § 476. Many administrative adjudicatory systems also feature case processing time standards, either by statute, regulation, or policy. *See, e.g.*, 42 U.S.C. § 1395ff (establishing hearing deadlines for cases before administrative law judges at the Department of Health and Human Services); Fed. Energy Regulatory Comm'n, *Complaint Resolution Paths and Target Time Frames*, https://www.ferc.gov/complaint-resolution-paths-and-target-time-frames (last updated April 24, 2025) (outlining time standards for administrative law judges hearing cases at the Federal Energy Regulatory Commission). Finally, most states have adopted court case processing time standards, many of which follow model standards. *See* Nat'l Ctr. for State Courts, *Model Time Standards for State Trial Courts* (2011), https://ncsc.contentdm.oclc.org/digital/collection/ctadmin/id/1836/.

[3] *See* Dressel, Hon. W.F., *Court Organization and Effective Caseflow Management: Time to Redefine* (2010), National Judicial College in association with U.S. Dept. of Justice, Bureau of Justice Assistance, *available at* https://www.judges.org/wp-content/uploads/2020/03/Time-to-Redefine.pdf.

[4] The Board of Immigration Appeals is subject to regulatory performance measures. *See, e.g.*, 8 C.F.R. § 1003.1(e)(8). The Office of the Chief Administrative Hearing Officer has previously been subject to case completion goals set by policy and may have new goals set in the future. *See* PM 25-13, *Office of the Chief Administrative Hearing Officer* (Jan. 31, 2025).

prioritization, such as the enforcement of statutory or regulatory deadlines for the completion of certain types of cases, including for certain applications for asylum, *see, e.g.*, 8 U.S.C. § 1158(d)(5)(A)(iii), and for cases subject to EOIR's goals under the Government Performance and Results Act (GPRA) of 1993, Pub. L. No. 103-62, 107 Stat. 285 (1993), and the GPRA Modernization Act of 2010, Pub. L. No. 111-352, 124 Stat. 3866 (2011).

EOIR has built upon these foundational statutory authorities through numerous measures designed to improve the efficiency and integrity of the nation's immigration courts. Establishing performance measures for the immigration courts and regularly reviewing immigration court performance is vital to ensuring the immigration court system is performing strongly; EOIR is adjudicating cases fairly, expeditiously, and uniformly consistent with its mission; and, EOIR is taking appropriate strides to address its pending caseload in support of the national interest. *See* Exec. Order No. 14159, 90 Fed. Reg. at 8443; Exec. Order No. 14165, 90 Fed. Reg. at 8467.

Although EOIR's immigration court employees have certainly made significant progress since January 20, 2025, to address the substantial backlog exacerbated by prior leadership, the enormity of the remaining backlog—and the agency's interests in maintaining appropriate adjudicatory efficiency—demand that the agency implement immigration court performance measures. Accordingly, the court-based performance metrics in Appendix A should be regularly tracked and accounted for by Assistant Chief Immigration Judges (ACIJs). These metrics are intended to determine which immigration courts are operating in an appropriate manner and which may need more specialized attention in the form of additional or new court management or personnel, creative thinking and planning, or other relevant action.

Further, the metrics established by this PM work in conjunction with PM 20-07, which provides additional guidelines and may subject some cases to more than one metric. EOIR will also track the age of existing cases at each court and may implement measures for excessively aged cases in the future.

These court-based measures are not intended to apply specifically to any individual employee. Rather, these metrics apply to the entire immigration court as a whole, and all immigration court employees share responsibility to ensure that their respective immigration courts successfully meet them.

## IV. Conclusion

To meet the current caseload, continue to reduce the existing immigration court backlog, ensure appropriate adjudicatory efficiency, and support the national interest in achieving the faithful, effective, and efficient enforcement of our Nation's immigration laws, EOIR will implement the court-based performance metrics outlined in Appendix A. As a professional administrative court system within the Department of Justice exercising the Attorney General's delegated authority, EOIR should strive to restore its adjudicatory integrity and standing as the preeminent administrative adjudicative agency within the federal government. All EOIR adjudicators should want to fulfill the agency's mission to the best of their abilities and at the highest level possible. System-wide standards for case prioritization and court performance metrics are common-sense and critical parts of achieving those goals.

The EOIR Director has the authority under 8 C.F.R. § 1003.0(b)(1)(ii) to "[d]irect the conduct of all EOIR employees to ensure the efficient disposition of all pending cases, including the power, in [her] discretion, to set priorities or time frames for the resolution of cases" and "otherwise to manage the docket of matters to be decided by" Immigration Judges. Under 8 C.F.R. § 1003.0(b)(1)(iv), the Director also has the authority to "[e]valuate the performance" of the Office of the Chief Immigration Judge and "take corrective action where needed." This PM utilizes those authorities to ensure that Immigration Judges will continue to adhere to applicable law in adjudicating cases, complete those cases efficiently and fairly, and restore integrity to EOIR adjudications, which was eroded significantly between 2021 and 2025.

Finally, to be clear, EOIR is not reinstating individualized performance measures for Immigration Judges at the present time. The partisan and intentional misrepresentation of the measures implemented in 2018 as "quotas" spawned numerous debates, which only served as a distraction—likely by design—and undermined the utility of the measures. *Cf.* PM 25-02, *EOIR's Core Policy Values*, 5 (Jan. 27, 2025) ("EOIR should not countenance any obtuse or tendentious arguments intended to undermine the application of its policies"). Additionally, despite the absurd discourse, baseless innuendoes of incompetence or a lack of ethics by Immigration Judges, and general "pearl-clutching" surrounding the appropriateness of the 2018 measure related to Immigration Judges completing 700 cases per year, recent history has demonstrated that Immigration Judges can easily meet that milestone even without such a measure.[5] Moreover, EOIR already continually monitors Immigration Judge performance and does not necessarily need a 700-case performance measure to ensure accountability, integrity, and fidelity to the law of its Immigration Judge corps.[6] To that end, ACIJs are reminded of their responsibility for ensuring the Judges they supervise are adjudicating cases impartially and in accordance with the law.

This PM is not intended to, does not, and may not be relied upon to create, any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person. Nothing herein should be construed as mandating a particular outcome in any specific case. Nothing in this PM limits an adjudicator's independent judgment and discretion in adjudicating

[5] In Fiscal Year (FY) 2024, 735 Immigration Judges completed 704,514 cases, an average of roughly 958 cases per Immigration Judge. *See generally* EOIR Workload and Adjudication Statistics, https://www.justice.gov/eoir/workload-and-adjudication-statistics. Moreover, the true average per Immigration Judge was almost certainly higher as the 735 total number of Immigration Judges included supervisory or management Judges who only infrequently adjudicated cases. The general silence in the face of these statistics from those who previously criticized the 700-completion performance measure as unrealistic or only attainable by unethically or incompetently violating due process underscored the dishonesty or hypocrisy of the initial criticism. Further, FY 2024 does not appear to have been a unique period. Through the first three quarters of FY 2025, Immigration Judges are averaging approximately 858 completions per Immigration Judge. *See id.* That average, too, almost certainly is an underestimate as the total number of Immigration Judges on board at EOIR at the end of Quarter Three includes both supervisory or management judges who only infrequently adjudicate cases and a significant number of judges who have already stopped adjudicating cases because they volunteered for the Deferred Resignation Program.

[6] Furthermore, past performance evaluations of Immigration Judges, nearly all of whom received the highest rating notwithstanding a wide range of performance abilities and commitments to applying the law impartially, were poor vehicles for assessing Immigration Judge quality. Although EOIR may revise its performance evaluation standards for adjudicators subject to such evaluations in the future, those evaluations cannot—and do not—substitute for the Attorney General's plenary judgment as to who merits being or remaining an inferior officer adjudicator at EOIR. *See* PM 25-23, *Inferior Officers* (Feb. 21, 2025).

cases or an adjudicator's authority under applicable law.

Please contact your supervisor if you have any questions.

## APPENDIX A
## IMMIGRATION COURT PERFORMANCE METRICS

1. Ninety-five percent (95%) of all non-status[7] detained[8] removal[9] cases should be completed[10] within 60 days of filing of the Notice to Appear (NTA), reopening or recalendaring of the case, remand from the Board of Immigration Appeals (BIA), or notification of detention.

2. Ninety-five percent (95%) of all non-status non-detained removal cases should be completed within 365 days (1 year) of filing of the NTA, reopening or recalendaring of the case, remand from the BIA, or notification of release from custody.

3. Ninety-five percent (95%) of all motions should be adjudicated within 30 days of filing.

4. Ninety-five percent (95%) of all custody redetermination requests should be completed within 5 days of the request for redetermination.

5. Ninety-five percent (95%) of all merits hearings should be completed on the initial scheduled individual merits hearing date.

6. One hundred percent (100%) of all credible fear reviews should be completed within seven (7) days of the initial determination by an asylum officer that an alien does not have a credible fear of persecution. *See* INA § 235(b)(l)(B)(iii)(III), 8 U.S.C. § 1225(b)(1)(B)(iii)(III). One hundred percent (100%) of all reasonable fear reviews should be completed within ten (10) days of the filing of the negative reasonable fear determination as reflected in Form I-863. *See* 8 C.F.R. § 1208.31(g).

7. One hundred percent (100%) of all expedited asylum cases should be completed within the statutory deadline. *See* INA 208(d)(5)(A)(iii); 8 U.S.C. § 1158(d)(5)(A)(iii).

8. Ninety-five percent (95%) of all Institutional Hearing Program (IHP) removal cases should be completed prior to the alien's release from detention by the IHP custodian.

9. One hundred percent (100%) of all electronic and paper records should be accurate and complete.

---

[7] A status case is (1) one in which an Immigration Judge is required to continue the case pursuant to binding authority in order to await the adjudication of an application or petition by U.S. Citizenship and Immigration Services; (2) one in which the Immigration Judge is required to reserve a decision rather than completing the case pursuant to law or policy; or (3) one which is subject to a deadline established by a federal court order.
[8] A detained case is one where the alien is in some type of official custody at the time of the EOIR hearing, regardless of whether the Department of Homeland Security, the Department of Health and Human Services, or another federal, state, or local entity is the custodian.
[9] A "removal" case includes a case in removal proceedings, in addition to any reopened, recalendared, or remanded cases in exclusion or deportation proceedings.
[10] A completed removal case is one in which a final decision has been rendered concluding the case at the immigration court level and encompasses an order of removal, an order of voluntary departure, an order terminating proceedings, or an order granting protection or relief from removal. For other types of cases, a completed case is one in which a final decision has been rendered appropriate for the specific type of case proceeding. A case that is administratively closed is still a pending case and, thus, not a completed case.